IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane

Criminal Action No. **12-cr-346-JLK**

**UNITED STATES OF AMERICA,**

Plaintiff,

v.

**1.    KEFELEGNE ALEMU WORKU,**

Defendant.

_____

SENTENCING MEMORANDUM AND ORDER
_____

Kane, J.

On October 11, 2013, following a four day jury trial, Defendant Kefelegne Alemu

Worku (hereafter "Worku") was convicted of three crimes: Unlawful Procurement of

Citizenship or Naturalization; Aggravated Identity Theft; and Fraud and Misuse of Visas,

Permits, and Other Documents.  The maximum term of imprisonment on the Unlawful

Procurement charge is ten years.  The charge of Aggravated Identity Theft carries a

mandatory penalty of two years' imprisonment, which must be consecutive to the

Unlawful Procurement sentence.  The third charge of Fraud and Misuse of Visas, Permits

and Other Documents carries a maximum of ten years.  A term of supervised release not

to exceed three years on Counts 1 and 3 and one year on count two may likewise be

imposed with the proviso that all supervised release terms shall run concurrently.  The

1

maximum fine that can be imposed is $250,000 per count which can be waived and a

mandatory special assessment of $100 per count which cannot be waived.

The gravamen of the charges for which Worku was convicted was his fraudulent

entry into the United States by using false and misleading documents purporting to

identify himself as another.  His plan was executed in Kenya, where he had lived for

approximately 13 years after fleeing his native Ethiopia.  While in Kenya, Worku

assumed the identity of another man, claimed parenthood of that man's children and

obtained refugee status under that man's identity.  In 2004 he gained entry into the United

States using that false identity and providing additional false documents.  Continuing with

that fraud, he was granted permanent refugee status in 2008 and U.S. citizenship in March

2010.  The false identity under which Worku was granted citizenship was that of Habteab

Berhe Temanu, deceased, who was also a native of Ethiopia.

## I.

### Background Information.

Information contained in an Affidavit in Support of Search Warrant of Worku's

residence, signed by a magistrate judge, provides the following background on the

political environment in Ethiopia in the late 1970's giving rise to the facts in this case:

> ...[I]n the late 1970's in Ethiopia, Mengistu Haile Mariam rose to assume
> unofficial control of the Provisional Military Administrative Committee
> (PMAC), also known as the Dergue.  The Dergue was a committee of
> nearly 120 military officers, that, once it came to power in the mid-1970's
> as a Marxist regime, abolished Ethiopia's Constitution and arrested the
> former emperor and members of the imperial government for alleged crimes
> against the Ethiopian people.  During this time Mengistu commanded the

execution of nearly 60 former government officials.  Mengistu gained full control in 1977 which unleashed a two-year campaign in Ethiopia known as the "Red Terror."  During the Red Terror tens of thousands of Ethiopian men, women, and children suspected of being members or supporters of the anti-Dergue revolutionary group known as the Ethiopian People's Revolutionary Party (EPRP) were arrested, tortured, and summarily executed. Those individuals who were detained were incarcerated in government prisons with deplorable conditions including being packed by the hundreds into airless, lightless cellars, where they could hear the screams of those being tortured while they awaited torture themselves.  One such prison was known as "Kebele 15" or "Kefetegna 15," which in English roughly translates to "Higher 15."  The Higher 15 prison housed approximately 1500 prisoners who had been imprisoned due to their political opinions and affiliations. . . . It is not known how many were killed, imprisoned or forced to flee from Ethiopia during the Red Terror campaign, but historical accounts indicate that a minimum of 10,000 people were killed in the city of Addis Ababa alone in 1977 with probably comparable numbers in the provinces in 1977 and 1978.

II.

The Sentencing Guidelines.

While the sentencing judge is not required to impose a sentence within the Guidelines range, U.S. v. Booker, 543 U.S. 220, 245 (2005), and commits error when he treats the Guidelines as mandatory, U.S. v. Labastida-Segura, 396 F.3d 1140, 1143 (10 Cir. 2005), the judge is nevertheless required to calculate correctly a Guideline sentence. U.S. v. Kieffer, 681 F.3d 1143, 1164-65 (10th Cir. 2012).  The judge has discretion to impose a sentence within the Guidelines or to deviate from their range.  Booker at 245. In short, the Guidelines are advisory, but the obligation is to ascertain the calculation in order to make certain  the accuracy of the tendered advice.

The Probation Office of the District of Colorado has calculated the Guideline

imprisonment range, and neither the Government nor the Defense has objected to the accuracy of those calculations.  Worku  has filed 31 objections to the Presentence Report, but none relates to the calculations.  I have reviewed the calculations and agree they are correct.  The Guideline range for Counts One and Three is zero to six months.  For Count Two the Guideline sentence is the minimum term of imprisonment required by statute: 24 months consecutive.  The term of supervised release is not more than three years for Counts 1 and 3 and one year for Count 2.  According to statute multiple terms of supervised release must run concurrently.  18 U.S.C. § 3624 (e). Worku is ineligible for probation on all counts.  The Guideline range for a fine is $1,000 to $10,000 and the costs of prosecution are required to be imposed on the defendant.  If, however, a defendant is impecunious, the fine may be waived.  The same applies to the expected costs of the government for any term of imprisonment and supervised release.  The most recent data provided by the Administrative Office of the U.S. Courts is $79.31 per day for imprisonment and $9.17 per day for supervised release.  A special assessment of $100 per count for each of the three counts is mandatory.  18 U.S.C. § 3013.  No restitution is owing in this case.

III.

The Offense Conduct.

More than 30,000 Ethiopians live in the Denver metropolitan are.  Many of these people live in the eastern part of Denver or directly east in the adjoining City of Aurora. On May 11, 2011, Kiflu Ketema, a naturalized United States citizen born in Ethiopia,

received a call from his brother, Samuel, to go to an Ethiopian restaurant in Aurora known as the Cozy Café.  Samuel alerted Kiflu that he had seen an older man at the restaurant whom he suspected had been an official at an Ethiopian political prison in which Kiflu had been imprisoned in the late 1970's.  This former official was rumored to be in the Denver area, but Samuel, having never seen him in Ethiopia, was unsure of the identity.

When Kiflu drove to the restaurant the man was standing outside, smoking and talking on a cell phone.  Kiflu immediately recognized him, by face and voice, to be Kefelegne Alemu Worku, a notorious official from the Higher 15 prison in Addis Ababa, Ethiopia.  Kiflu had witnessed Kefelegne Alemu Worku torture political prisoners who opposed the regime in power, then known as the Red Terror.[1]  Samuel Kitema wrote down the license plate number of Worku's car.

A few days after seeing Worku,  Kiflu Ketema reported his discovery to Special Agent Jeffrey Lembke of the U.S. Department of Homeland Security, Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI).  Special Agent Lembke traced the license plate number and found the car was listed to Habteab B. Temanu.  He then reviewed the Alien file (A-file) maintained in the U.S. Citizenship and Immigration Services (CIS) database for Habteab B. Temanu.  Those records reflected

---

[1] Background information of the recent history of Ethiopia and the treatment of its people in the last half of the twentieth century can be found in *Forced To Flee: Human Rights and Human Wrongs in Refugee Homelands* by Peter W. Van Arsdale, Lexington Books (Oxford, 2006).

that Habteab B. Temanu entered the United States from Kenya as a refugee on July 12, 2004 and that he had traveled to this country with four children he claimed were his own – Yishak Habteab Berhe, Amanuel Habteab Berhe, Meraf Habteab Berhe, and Tans Berhe.

Special Agent Lembke took a photograph of Habteab Berhe Temanu from the A-file and compiled a photographic line-up of it and five other photographs of Ethiopian males similar in age to Worku. Kiflu Ketema identified Worku's photograph as that of the person he knew to be Worku.

Kiflu Ketema testified at the trial that he saw Worku, whom he knew as Kefelegne Alemu, participating in beating political prisoners at the Higher 15 prison. He had heard Worku say such things as, "I am going to hit him and dump him." He testified further that he knew Worku to be "a big fish" at the Higher 15 and that he was the "most feared"of those in control. He identified Worku and testified he did so with one hundred percent certainty.

Samuel, the eldest son of Habteab Berhe Temanu, came to the United States from Ethiopia in 1995 on a diversity visa. He became a naturalized citizen in 2001. In 2000 he had sought to sponsor his father's and his younger siblings' immigration from Ethiopia to the United States. He was concerned for their safety because between 1997 and 2000 there was an armed conflict between Ethiopia and Eritrea, a former part of Ethiopia. It was common for Ethiopia to send fighting-aged males with Eritrean blood back to Eritrea and his father, Habteab Berhe Temanu, was from Asmara in present day Eritrea. The

father and Samuel's youngest brother, aged 14, had been sent back to Eritrea.  This

brother had been forced to join Eritrean armed forces and was killed.

Fearing for his other siblings, Samuel convinced them to leave Ethiopia and go to

Kenya where they could obtain refugee status and apply for admission to the United

States.  His father left Eritrea and joined them in Kenya, but his physical and mental

states had deteriorated to such an extent that the family feared he could not successfully

complete the required in-person refugee interviews.

To obtain refugee visas, interviews are required.  Children of a refugee can qualify

in the same application process as a parent if their relationship is established by the

submission of biographical information and identification by the principal applicant.

Samuel Berhe's fears, however, were well-founded.  Habteab Berhe Temanu was so

demented that he was unable to recall his children's names or dates of birth and his

children's derivative status could not be established without his being interviewed.

Searching for a way out, the siblings found a broker in Kenya who was in the business of

connecting people with vacant refugee spots for a fee.  He introduced them to Worku who

thereupon falsely assumed the identity of Habteab Berhe Temanu. The father later

returned to Eritrea where he died on March 29, 2005.  Worku learned the children's

names and dates of birth, participated in the interviews as if he were their father and

immigrated to the United States with  Samuel Berhe's four remaining siblings.

Once in the United States, Samuel, his siblings and Worku, known to the family as

"Tufa," resided in Denver, Colorado for about seven months.  Samuel, Amanuel and

Meraf Berhe each identified Worku at trial as the man who immigrated with them using their father's name and identity and lived with them in Denver.  They also testified that their biological father was dead.

While in Colorado, Worku filed Form I-485, Application to Register Permanent Residence or Adjust Status, with the official immigration authority.  In the application he identified his children as Samuel Habteab Berhe, who had sponsored the family's immigration and Yishak Habteab Berhe, Amanuel Habteab Berhe, Meraf Habteab Berhe, and Tans Berhe, the four children who had traveled with him from Kenya. He represented himself to be Habteab Berhe Temanu. As proof of identification for the application, Worku presented a Colorado driver's license and a social security card in the name of Habteab Berhe Temanu.  On January 19, 2008, Worku's completed form I-485 was approved and he was granted permanent residency in the United States and a Permanent Resident Card.  The mailing envelope for that card was recovered from Worku's apartment when a search warrant was executed on August 24, 2012.  On the same date, at the time of his arrest, the Colorado driver's license and the social security card bearing the name of Habteab Berhe Temanu were recovered from Worku's wallet.

On November 22, 2009, Worku, while still residing in Colorado, filed Form N-400, Application for Naturalization, in which he submitted the same fictitious biographical and family information.  On March 2, 2010, the Application was approved and he was granted United States citizenship.  As proof of identification for this application, Worku submitted his Permanent Resident Card and the Colorado driver's

license, each bearing the name of Habteab Berhe Temanu. He was issued Certificate of

Naturalization number 32776687.  He retained possession of the Permanent Resident

Card until he was required to surrender it when he took the Oath of Allegiance and

received his Certificate of Naturalization.

On August 24, 2012, following his arrest, Worku admitted to Special Agent

Lembke that his true identity was Kelefegne Alemu Worku, that he had lived in Kenya for

13 years and that while there he had assumed the name and identity of Habteab Berhe

Temanu.  He admitted that he had worked in the district in Addis Ababa, Ethiopia, known

as Higher 15 for 18 months and that he had thereafter been imprisoned in Ethiopia for six

years.

During the trial, Worku was identified by the members of the Berhe family and

four other witnesses –  Berhand Dargie, Nesibut Sibhat, Assayehgen Feleke, and Abebech

Demissie – each of  whom had been imprisoned at Higher 15 and saw him there. Worku

was also identified by Kinfe Wolday, who had not been a prisoner at Higher 15, but who

had conversations with Worku in approximately 1980-82.  Worku told Wolday that he

was a "cadre" and had been in charge of the Higher 15 prison.  Worku used the term

"kera" which means blood or butcher in Amharic, the predominant language of Ethiopia,

to describe the conditions at Higher 15.  According to Wolday, Worku bragged about

killing 150 people.  Wolday testified he was "99% sure" the person he talked with was

Worku.

Worku's identity and the constituent elements of the crimes with which he was

charged, *viz.,* Unlawful Procurement of Citizenship or Naturalization, Aggravated Identity Theft and Fraud and Misuse of Visas, Permits and Other Documents were established beyond doubt.

IV.

18 U.S.C. § 3553 Analysis.

<u>The Defendant's Criminal History:</u>

Since coming to the United States and until the present verdicts of guilty, Worku has not been convicted of any other felonies or crimes of moral turpitude.  He has been convicted of six traffic violations and a three-count motor vehicle case, including a charge of driving under the influence of alcohol, is pending in the Arapahoe County Court.  His conviction(s) of crimes by the Ethiopian government for crimes committed in Ethiopia are not considered part of his criminal history in determining an appropriate sentence for those crimes committed in the United States.  The testimony of witnesses to the conduct which resulted in those Ethiopian convictions, however, will be considered in connection with victim impact and Worku's personal data and characteristics.

<u>The Nature and Circumstances of the Offense.</u>

In committing the acts for which he was convicted, Worku concealed his true identity and sought to avoid further prosecution and punishment for his participation in Ethiopia of the crimes of torture and murder.  Those events underscore the serious nature of the violation of United States laws in misrepresenting and concealing facts for the purpose of obtaining immigration and naturalization benefits.  The scope of the statute

10

ranges from minor cheating to crowd into the line of deserving applicants, to seeking haven from prosecution and punishment for the perpetration of crimes considered by humanity to be abominations.

In such flagrant cases, the very integrity of the United States is challenged and its claim to decency in the world community is besmirched.  In accordance with other cases such as United States v. Munyenzi, 1:10-cr-00085-SM (D.N.H. 2013) and United States v. Jordan, 1:10-cr-80069-WJZ (S.D. Fla.), I find that the nature of Worku's conduct in Ethiopia and the lies he employed to cover up that sordid conduct take this case out of the heartland of § 1425 prosecutions.  As Judge Zloch observed in the Jordan case, "individuals involved in egregious human rights violations abroad must be meaningfully deterred in their attempts to fraudulently obtain United States citizenship." Tr. of Continued Sentencing Hg., 9/16/2010 (Doc. 57 in 10-cr-80069-WJZ) at 13.

The Characteristics of the Defendant:

Worku is best described by the witnesses who testified against him at trial. In addition to Kiflu Ketema, the following witnesses, all of whom were prisoners at the Higher 15, testified:

Berhan Dargie  now practices law in Washington, D.C.  He testified that he was a professor of law in Addis Ababa and although never a member of the EPRP,  he was suspected of being so.  He was  arrested and taken to the Higher 15 in about January 1978.  He was stripped to his underwear and his hands and feet were bound behind him. He was beaten with electric wires, sticks and wood.  Water was poured on his wounds.

His feet were beaten on the soles, resulting in permanent injuries.  He saw Worku twice a week during his imprisonment at Higher 15.  He identified Worku in court.  He had previously identified Worku during the investigation from a photographic lineup as the person at Higher 15  known as Kefelegne who was one of the men who participated in his torture and who told him, "I can finish you here."

Mr. Dargie is a member of the District of Columbia Bar. He made another trip to Denver to address the court at sentencing, primarily on behalf of deceased victims and their families.

Nesibut Sibhat  testified that he was arrested along with his sister and taken to the Higher 15 in about December 1977.  He was a member of the EPRP Youth League and had participated in demonstrations and distributed pamphlets about democracy.  At age 14 he was stripped and severely beaten at Higher 15 by a number of people, including Worku whom he identified as Kefelegne.  Mr. Sibhat was imprisoned at Higher 15 for several months during which he was beaten for hours on two separate occasions.  He testified that during the first two months of his imprisonment Worku would insult and kick him.  Mr. Sibhat picked Worku out of a photographic lineup, and identified Worku as the Kefelegne he knew at Higher 15.  Mr. Sibhat first identified Worku by sight in open court and then re-identified him by his voice when Worku was ordered to speak.  Mr. Sibhat expressed no doubt about the accuracy of his identification of Worku.

Assayehgen Felek testified that he had joined the EPRP Youth League at age 15. In about January 1978 he was arrested at his sister's house and taken to the Higher 2

prison.  Two weeks later he was transferred to Higher 15 where he was stripped, his hands and feet bound behind him, and he was hung upside down while beaten and interrogated. He described how water was poured into his open wounds.  He selected Worku in a photographic lineup and later identified him in court, stating that he knew Worku as Kefelegne Alemu and that Worku was the person who had ordered his torture.

Abebech Demissie testified that she had joined the EPRP as a 16-year-old high school student.  Near the end of 1977 she was arrested at her high school, taken to Higher 15, stripped to her underwear, beaten and interrogated about her political affiliations by three people, including Worku, whom she knew as Kefelegne.  She testified that she saw Worku shoot and kill three people, including a teenage boy, after one of the three had said, "EPRP will win."  She said the room was covered in blood and she heard Worku order another prisoner to lick the blood.  Ms. Demissie picked Worku's photograph out of a lineup during the investigation.  At trial, when Worku, whose back was turned to the witness stand, was ordered to face the witness, she again recognized him and testified that his identity was certain.

Ms. Demissie now lives in San Jose, California where she is an entrepreneur. She appeared at the sentencing hearing and addressed the court on her own behalf and that of her friends whom she saw murdered at the Higher 15 at  Worku's hands and under his direction.

Personal History of the Defendant.

Worku was born in 1952 according to the Gregorian calendar, but in 1944,

according to the Ethiopian calendar.  He was born and raised in Nazareth, Ethiopia (a city in the central part of the country) to parents who are now deceased of natural causes. His father was a farmer and businessman who provided firewood for factories and hospitals, and whose title indicated he had served the Royal Crown and was loyal to the government.  His mother did not work outside the home.  Worku is the fifth of six children.  He says that other siblings died before he was born, and he is the only member of this family who left Ethiopia.  One of his brothers owns factories in Nazareth and has built a hospital.  This brother is now retired, but once served as Deputy General Manager of the national Ethiopian Airlines.  Another brother was the headmaster of a school who became ill and died when Worku was living in Kenya.  An older sister probably works in a thermoplastic factory owned by his brother.  Another sister became a monk, but Worku does not know if she is living.  He is unsure where his other sisters are or what they are doing.

After attending a polytechnic institute near Nazareth, Worku joined a government program building schools and clinics.  After finishing this building program, Worku returned to the polytechnic institute.  He completed twelfth grade and when he was in his twenties attended the Bahardar Polytechnic Institute, a boarding school in a town about 500 km from Nazareth.  He was an average student, but did not graduate.  Following his imprisonment in Ethiopia, Worku managed his family's transportation business and became involved in the plastics trading business with his brother.  He moved to Kenya where he worked in a flour mill, ran a small store and operated a taxi cab.

14

<u>Mental and Physical Health</u>: Worku suffers from gout and has frequent flare-ups.  He has no head injuries or seizures, and no neurological disorders.  While in custody for this case he has undergone surgery for cataracts and glaucoma. He has no history of mental health treatment in either a hospital or outpatient setting, and he has never been prescribed or taken psychoactive medications.  He has no history of suicide attempts or ideation.  He asserts that he never had any hallucinations.

Because of the evidence presented at trial and before sentencing, I ordered psychological and psychiatric evaluations.  I ordered the psychiatric examination to determine whether Worku suffered from a mental illness and, if so, whether such illness was treatable, and to inform any conditions of confinement or supervision I might impose to accommodate it.  I ordered the psychological examination to obtain appropriate testing and diagnosis of any personality or character disorder that might explain Worku's behavior so as to make a sentence and conditions of supervision appropriate in the context of possible rehabilitation, recidivism and treatment programs.

The psychiatric examination reveals that Worku "has some relatively mild symptoms of depression.  Getting to sleep and staying asleep are a real challenge for him. <u>He does not have a psychotic disorder</u>." (Emphasis added.)  The examiner writes, "Mr. Worku maintains that he has not committed any of the atrocities of which he has been accused and of which he has been convicted in Ethiopia. . . . It may be that he is unable and/or unwilling to admit to himself, let alone to others, that he did that of which he has been accused and convicted. He may so very tightly compartmentalize this part of his past,

utilizing the non-psychotic psychological defense of denial, that he puts this part of his

past in a box and tries to forget about it."  In sum, while the evidence is substantial,

credible and indeed uncontradicted that the acts of violence were committed by Worku

and eventually resulted in his identity theft, use of false documents and fraud in obtaining

entry to the United States and thereafter U.S. citizenship, his denial is not the result or

product of a psychotic disorder, mental disease or defect.

The psychological evaluation differs considerably from the psychiatric one.  The

clinical psychologist describes Worku as "clinically depressed to a fairly serious degree.

He meets the criteria for a diagnosis of Major Depressive Disorder with a level of clinical

anxiety.  This condition may very well be the result of his difficult circumstances.  While

he generally seems to be a simplistic individual who prefers structured situations and

adopts a narrow, avoidant focus of attention when processing information, his situation

seems to have stirred up thoughts, feelings and regrets in him, making him a more

psychologically complex person than he ordinarily would be."

Moreover, some of Mr. Worku's evaluation results (primarily his
Rorschach record) suggest that he is profoundly limited in empathy for other
people, in part because his understanding of them is so distorted.  If the
convictions in Ethiopia are to be believed, then this finding, coupled with
those convictions, suggest he may have antisocial or sociopathic personality
features which can be described as 'psychopathic.'  There was a detached,
sadistic quality to some of his Rorschach responses . . . that suggests that
Mr. Worku can harbor violent thoughts with little or no emotion or empathy.
Although there is neither clear evidence that he acts upon such thoughts nor
any evidence that he tends to be impulsive, their presence and the absence of
feeling or anxiety with which he expressed them indicate sadomasochistic
inclinations in the context of antisocial personality traits.  His more obvious
depression and anxiety mask a more disturbed inner world.

16

(Emphasis added.)

The psychologist continues

It is my opinion, to a reasonable degree of professional certainty that Mr. Worku is suffering from a mental disease for which he could benefit from treatment. This mental disease is a severe ongoing depression coupled with clinical anxiety. It may be argued that guilt and regret are expected artifacts of aging and/or of having committed certain acts or failed to perform certain acts in one's life. Moreover, the presence of these affects may be necessary for Mr. Worku to come to terms with whatever he has done in the past.

While depression and anxiety are generally amenable to treatment through psychopharmacology and/or psychotherapy, Mr. Worku has more troubling aspects in his psychological make-up that are generally not treatable. These aspects are described herein as "psychopathy," and refer to his apparently violent fantasies, detached from human concern and without empathy a well as some serious impairment of reality testing. This tends to be a chronic condition and is not generally treatable, especially in the short-term. . . .

V.

The Need For The Sentence Imposed.

Section 3553's overarching purpose is set forth in the first sentence: "The court shall impose a sentence sufficient, but no greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553 (a). Paragraph (2) of § 3553 enumerates the specifics of the sentencing judge's task:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to conduct;

(C) to protect the public from further crimes of the defendant; and

17

(D) to provide the defendant with needed educational or vocational training, medical care,

or other correctional treatment in the most effective manner . . . .

With the nature and circumstances of the offense and the history and characteristics of the defendant and the mental evaluations performed in mind, I have considered each of these factors in determining the appropriate sentence.

<u>Reflecting the Seriousness of the Crime</u>.

The crimes of which Worku stands convicted are those committed against the United States in gaining entry to this country and in fraudulently obtaining U.S. citizenship. The relevance of his actions in Ethiopia, overwhelmingly established by credible testimony, is limited to consideration of the degree of punishment necessary to deter those who have violated human rights from seeking entry into this country. The seriousness of the crimes Worku committed here is measured by the degree to which his actions corrupt the established processes of immigration and the effect such actions have in depreciating the prospects of those truly deserving of admission to this country.

<u>Adequate Deterrence to Criminal Conduct</u>.

The purpose of this sentence is not to punish Worku for crimes committed in Ethiopia, but to punish him for his indifference to the laws of the United States and for his assault on the integrity of those laws. The United States must emphatically reject becoming a haven for fugitives from justice in their own countries and in the eyes of the civilized world.

<u>Protection of the Public from Further Crimes of the Defendant.</u>

Deterring Worku from committing further crimes against the United States is not the problem.  Now that he has been convicted, and assuming he may be deported, his opportunity to commit similar crimes is reduced to a near nullity because of the immigration authorities' ability to recognize him no matter what false identity he assumed.  Moreover, given his age and health, the prospects of recidivism are substantially reduced.  To put it bluntly, his age and health are such that he lacks the vitality to endanger the public again.

<u>Providing the Defendant with Needed Educational and Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner.</u>

Humane treatment in a correctional facility is available for persons of Worku's age.  He requires no special medical treatment that cannot be provided while he is confined.  The psychiatric and psychological evaluators agree that he is not psychotic and any psychological treatment he might require is readily available.   Although Worku has been diagnosed with clinical depression, treatment and psychotropic medication are not presently recommended.  I note that the prison population in the United States is getting older and that the Bureau of Prisons is more than adequately confronting the problems an aging population of inmates present.  As to educational and vocational training, there is no doubt Worku would benefit from further English language instruction, but he can do that while he is incarcerated. His work record before conviction does not suggest that he is need of further vocational training.

VI.

The Sentence To Be Imposed.

The Sentencing Guidelines calculate a total offense level of 8 and a criminal history category of 1.  The resulting recommendation range is 0 to 6 months as to Counts 1 and 3, and 24 months consecutive as to Count 2.  The fine range recommendation is $1,000 to $10,000.  The supervised release range is 1 to 3 years as to Counts 1 and 3 and 1 year as to Count 2. Neither the Defense nor the Prosecution objects to these calculations and I have found them to be accurate.  I also reject them in their entirety.

I note the Probation Department recommends an upward departure to 96 months as to Counts 1 and 3, to run concurrently and 24 months as to Count 2 to run consecutively for a total term of 120 months.  The Government objects and requests a maximum combined sentence of 22 years imprisonment.  The Defendant objects and requests a downward departure to a combined sentence of 60 months.  I do not think it necessary to dwell on these objections.  Suffice to say the calculations are accurate and advisory and I reject them.  Because I have provided for an evidentiary hearing and advised counsel that I will not follow the Guidelines, but rather adhere to 18 U.S.C. § 3553 criteria, I overrule the objections as moot.

I reject the Guideline recommendation because it has no regard to the circumstances of this case.  Rather, it is the product of a matrix established for all violations of the statutes forming the charges in the Indictment.  There are not enough cases involving convictions of human rights violators entering the United States with false

20

documents and false statements to form the basis for a statistically valid array. The Sentencing Commission has failed to provide a justification or empirical data to support its recommendation. The incongruity of a Guideline sentence of zero to six months, followed by a two year mandatory sentence for a lesser offense, is enough to reject it. To say that a person fleeing another country on the basis of convictions for human rights violations should be treated the same as an impecunious migrant using his brother's or friend's identification to gain entry into this country in search of work is refuted merely by forming the words.

The statutes enacted by Congress provide maximum penalties of ten years imprisonment for two counts and a mandatory consecutive two year sentence for the third. If not this case, what is the maximum sentence for? The interests of the United States in keeping its immigration processes free of corruption must be measured in terms of the degree of that corruption. Such, I think, is Congress's intent.

Unlawful Procurement of Citizenship or Naturalization offends the very structure of the United States government and its national and foreign policies. Aggravated Identity Theft in pursing that unlawful procurement is considered by Congress sufficient to add a mandatory consecutive sentence of two years. Similarly, a ten year maximum sentence is provided for Fraud and Misuse of Visas, Permits, and Other Documents. I do not see any justification for making these sentences run concurrently. Count 1 and Count 3 of the Indictment constitute separate and serious crimes.

Could the Government have charged more in this case? Based on the evidence

adduced at trial the answer is clearly, "Yes."  Could the Government have charged fewer

counts?  Also, "Yes," and the question is a matter of prosecutorial discretion.  But the

actual charges presented, and the guilty verdicts on each of them, require individual

consideration just as this Defendant is entitled to individual consideration.  Neither the

charges nor the Defendant can be melded into an unidentifiable lump and then used to

arrive at a sentence as an exercise of baseless *ipse dixit.*

The Congress has provided maximum sentences for the most egregious violations of these

statutes.  If this case is not egregious, I cannot imagine what case would be.  Accordingly,


It is the judgment and sentence of this court that the Defendant, Kefelegne Alemu

Worku, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for

a term of 10 years on Count 1 and 10 years on Count 3, said sentences to be served

consecutively and not concurrently and a term of 2 years on Count 2 to be served

consecutively and not concurrently for a total term of imprisonment of 22 years.

Upon release from imprisonment, the Defendant shall be placed on supervised

release for a term of three years.  Within 72 hours of release from custody of the Bureau

of Prisons, and assuming the Defendant is not detained by the U.S. Homeland Security,

Immigration and Customs Enforcement, he shall report to the probation office in the

district to which he is released.

While on supervised release, the Defendant shall not violate any federal, state, or

local criminal laws, shall not possess a firearm as defined by U.S. statutes and shall

comply with the standard conditions that have been adopted by this court.

The mandatory drug testing provisions of 18 U.S.C. Section 3563 (a)(5) are waived because it is likely the Defendant will be deported and the reports on this Defendant indicate a low risk of substance abuse.  The Defendant, however, is ordered to cooperate in the collection of DNA as directed by the probation officer.

If the Defendant is deported, he shall not thereafter re-enter the United States without the express written approval of the Attorney General of the United States and under such conditions as the Attorney General shall impose.

I find the Defendant does not have the ability to pay a fine and so I waive the fine in this case.  The special assessment of $300, however, is not permitted by statute to be waived and it is due and payable immediately.

Although  I have already complied with the statutory requirement of canceling Worku's citizenship and irrespective of the fact that revocation of citizenship upon conviction for naturalization fraud under 18 U.S.C. § 1425 is automatic under 8 U.S.C. § 1452(e), I am advised that the Immigration and Customs Enforcement division of the U.S. Homeland Security requires such cancellation to be included in the Judgment and Sentence.  Let it therefore be restated that the Certificate of Naturalization of this Defendant has been and is cancelled and held for naught.

Finally, if released from custody, the Defendant is permanently restrained and enjoined from having any contact directly or indirectly with Berhand Dargie, Nesibut Sibhat, Kiflu Kitema, Samuel Kitema, Assayehgen Feleke, or Abebech Demissie.

23

The Defendant is advised of his right to appeal his convictions and the sentences imposed by this court.  To do so, the Defendant must file a notice of appeal with the clerk of the court within 14 days after the entry of judgment or the right to appeal will be lost. If the Defendant is unable to afford an attorney for an appeal one will be appointed to represent him.  In the interim, the appointment of the Federal Public Defender is continued.  If the Defendant so requests, the clerk of the court will immediately prepare and file a notice of appeal on his behalf.

The Defendant is remanded to the custody of the United States Marshal.

Dated this 27th day of May, 2014, *nunc pro tunc* to May 23, 2014.

*s/John L. Kane*_____
SENIOR U.S. DISTRICT JUDGE