# IN THE UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF COLORADO

Criminal Action No. 12-cr-00346-JLK-01

UNITED STATES OF AMERICA,

v.

KEFELEGNE ALEMU WORKU, a/k/a Habteab Berhe Temanu, a/k/a Habteab B. Temanu, a/k/a TUFA, a/k/a Kefelegn Alemu, *Movant.*

---

## MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT
## SENTENCE BY A PERSON IN FEDERAL CUSTODY

---

**TABLE OF CONTENTS**

I.      CONVICTION UNDER ATTACK....................................................................1

II.     DIRECT APPEAL ........................................................................................1

III.    POST-CONVICTION PROCEEDINGS ...........................................................2

IV.     RELEVANT BACKGROUND ........................................................................2

        A.      A TUMULTUOUS TIME IN ETHIOPIA.............................................2

        B.      THE INVESTIGATION INTO MR. WORKU ........................................4

        C.      THE TRIAL...................................................................................7

        D.      SENTENCING ..............................................................................11

        E.      THE DIRECT APPEAL...................................................................13

V.      CLAIMS ....................................................................................................14

        A.      LEGAL STANDARD FOR SECTION 2255 MOTIONS .......................14

        B.      CLAIM ONE:  Mr. Worku's Conviction Under Counts 1 And 3
                Violated The Double Jeopardy Clause...........................................15

                1.      Introduction.......................................................................15

                2.      Relevant Facts...................................................................16

                3.      Discussion.........................................................................16

                        a.      *The Tenth Circuit failed to properly consider Mr. Worku's*
                                *double jeopardy claim.*                                        16

                        b.      *On direct appeal, Mr. Worku established that his convictions*
                                *under Counts 1 And 3 were multiplicitous and violated the*
                                *Double Jeopardy Clause.*                                       17

                        c.      *The Tenth Circuit's analysis regarding Mr. Worku's double*
                                *jeopardy claim violated his rights under the Fifth Amendment.*  20

        C.      CLAIM TWO:  Mr. Worku was Deprived of his Due Process
                Rights under the Fifth Amendment.................................................22

                1.      Introduction.......................................................................22

                2.      Relevant Facts...................................................................23

                3.      Legal Standard ..................................................................25

                4.      Discussion.........................................................................26

        D.      CLAIM THREE:  Mr. Worku's Trial Attorney Provided Ineffective
                Assistance of Counsel Under the Sixth Amendment .......................30

                1.      Introduction.......................................................................30

                2.      Relevant Facts...................................................................31

                3.      Legal Standard ..................................................................31

                4.      Discussion.........................................................................35

i

a.    *Trial counsel's performance was deficient for failing to investigate the connection between the Government's Higher 15 Witnesses.*    35

b.    *Trial counsel's performance was deficient for failing to point out numerous inaccuracies in the witnesses' testimony and/or otherwise present an adequate defense.*    40

c.    *Trial counsel's performance was deficient for failing to present expert testimony that would have discredited the reliability of identifications 30+ years later under the conditions at issue.*    42

d.    *Trial counsel's performance was deficient for failing to object to the jury instructions and during closing arguments, resulting in Mr. Worku being convicted and sentenced for the same conduct twice, in violation of the Double Jeopardy Clause.*    44

e.    *Trial counsel's performance was deficient for failing to move to recuse the trial judge after he demonstrated an inability to be impartial in sentencing Mr. Worku.*    45

VI.    OTHER CONVICTIONS ................................................................................52

VII.    LEGAL REPRESENTATION..........................................................................52

VIII.    REQUEST FOR RELIEF/CONCLUSION .......................................................52

## **TABLE OF AUTHORITIES**

**Federal Cases**

*Ball v. United States*, 470 U.S. 856 (1985) ................................................................ 19

*Carter v. Kentucky*, 450 U.S. 288 (1981) ................................................................. 21

*Dambman v. Long*, No. 09-cv-02167, 2009 WL 2983187 (D. Colo. Sept. 11, 2009) ................................................................................................................. 45

*Elmore v. Ozmint*, 661 F.3d 783 (4th Cir. 2011) ..................................................... 32

*Griffin v. California*, 380 U.S. 609 (1965) ............................................................... 21

*Grubbs v. Hannigan*, 982 F.2d 1483 (10th Cir. 1993) .............................................. 26

*Hinton v. Alabama*, 134 S.Ct. 1081 (2014) ........................................................ 33, 44

*In re Winship*, 397 U.S. 358 (1970) ......................................................................... 21

*Jones v. State*, 197 So. 3d 1085 (Fla. Dist. Ct. App. 2015) ........................ 28, 41, 43, 44

*Knowles v. United States*, 224 F.2d 168 (10th Cir. 1955) .......................................... 21

*Liteky v. United States*, 510 U.S. 540 (1994) ........................................................... 49

*Malloy v. Hogan*, 378 U.S. 1 (1964) ........................................................................ 21

*Massaro v. United States*, 538 U.S. 500 (2003) ........................................................ 15

*Minor v. United States*, 57 A.3d 406 (D.C. 2012) ............................................ 28, 43, 44

*Neil v. Biggers*, 409 U.S. 188 (1972) ................................................................. passim

*People v. Campbell*, 847 P.2d 228 (Colo. App. 1992) ......................................... 28, 43

*People v. Lerma*, 19 N.E.3d 95, aff'd, 47 N.E.3d 985 ........................................ 28, 43

*Rompilla v. Beard*, 545 U.S. 374 (2005) .................................................................. 32

*Runnels v. Hess*, 653 F.2d 1359 (10th Cir. 1981) .................................................... 21

*Rutledge v. United States*, 517 U.S. 292 (1996) ................................................. 18, 19

*Speiser v. Randall*, 357 U.S. 513 (1958) ................................................................. 21

*Stone v. Powell*, 428 U.S. 465 (1976) ..................................................................... 15

*Strickland v. Washington*, 466 U.S. 668 (1984) ................................................. passim

*U.S. v. Becker*, 109 Fed.Appx. 264 (10th Cir. 2004) ........................................... 33, 44

*United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007) .......................................... 18

*United States v. Battle*, 289 F.3d 661 (10th Cir. 2002) ............................................ 20

*United States v. Benoit*, 713 F.3d 1 (10th Cir. 2013) .......................................... 18, 19

*United States v. Blaylock*, 20 F. 3d 1458 (9th Cir. 1994) ............................................................. 32

*United States v. Brittain*, 931 F.2d 1413 (10th Cir. 1991) ................................................. 25, 28, 29

*United States v. Burns*, 775 F.3d 1221 (10th Cir. 2014) ................................................................ 45

*United States v. Edgar*, 348 F.3d 867 (10th Cir. 2003) ................................................................ 20

*United States v. Franco-Guillen*, 196 Fed. Appx. 716 (10th Cir. 2006) ...................................... 46

*United States v. Frierson*, 698 F.3d 1267 (10th Cir. 2012) .......................................................... 20

*United States v. Gonzalez Edeza*, 359 F.3d 1246 (10th Cir. 2004) .............................................. 45

*United States v. Haley*, 529 F.3d 1308 (10th Cir. 2008) ................................................................ 52

*United States v. Johnson*, 130 F.3d 1420 (10th Cir. 1997) .................................................... 18, 19

*United States v. Lata*, 415 F.3d 107 (1st Cir. 2005) .................................................................... 25

*United States v. Lawrence*, No. 06-CV-02084, 2010 WL 1268147 (D. Colo. Mar. 30, 2010) ................................................................................................................. 14

*United States v. McAleer*, 138 F.3d 852 (10th Cir. 1998) ............................................................ 45

*United States v. Morris*, 247 F.3d 1080 (10th Cir. 2001) ............................................................ 18

*United States v. Nolan*, 416 F.2d 588 (10th Cir. 1969) ................................................................ 21

*United States v. Prichard*, 875 F.2d 789 (10th Cir. 1989) ............................................................ 25

*United States v. Simpson*, 7 F.3d 186 (10th Cir. 1993) ................................................................ 21

*United States v. Twitty*, No. 13-cr-0076, 2013 WL 5303488 (D. Colo. Sept. 20, 2013) ................................................................................................................................. 46

*United States v. Warner*, 23 F.3d 287 (10th Cir. 1994) .......................................................... 15, 16

*United States v. Waseta*, 647 F.3d 980 (10th Cir. 2011) ........................................................ 25, 29

*United States v. Worku*, 800 F.3d 1195 (10th Cir. 2015) ...................................................... passim


**State Cases**

*In re Estate of Elliott*, 993 P.2d 474 (Colo. 2000) ........................................................................ 46


**Federal Statutes**

28 U.S.C. § 144 ................................................................................................................................ 33

28 U.S.C. § 455 ........................................................................................................................ 33, 45

28 U.S.C. § 2255 ...................................................................................................................... passim

Title 18 United States Code Section 3553 ...................................................................................... 46

U.S.S.G. § 2L2.2 ............................................................................................................ 11, 50, 51

**Federal Rules**

F.R.E. 403.................................................................................................................................. 48

**Other Authorities**

ABA Criminal Justice Section Standards, Defense Function, Standard 4-1.2............................. 33

ABA Criminal Justice Section Standards, Defense Function, Standard 4-3.6............................. 33

ABA Criminal Justice Section Standards, Defense Function, Standard 4-4.1........................ 33, 38

ABA Model Rules of Professional Conduct 1.1 .................................................................... 33, 38

ABA Model Rules of Professional Conduct 1.3 .................................................................... 33, 38

*Abusing Self-Determination and Democracy: How the TPLF is Looting*
   *Ethiopia*, Matthew J. McCracken, 36 Case W. Res. J. Int'l L. 183 (2004) ....................... 2, 40

U.S. Const. Amend. 5 ............................................................................................................... 21

## I.    CONVICTION UNDER ATTACK

1.    Name and location of Court:  United States District Court for the District of Colorado, 901 19th Street, Denver, Colorado 80294.

2.    Date of Judgment of Conviction:  May 23, 2014

3.    Case Number:  12-cr-00346-JLK-01

4.    Type and Length of Sentence:  Imprisonment for 120 months as to Count 1, 24 months as to Count 2, and 120 months as to Count 3, to run consecutively, for a total term of 264 months (22 years).

5.    Movant is not serving a sentence imposed for a conviction other than the conviction being attacked in this application.

6.    Nature of Offenses Charged:   Count 1 – Unlawful Procurement of Citizenship or Naturalization in violation of 18 U.S.C. § 1425(a) and (b); Count 2 – Aggravated Identity Theft in violation of 18 U.S.C. § 1028A(a)(1); and Count 3 – Fraud and Misuse of Visas, Permits, and other Documents in violation of 18 U.S.C. § 1546(a).  A copy of the indictment is attached hereto as **Exhibit 1**.

7.    Movant was convicted on all three Counts.  A copy of the Verdict is attached hereto as **Exhibit 2**.

8.    Movant entered a plea of not guilty.

9.    Movant's case was tried before a jury October 7 – 11, 2013.

10.    Movant did not testify at trial.

## II.    DIRECT APPEAL

1.    Movant filed a timely direct appeal with the Tenth Circuit Court of Appeals.

2.    The Tenth Circuit Court of Appeals issued its order affirming the judgement below on September 1, 2015.  Movant's petition for rehearing and for rehearing en banc was denied on September 28, 2015.  The Mandate was issued on October 6, 2015.  Copies of the Court's orders and mandate are attached hereto as **Exhibit 3**.

3.    A petition for a writ of certiorari was filed with the United States Supreme Court on December 23, 2015.  The Supreme Court denied the petition on February 29, 2016.  A copy of that denial is attached hereto as **Exhibit 4**.

4.      The following issues were raised on direct appeal:

(a)      Whether the district court plainly erred by allowing Movant to be convicted under both Count 1 (violation of 18 U.S.C. § 1425) and Count 3 (violation of 18 U.S.C. § 1546(a)) based on the same criminal conduct in violation of the Double Jeopardy Clause of the U.S. Constitution.

(b)      Whether the district court plainly erred by allowing Movant to be convicted under Count 2 (violation of 18 U.S.C. § 1028A, identity theft) when his alleged use of the identity of another was consensual.

(c)      Whether a sentence of 22 years for consensually using another's identity to enter and become naturalized in the United States, a 31-level increase under the Sentencing Guidelines, is procedurally and substantively unreasonable.

## III.     POST-CONVICTION PROCEEDINGS

1.      Other than the direct appeal, this petition is the only other post-conviction proceedings that have been initiated by Movant.

## IV.     RELEVANT BACKGROUND

### A.    A TUMULTUOUS TIME IN ETHIOPIA

Mr. Worku[1] was born in Ethiopia and is currently approximately 64 years old.  He grew up in Ethiopia at a tumultuous time in that country's history.  In the 1970s, there were two main political groups in Ethiopia – the Derg, and the Ethiopian People's Revolutionary Party ("EPRP").  In a period known as the "White Terror," the EPRP launched violent attacks against the Derg; the Derg responded with its own campaign known as the "Red Terror."  *Abusing Self-Determination and Democracy: How the TPLF is Looting Ethiopia*, Matthew J. McCracken, 36 Case W. Res. J. Int'l L. 183, 191 (2004).  There was violence by members of both parties, including periods where the Derg had imprisoned members of the EPRP, only for the tables to be turned and the EPRP to imprison the

_____

[1] Mr. Worku disputes that he is Kefelegne or Kefelgn Alemu, or that he ever admitted as much during the investigation in this case.

Derg members once they gained the power. (*See, e.g.*, 10/9/13 Trial Tr., Dkt. # 134, ROA p. 561:4-7 (Dargie); 10/10/13 Trial Tr., Dkt. # 135, ROA p. 667:7-9 (Feleke).)[2]  The distrust and dislike between former members of the two political groups is still prevalent for many.

As Mr. Worku was a young adult during the political upheaval in Ethiopia, he was required to join the Derg's "National Campaign" in the mid-1970s.  (Pre-Sentence Investigation Report ["PSR"], Dkt. # 131, Restr. ROA p. 110.)  Sometime around early 1977, he worked for the railway in Addis Ababa.  (*Id*.)  He eventually went to work for the government and was assigned to a sector of Addis Ababa known as "Higher 15"[3] around 1979, where he worked as an "organizer." (*Id*.)  After one year of that employment, Mr. Worku was identified as an opponent and was detained as a political prisoner for roughly five years until 1984. (*Id*.)

After Mr. Worku was released from prison, he continued to live in Addis Ababa as a broker in the plastics industry until 1992, when the existing government (the Derg) was overthrown, and the new government started to persecute people deemed political opponents.  (*Id*.)  At that point, Mr. Worku moved to Kenya, where he initially lived in a refugee camp.  (*Id*., p. 111.)  He eventually was granted refugee status and political asylum by the Kenyan government, and he worked at various times in business, as a taxi operator, and at a flour mill.  (*Id*.)  While he was concerned that the Kenyan government was corrupt and that he might be imprisoned there arbitrarily, there is no evidence that he was in fact imprisoned there, or threatened with deportation to Ethiopia.  (*Id*.)

---

[2] Citations are to the record on appeal as it was designated in the Tenth Circuit.

[3] At the time, Addis Ababa was separated into twenty-five areas known as "Highers." (10/8/13 Trial Tr., Dkt. # 133, ROA p. 142:1-7.)  This is not to be confused with the Higher 15 Witnesses' later testimony about "Higher 15," to which they are referring to the prison in that sector.

Around 2003-2004, when Mr. Worku was living in Kenya, he was approached by a friend of the Berhe family.  (10/8/13 Trial Tr., Dkt. # 133, ROA p. 349:15-20.)  That friend explained that the Berhe family was currently living illegally in Kenya and was in process of applying for admission to the United States as refugees.  (*Id*., pp. 347:20-348:5.)  The father of the family, Habteab Berhe Temanu, was suffering from dementia or Alzheimer's and was incapable of remembering the names of his family members, their birth dates, and other information that was critical to the interview for admission to the United States.  (*Id*., p. 339:16-21.)  The family needed to leave Kenya because, as they were living in Kenya illegally, they faced a threat of deportation back to Eritrea/Ethiopia.  (*Id*., pp. 347:20-24, 356:13-20.)  Knowing that they needed a "father" to complete the interview and serve as the guardian to bring the younger children to the United States, the Berhe family asked Mr. Worku to assume the identity of their father, Habteab Berhe Temanu, to complete the refugee process.  (*Id*., pp. 339:5-340:5.)  Mr. Worku agreed to assist the Berhe family and entered the United States as Habteab Berhe Temanu on or around July 12, 2004.

## B.   THE INVESTIGATION INTO MR. WORKU

The investigation that led to Mr. Worku's arrest and trial began after a man named Samuel Ketema, brother to Kiflu Ketema[4], heard rumors from an unidentified person that Kefelegn Alemu – allegedly a guard at the Higher 15 prison who tortured and killed numerous people – was in Denver using the name Tufa.  (10/8/13 Trial Tr., Dkt. # 133, ROA p. 218:5-7.)  Kiflu had been a prisoner at the Higher 15 prison in the late 1970s, but Samuel had never been in Higher 15 nor had he ever seen this Kefelegn Alemu. (*Id*., p. 218:18-21.)

---

[4] For purposes of distinguishing between the Ketema brothers, this motion will refer to Kiflu Ketema as Kiflu, and Samuel Ketema as Samuel.

Based upon these unsubstantiated "rumors" and after discussing the plan with his brother, Samuel went to Cozy Bar, an alleged hangout of this person going by the name of Tufa, to find this alleged man. (*Id*., pp. 218:25-219:1.) Samuel found the only man in the bar at that time old enough to potentially be that man and called Kiflu to let him know he had found him. (*Id*., p. 219:12-18.) Kiflu then arrived at the bar certain that whoever he was about to see was this Kefelegn Alemu. Instead, he found Mr. Worku, better known as Habteab Berhe Temanu. When Kiflu confronted Mr. Worku, Mr. Worku denied knowing Kiflu and denied that he was Kefelegn Alemu or that he was at the Higher 15 prison. (*Id*., p. 165:3-10.) When Mr. Worku left, Samuel took down the license plate of the car he was driving. (*Id*., p. 222:11-14.) A few days later, Kiflu contacted Special Agent Jeffrey Lembke with the U.S. Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations Division ("HSI") and an investigation was opened. (PSR, Dkt. #131, Restr. ROA p. 97.)

Agent Lembke ran the license plate information and learned that the car was registered under the name Habteab Berhe Temanu. (9/12/13 Motions Hearing Tr. ["Mot. Hear."], Dkt. # 94, ROA pp. 9-10.) Using a picture from the immigration database for Habteab Berhe Temanu, Agent Lembke then created a photo array that would later be shown to each of the five "Higher 15 Witnesses."[5] (*Id*. p. 34:19-21.)

The photographs selected by Agent Lembke contained significant differences between the "control group" photos and Mr. Worku's photo. For example, of the six photos shown to four of the

---

[5] The five Higher 15 Witnesses who made identifications of Mr. Worku from the photo arrays, and subsequently at trial, are: Kiflu Ketema, Nesibu Sibhat, Berhan Dargie, Assayehgen Feleke, and Abebech Demissie. These witnesses were allegedly imprisoned at the Higher 15 prison where they saw or experienced torture, allegedly in part, at the hand of Kefelegn Alemu.

witnesses, only two had a full head of hair, and only one of those two had gray hair – Mr. Worku. The other four individuals were bald.  There were only two individuals without any facial hair, and only one of those two had hair on his head (Mr. Worku).  (*See* Trial Exhs. 27, 41, 43, 44, Supp. ROA, pp. 3, 16-19.)  Mr. Worku's photograph is the newest looking (the brightest and clearest) in two of the photo arrays (Exhibits 27 and 41).  In the third (Exhibit 44), the contrast is even worse, as his photograph is the newest looking and his face is heavily shadowed and dark compared with the others.  Mr. Worku was also the only individual wearing a large puffy winter jacket, with a hood. The other five individuals were wearing either suit jackets or a dress shirt.[6]  Moreover, the agents who administered the photo array interviews to the witnesses failed to follow protocol that would have admonished the witnesses with important warnings to help prevent misidentification.  (Mot. Hear., Dkt. # 94, ROA pp. 65:21-24, 79:22-80:7, 82:14-18, 91:14-20, 95:21-25, 100:20-101:15, 115:1-4, 21-22.)

Mr. Worku argued that these problems were a violation of due process because the photos used and manner of presentation made the arrays unduly suggestive.  The five Higher 15 Witnesses had not seen Kefelegn Alemu in more than thirty-five years when he would have been around thirty years old.[7]  They also ultimately testified that their sightings were in poor lighting and other

---

[6] One witness (Assayehgen Adinew Feleke) was shown a fourth photo array involving twelve photos, also as a composite. (Trial Exh. 43.)  Although this array had more photographs, it also was unduly suggestive. For example, out of twelve photos, only three have significant hair.  Of those three, only one has gray hair – Mr. Worku.  Again, the other individuals are all wearing suits and dress shirts, while Mr. Worku is wearing a heavy winter coat.  Mr. Worku's photograph also stands out for being newer and far less grainy than the other photos with the exception of one photo (marked 6) of an individual who does not appear to be old enough to have been an adult in 1979.

[7] None of them were ever shown a graphic or illustration purporting to depict Mr. Worku in his early thirties.

challenging conditions. (10/8/13 Trial Tr., Dkt. # 133, ROA pp. 190:5-16, 191:10-16, 192:12-17, 203:1-205:4; 10/9/13 Trial Tr., Dkt. # 134, ROA pp. 531:13-14, 532:2-6, 573:11-12, 615:10-11, 619:16-18; 10/10/13 Trial Tr., Dkt. # 135, ROA pp. 657:4-5, 658:10, 754:21-23.)   Kiflu's identification, as explained above, came after being told that the person he saw at the bar was Kefelegn Alemu; there was no evidence of him independently identifying Mr. Worku as that man. Then Kiflu contacted some of the other witnesses prior to their review of a photo array (and those witnesses referred agents to other witnesses). (10/9/13 Trial Tr., Dkt. # 134, ROA pp. 494:21-495:6.) The remaining witness had been told that Mr. Worku was really Kefelegn Alemu and was going to "have a case" in Denver. (*See, e.g.*, Mot. Hear., Dkt. # 94, ROA p. 92:17-23; 10/10/13 Trial Tr., Dkt. # 135, ROA pp. 681:3-7, 759:23-760:5.)  The court denied the motion to suppress. (Mot. Hear., Dkt. # 94, ROA p. 120:13.)  The photo arrays were then introduced as Exhibits at trial and used by the Higher 15 Witnesses to allegedly identify Mr. Worku as Kefelegn Alemu.  Two of those witnesses again testified during the Sentencing Hearing.

## C.   THE TRIAL

Mr. Worku was ultimately charged with:

(1)   unlawful procurement of citizenship or naturalization in violation of 18 U.S.C. § 1425(a) and (b) by knowingly making false statements on his N-400 Application for Naturalization;

(2)   aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1) for knowingly possessing and using, or attempting to possess and use, without authority, the identification of another person; and

(3)   fraud and misuse of visas, permits or other documents in violation of 18 U.S.C. § 1546(a) for knowingly uttering, using, possessing, obtaining, accepting or receiving an immigration document to stay and work in the United States, knowing it to have been procured by means of a false claim or statement.

(Superseding Indictment, Dkt. # 41, ROA p. 63.) Under Count 1, Mr. Worku could be found guilty if the jury found that he obtained a certificate of naturalization as the result of false statements made on his N-400 application for naturalization. (*See* Jury Instruction 3.2, Dkt. # 75, ROA pp. 249-50.) As to Count 1, the superseding indictment further charged that the false statements could include – in addition to misrepresentation of identity – falsely affirming that the defendant had not committed a crime for which he had not been convicted, and falsely affirming that the defendant had not persecuted anyone for their political beliefs or associations. (Superseding Indictment, Dkt. # 41, ROA p. 65.)

Notwithstanding these additions to the indictment, the jury instructions later made clear that the jury only needed to find one false statement, such as misrepresentation of identity, to convict on Count 1. (Jury Instruction No. 3.2, Dkt. # 75, ROA pp. 250-51.) The jury instructions for Count 3 instructed that, to be found guilty, the jury must find that Mr. Worku "knowingly, uttered, possessed, used, or tried to use an immigrant or nonimmigrant visa, permit, alien registration receipt card, or other document" between November 21, 2002 and March 2, 2010 that he knew had been procured by a false claim or statement. (Jury Instruction No. 3.4, Dkt. #75, ROA pp. 255-56.) This date range was significant because it included the time period covering the N-400 at issue in Count 1. (*See* Jury Instruction 3.2, Dkt. #75, ROA p. 250 (noting that the N-400 had been submitted on November 22, 2009 and was re-affimed on or about March 2, 2010).)

During trial, the Government presented the testimony of three members of the Berhe family – all of whom confirmed the failing health of their father during that time and that Mr. Worku assumed the identity of their father at the request of the Berhe family. (*Id*., pp. 241:4-15, 339:16-340:5, 369:22-25.) No evidence was presented, or even suggested, that Mr. Worku would have otherwise

attempted to take the identity of any individual, that Mr. Worku was "fleeing" to the United States to escape criminal prosecution in Ethiopia, or that Mr. Worku had any other motivation for entering the United States other than to help this family and perhaps have a better quality of life.  The Berhes testified that Mr. Worku then entered the United States as Habteab Berhe Temanu in 2004.  (*Id.*, p. 356:21-357:1.)  He worked first in the cabin service department of Denver International Airport, then as a driver in an airport shuttle service, and then as a meter checker for a parking company, until he was arrested in 2012 and charged as described above.  (PSR, Dkt. # 131, Restr. ROA p. 114.)

Before trial, the district court revealed its plan to aggressively sentence Mr. Worku by allowing cumulative, unnecessary testimony regarding this alleged torture.  For example, on July 11, 2013, the court held a hearing.  (Dkt. # 55, ROA p. 5.)  During the hearing, the court previewed its intention to "not be following the sentencing guidelines" (*id.*, p. 6:21-25) and to sentence Mr. Worku to terms "to be served consecutively" (*id.*, p. 8:18-21) because the guidelines "never contemplated the kind of case which is presented here" (*id.*, p. 8:25-9:1).  Thus, even prior to trial, the court viewed Mr. Worku as the equivalent of a fleeing Nazi official,[8] and viewed the case as one about torture rather than about the immigration charges at issue.  The trial judge's comments further evidenced his determination to punish Mr. Worku for these presumed human rights violations, despite the absence of any such charge.

---

[8] While Mr. Worku had expressed some concerns that the Kenyan government was corrupt and that he might be imprisoned there arbitrarily, there was no evidence that he was ever threatened with deportation to Ethiopia and Mr. Worku had official refugee status in Kenya, where he lived for approximately ten years, thus he had no reason to "flee" Kenya. (Pre-Sentence Investigation Report ["PSR"], Dkt. # 131, Restr. ROA  p. 110.)

The charges against Mr. Worku were tried to a jury from October 7-11, 2013. As discussed above, the evidence was uncontroverted that Mr. Worku had assumed the identity of the father of the Berhe family in entering the United States and applying for naturalization, and it was undisputed that he did so at that family's request.  (10/8/13 Trial Tr., Dkt. # 133, ROA pp. 241:4-15, 339:16-340:5, 369:22-25.)   There was no evidence that Mr. Worku had entered the United States to avoid prosecution in Ethiopia, as he already had refugee and asylum status in Kenya.

Although Mr. Worku was charged only with identity theft and immigration fraud, and despite testimony from three members of the Berhe family, the Court allowed the Government to extend what could have been a one-day trial into four days with the majority of Mr. Worku's trial focused on allegations that Mr. Worku participated in torture in Ethiopia in the 1970s – allegations he continues to deny.  The vast majority of the trial consisted of the five Higher 15 Witnesses testifying about the violent conditions in Ethiopia during the 1970s and the torture they generally experienced at the Higher 15 prison, even though most of the testimony was not about the actions of Kefelegn Alemu.

Trial counsel for Mr. Worku objected to this unnecessarily cumulative, highly prejudicial evidence with little probative value through a pre-trial motion in limine (Dkt. # 99, ROA p. 285), and during trial (10/9/13 Trial Tr., Dkt. # 134, ROA p. 587:9-17). The Court denied that motion (Vol. 6, 10/7/13 Trial Tr., Dkt. # 159, ROA pp. 126:15-127:5) and overruled the same trial objection (10/9/13 Trial Tr., Dkt. # 134, ROA p. 587:18-25).

At the end of the trial, Mr. Worku was convicted of all three counts.  (Verdict, ROA p. 326.)  Through special interrogatories on Count 1, the jury made the following findings, among other things:

- Mr. Worku falsely identified himself as Habteab Berhe Temanu on his N-400; and

- Mr. Worku falsely answered no on his N-400 to the question of whether he had ever persecuted (either directly or indirectly) any person because of race, religion, national origin, membership in a particular social group, or political opinion.

There were no special interrogatories for Counts 2 or 3. Importantly, however, there was no request that the jury determine whether Mr. Worku's false statements to immigration authorities were made to "conceal" any of the facts that would give rise to heightened offense levels under U.S.S.G. § 2L2.2 (2012).

## D.    SENTENCING

Mr. Worku's conviction under 18 U.S.C. § 1028A (Count 2) had a two-year statutory sentence. With respect to 18 U.S.C. § 1425 (Count 1) and 18 U.S.C. § 1546 (Count 3), each statute provides for a 10-year maximum sentence. The Pre-Sentencing Report looked to U.S.S.G. § 2L2.2(a) (2009), as the conduct concluded March 2010, to conclude that the convictions resulted in a total offense level of 8, and found that Mr. Worku had no criminal history points, so his criminal history category was I. Thus, the Guidelines recommended 0-6 months imprisonment for the 18 U.S.C. § 1425 and § 1546 convictions. Even if those convictions ran consecutively, and even if both ran at the high end of the range, Mr. Worku's sentence would have been a total of three years' imprisonment under the Guidelines' recommendation and the statutory sentence under 18 U.S.C. § 1028A.

The 2010 Guidelines did not address scenarios where immigration fraud is allegedly used to conceal serious human rights violations. However, the Sentencing Commission amended the Guidelines in 2012 to address such scenarios. Pursuant to that amendment, U.S.S.G. § 2L2.2(b)(4)(A) and (B) now include significant enhancements when a defendant was involved in

human rights offenses.   (Dkt. # 113, ROA p. 345.)   The Commission stated that U.S.S.G. § 2L2.2(b)(4) was amended in conjunction with § 3A1.5 as a result of "the Commission's multi-year review to ensure that the guidelines provide appropriate guidelines penalties for cases involving human rights violations."  U.S. Sentencing Commission, Amendments to the Sentencing Guidelines (2012), p. 15, available at: http://www.ussc.gov/sites/default/files/pdf/amendment-process/official-text-amendments/20120430_Amendments.pdf.  "The new enhancement reflects the impact that such immigration fraud offenses can have on the ability of immigration and naturalization authorities to make fully informed decisions regarding the defendant's immigration petition, application or other request and is intended to ensure that the United States is not a safe haven for those who have committed serious human rights offenses."  *Id*. at 17.  If that 2012 amendment applied to Mr. Worku, the highest offense level would be 25, resulting in a Guideline range up to 71 months for each of the 18 U.S.C. § 1425 and § 1546 convictions, such that even if sentences were to run consecutively, the Guidelines' recommended sentence would have been for 142 months for the two immigration charges.  Including the 18 U.S.C. § 1028A conviction, the maximum within-Guidelines sentence under the Guidelines Amendment would have been 166 months, the equivalent of 13 years and 10 months.

The Government requested, over Mr. Worku's objections, 240 months for the immigration fraud charges (for a total of 264 months for all three counts)—far more than the 2012 amendments to Guidelines could ever support for immigration fraud, and even more than the Guidelines would have recommended if Mr. Worku had in fact been convicted of crimes involving serious human rights violations resulting in death.  (Dkt. # 113, ROA pp. 358-362.)  In other words, the Government sought a sentence to correspond with conduct it apparently wished it had charged, but had not so

charged, and was not any element of the offenses charged.  Although the Government did not present any evidence that Mr. Worku adopted Habteab Berhe Temanu's identity to conceal Mr. Worku's involvement in human rights violations and although the jury made no such finding, at sentencing the Government pointed to an *in abstentia* 2000 conviction of Kefelgn Alemu relating to genocide charges in Ethiopia to support its request.  Mr. Worku objected. (Vol. 6, 5/23/14 Sent. Hrg. Tr., Dkt. # 155, ROA pp. 56:21-64:7.)

The trial court, based on the testimony of the Higher 15 Witnesses  and a document indicating that an Ethiopian court previously tried and convicted one "Kefelgn Alemu" in abstentia (ROA, p. 370), found that "[i]n committing the acts for which he was convicted, Worku concealed his true identity and sought to avoid further prosecution and punishment for his participation in Ethiopia of the crimes of torture and murder."  (ROA, p. 502.)  As a result, the trial court sentenced Mr. Worku to 10 years for each of the immigration fraud statutes, running consecutively, together with the statutory two years for identity theft.  (Dkt. # 140, ROA p. 514; *see* Appendix E.)  This represented the equivalent of an offense level of 39.  In so doing, the court did not analyze whether the 2012 Guideline amendment that addressed human rights violations should be followed or provided a benchmark for guidance.  Instead, the court stated that it summarily "reject[ed]" the Guidelines "in their entirety…because it has no regard to the circumstances of this case."  (ROA, p. 512.)

## E.     THE DIRECT APPEAL

Mr. Worku filed a timely direct appeal with the Tenth Circuit Court of Appeals (the "Court of Appeals").  In that appeal he raised three issues: (1) whether his conviction and sentences for Counts 1 and 3 were in violation of the Double Jeopardy Clause; (2) whether his conviction and sentence for

Count 1 was in plain error when his alleged use of the identity of another was consensual; and (3) whether his sentence of 22 years, representing a 31-level increase under the Sentencing Guidelines was procedurally and substantively unreasonable.  The Court of Appeals affirmed the judgement below.  Specifically, the Court of Appeals presumed, for purposes of the double jeopardy argument, that the jury's conviction for Counts 1 and 3 were based on the same conduct, but denied the claim under the plain error test and improperly shifted the burden of proof to Mr. Worku, infringing upon his right against self-incrimination in violation of the Fifth Amendment.  *United States v. Worku*, 800 F.3d 1195, 1199 (10th Cir. 2015).  The Court of Appeals also rejected Mr. Worku's argument that he could not be guilty of identity fraud because the use of the identity was consensual.  *Id*. at 1200. Finally, the Court of Appeals rejected Mr. Worku's procedural and substantive unreasonableness arguments and, in doing so, also replaced the required analysis of pretrial photo identifications and their subsequent in-court identifications articulated in *Neil v. Biggers*, 409 U.S. 188 (1972) with a new "extraordinary circumstances" standard.  *Id*. at 1206, 1208.

The Court of Appeals denied Mr. Worku's petition for rehearing and for rehearing *en banc*. The United States Supreme Court denied Mr. Worku's petition for a writ of certiorari on February 29, 2016.  This timely Motion follows.

## V.     CLAIMS

### A.     LEGAL STANDARD FOR SECTION 2255 MOTIONS

A prisoner in federal custody may move the district court, pursuant to 28 U.S.C. § 2255, to vacate, set aside, or correct his sentence where "the sentence was imposed in violation of the Constitution or the laws of the United States . . . or that the sentence . . . is otherwise subject to collateral attack."  28 U.S.C. § 2255(a); *see also United States v. Lawrence*, No. 06-CV-02084, 2010

WL 1268147, at *3 (D. Colo. Mar. 30, 2010) ("The movant has the burden of demonstrating that he is entitled to relief because his sentence was imposed in violation of the Constitution or laws of the United States, or otherwise is subject to collateral attack.").

Claims asserted in a Section 2255 motion must have been raised before or at trial, or on direct appeal, or else the movant must show cause excusing his procedural default and actual prejudice resulting from the errors of which he complains, or show that a fundamental miscarriage of justice will occur if his claim is not addressed. *See, e.g.*, *United States v. Warner*, 23 F.3d 287, 291 (10th Cir. 1994). Although a claim may be rejected under 28 U.S.C. § 2255 if it was previously disposed of on direct appeal, it is not barred if the defendant was not provided the opportunity for full and fair consideration at trial and on direct review of that claim. *See Stone v. Powell*, 428 U.S. 465, 495 (1976).

Further, a claim for ineffective assistance of counsel may be raised for the first time in a motion under Section 2255. *Massaro v. United States*, 538 U.S. 500, 504 (2003) ("The better-reasoned approach is to permit ineffective-assistance claims to be brought in the first instance in a timely motion in the district court under § 2255. We hold that an ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal.").

**B.      CLAIM ONE:  Mr. Worku's Conviction Under Counts 1 And 3 Violated The Double Jeopardy Clause.**

**1.      Introduction**

Mr. Worku was punished under two separate counts for the same criminal behavior. The counts were multiplicious and violated the Double Jeopardy Clause of the Fifth Amendment to the

U.S. Constitution.  Although Mr. Worku raised this argument on direct appeal, typically precluding any further consideration of the issue, the Tenth Circuit affirmed by applying an improper and unconstitutional analysis that shifted the burden of proof and impermissibly infringed upon Mr. Worku's right against self-incrimination.  In doing so, Mr. Worku was subject to a separate Fifth Amendment due process violation, such that his sentence was impaired in violation of the U.S. Constitution.  Accordingly, this Court should consider Mr. Worku's argument anew and apply the correct analysis.  Any failure to do so would result in a fundamental miscarriage of justice.

2.      **Relevant Facts**

Mr. Worku was convicted under 18 U.S.C. § 1425(a) and (b) (Count 1) and 18 U.S.C. § 1546(a) (Count 3), both covering Mr. Worku's alleged false statements in procuring naturalization. The facts set forth in the background section above provide a summary of these charges, the relevant evidence at trial, and the resulting convictions.  Additional facts supporting Mr. Worku's double jeopardy claim are discussed in more depth below.

3.      **Discussion**

a.      ***The Tenth Circuit failed to properly consider Mr. Worku's double jeopardy claim.***

Ordinarily, courts may reject claims that were raised and rejected on direct appeal that are subsequently raised in collateral attacks. *See, e.g.*, *Warner*, 23 F.3d at 291.  Similarly, a defendant's failure to present an issue on direct appeal bars him from raising the issue in his 28 U.S.C. § 2255 motion, unless he can show cause excusing his procedural default and actual prejudice resulting from the errors of which he complains, or he can show that a fundamental miscarriage of justice will occur if his claim is not addressed. *Id.*

Here, Mr. Worku's double jeopardy claim must be addressed because the Tenth Circuit failed to properly consider the argument. As more fully explained in Section V.B.3.c., *infra*, the Tenth Circuit based its affirmance of Mr. Worku's conviction on his failure to testify and/or prove his innocence. Such findings improperly shift the burden to Mr. Worku and imply that he was required to prove his own innocence and testify on his own behalf. Because of this, Mr. Worku's double jeopardy claim was neither properly addressed, nor properly rejected on direct appeal, and therefore cannot be considered barred for purposes of 28 U.S.C. § 2255.

Further, Mr. Worku could not have addressed this improper burden shifting in his direct appeal to the Tenth Circuit because he had no notice that the Tenth Circuit was going to affirm his conviction on this unconstitutional basis until after it issued its mandate and the U.S. Supreme Court refused to hear the case, denying Mr. Worku a meaningful opportunity to address this particular violation of his constitutional rights. As such, refusing to hear this claim now would result in a fundamental miscarriage of justice.

> **b.    On direct appeal, Mr. Worku established that his convictions under Counts 1 And 3 were multiplicitous and violated the Double Jeopardy Clause.**

Mr. Worku was convicted of violating 18 U.S.C. § 1425(a) and (b) based on allegations that Mr. Worku obtained naturalization documentation by making false statements regarding a material fact. (Superseding Indictment, Dkt. # 41, ROA p. 64.) He also was convicted of violating 18 U.S.C. § 1546(a) for uttering, possessing, using, or trying to use immigration documents knowingly procured by a false statement. (*Id*. p. 66.) On appeal, Mr. Worku argued that under the statutory elements and corresponding jury instructions for Count 1 (18 U.S.C. § 1425(a) or (b)) and Count 3 (18 U.S.C. § 1546(a)), the necessary elements for conviction under both counts were the same and,

therefore, his conviction under these counts constituted a double jeopardy violation under the Fifth Amendment to the U.S. Constitution because the two counts were based on the same conduct.

"The [Double Jeopardy] Clause is implicated if two statutes prohibit the same act or transaction, typically because one is a lesser included offense of the other." *United States v. Benoit*, 713 F.3d 1, 12 (10th Cir. 2013) (citing *Rutledge v. United States*, 517 U.S. 292, 297 (1996)). "Multiplicity refers to multiple counts of an indictment which cover the same criminal behavior." *United States v. Barrett*, 496 F.3d 1079, 1095 (10th Cir. 2007) (quoting *United States v. Johnson*, 130 F.3d 1420, 1424 (10th Cir. 1997)). "Although multiplicity is not fatal to an indictment, multiplicitous counts which may result in multiplicitous convictions are considered improper because they allow multiple punishments for a single criminal offense." *Barrett*, 496 F.3d at 1095 (citations omitted). "Multiplicitous sentences violate the Double Jeopardy Clause." *Id.* (citing *United States v. Morris*, 247 F.3d 1080, 1083 n. 2 (10th Cir. 2001)).

Count 1 simply required the jury to find that Mr. Worku had knowingly applied for or obtained naturalization documentation either "contrary to law" *or* "knowing that he was not entitled" to naturalization. (Jury Instruction 3.2, Dkt. # 75, ROA p. 250.) The jury was instructed that an applicant for naturalization acts "contrary to law" when he "knowingly makes a false statement or omission regarding a material fact." (*Id.* 251-252.) Notably, the jury was not instructed as to any other way to conclude that Mr. Worku had acted "contrary to law." Instead, the instruction regarding "contrary to law" was based solely on misstatements, consistent with the jury's finding that Mr. Worku made six misrepresentations on the naturalization application. The jury was allowed to convict on Count 1 simply by finding that Mr. Worku had made those misrepresentations, without also finding that he knew he was not entitled to naturalization. In fact, the jury was not even

18

instructed as to how it could determine whether Mr. Worku was "not entitled to naturalization." Likewise, there is nothing in the record to show that the jury found Mr. Worku also knew he was "not entitled to naturalization."

Count 3 required the jury to find that Mr. Worku "uttered, *possessed*, used *or* tried to use" naturalization documentation that had been "procured by means of a false claim or statement." (Jury Instruction 3.4, Dkt. # 75, ROA p. 256 (emphasis added).) The jury had already found that Mr. Worku made false statements on his naturalization application pursuant to Count 1. But to then convict as well on Count 3, the jury needed only to find that Mr. Worku "possessed" the naturalization documentation that was allegedly obtained by those false statements.

Possession is a lesser included offense of obtaining an allegedly unlawful thing, so convictions for both illegally obtaining and illegally possessing the same thing violate the Double Jeopardy Clause. *See, e.g.*, *Ball v. United States*, 470 U.S. 856, 862 (1985); *Benoit*, 713 F.3d at 18 (same); *see also United States v. Johnson*, 977 F.2d 1360, 1373 (10th Cir. 1992) ("Because subsection [18 U.S.C. § 856](a)(1) is a lesser included offense of subsection (a)(2), convictions under both subsections violate double jeopardy principles, and one of the counts must be vacated.").

Accordingly, 18 U.S.C. § 1425 – as explained to the jury under Count 1 – did not require "proof of a fact" that § 1546(a) does not. *See Rutledge*, 517 U.S. at 292. Mr. Worku argued that under those elements and instructions, violation of 18 U.S.C. § 1425 is a lesser included crime of 18 U.S.C. § 1546(a) and Mr. Worku's conviction under both is a violation of double jeopardy.

        ***c.***     ***The Tenth Circuit's analysis regarding Mr. Worku's double jeopardy claim violated his rights under the Fifth Amendment.***

The Tenth Circuit found that because this issue had not been raised by trial counsel, the plain error standard applied.  *Worku*, 800 F.3d at 1198.  "Under the plain error standard, [a defendant] must show clear or obvious error that affected his substantial rights and seriously affected the integrity of the judicial proceedings."  *See United States v. Frierson*, 698 F.3d 1267, 1269 (10th Cir. 2012) (citing *United States v. Battle*, 289 F.3d 661, 669 (10th Cir. 2002)).  To satisfy this standard, "the error must (1) be an actual error that was forfeited; (2) be plain or obvious ...; (3) affect substantial rights ....[; and] (4) ... seriously affect[ ] the fairness, integrity, or public reputation of judicial proceedings." *United States v. Edgar*, 348 F.3d 867, 871 (10th Cir. 2003).

In its opinion, the Tenth Circuit assumed that Mr. Worku could satisfy the first three prongs of the plain error test and addressed the merits of only the fourth prong – whether the error seriously affected the fairness, integrity, or public reputation of judicial proceedings.  In finding that Mr. Worku could not satisfy this prong, the Tenth Circuit held, in pertinent part:

> If the jury instruction for Count 3 had been narrowed to false statements in the form for permanent residence, we know that the jury would have found Mr. Worku guilty of lying in two different documents, constituting two separate acts. In both forms, the defendant stated under oath that his name was "Habteab Berhu Temanu." **But the defendant never denied** that he had used a false name on both forms.
>
> **Without any dispute on this fact**, the jury found that Worku had used a false name.

*Worku*, 800 F.3d at 1199 (emphasis added).  In short, the Tenth Circuit's findings are based on Mr. Worku's failure to testify and failure to prove his innocence.

One of the cornerstones of the U.S. Constitution is the freedom of a defendant in a criminal trial to remain silent "unless he chooses to speak in the unfettered exercise of his own will." U.S. Const. Amend. 5; *Carter v. Kentucky*, 450 U.S. 288, 305 (1981); *Malloy v. Hogan*, 378 U.S. 1, 8 (1964). The U.S. Constitution further guarantees that no adverse inferences are to be drawn from the exercise of that privilege. *See, e.g.*, *Griffin v. California*, 380 U.S. 609 (1965). Likewise, "[d]ue process commands that no man shall lose his liberty unless the Government has borne the burden of convincing the factfinder of his guilt" beyond a reasonable doubt. *See, e.g.*, *Speiser v. Randall*, 357 U.S. 513, 526 (1958); *In re Winship*, 397 U.S. 358, 364 (1970). It is never the defendant's burden to prove his or her innocence. *See Winship,* 397 U.S. at 364.

Indeed, suggesting a defendant's guilt based on his failure to testify or present a defense to a jury at trial is routinely held as an impermissible penalty for exercising a constitutional right. *See, e.g., United States v. Simpson*, 7 F.3d 186, 189 (10th Cir. 1993) (citing *United States v. Nolan*, 416 F.2d 588, 594 (10th Cir. 1969) ("It is axiomatic that comment upon a defendant's failure to testify violates the defendant's Fifth Amendment rights against self-incrimination."); *Runnels v. Hess*, 653 F.2d 1359, 1361 (10th Cir. 1981) (citing *Knowles v. United States*, 224 F.2d 168, 170 (10th Cir. 1955)) (Prosecutorial comment upon a failure to testify constitutes reversible error if it was "manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.").

The same rationale applies here. The Tenth Circuit upheld Mr. Worku's conviction which otherwise could have been invalidated on double jeopardy grounds, based on his failure to testify and/or prove his innocence. His Fifth Amendment right against self-incrimination was impermissibly infringed upon and the burden of proof was improperly shifted to Mr. Worku. As

such, the Court should consider Mr. Worku's claim applying the correct analysis, and for the reasons stated above, the convictions under both counts cannot stand. Because Mr. Worku was sentenced to ten years imprisonment for each count, running consecutively, he is suffering actual prejudice from this constitutional violation.

**C.     CLAIM TWO:  Mr. Worku was Deprived of his Due Process Rights under the Fifth Amendment**

**1.     Introduction**

Mr. Worku moved to suppress the photo arrays that were used by agents with witnesses to obtain witness photo identifications that would be the basis for alleging that Mr. Worku was really Kefelegn Alemu and had actually participated in torture in the Higher 15 prison in Ethiopia for a period of time in the 1970s. The arguments in his motion and hearing were based on established factors for ascertaining reliability of witness photo identifications. And it was beyond dispute that these witnesses had not seen Kefelegn Alemu since their detention in the Higher 15 prison, more than thirty-five years prior. The Court of Appeals called the time gap "extraordinary," offering no precedent for either the Tenth Circuit or the Supreme Court in terms of the impact on the reliability of the identifications. So, the Court announced a new standard to assess reliability, namely one of "extraordinary circumstances," without any roots in Tenth Circuit or Supreme Court case law, and obviously without notice to Mr. Worku. The Court then evaluated the identifications in that light after Mr. Worku had already been to trial and was powerless to ascertain the scope of the new standard and argue as to why it was not met. Doing so was a violation of Mr. Worku's due process, a constitutional deprivation suitable for remedy under 28 U.S.C. § 2255.

### 2.      Relevant Facts

As noted above, Mr. Worku was convicted of violating 18 U.S.C. §§ 1425(a) and (b), 1028A(a)(1) and 1546(a).  None of these statutes required identification of Mr. Worku as a war criminal for conviction.  However, the Government sought to introduce evidence through witness identifications that Mr. Worku had been involved in violence and human rights violations in a prison in Ethiopia in the 1970s.  As part of the investigation, agents used four photo arrays from which the five Higher 15 Witnesses made an identification.  Three of the arrays contained six photographs, and the fourth contained twelve.  (Tr. Exhs. 27, 41, 43, 44.)  The photographs used in all four photo arrays were selected by Agent Jeffrey Lembke from the Denver Homeland Security Investigations office.  (Mot. Hear., Dkt. # 94, ROA pp. 34:19-21, 43:20-25.)

Prior to trial, Mr. Worku moved to suppress the photo arrays and any resulting in-court identification as impermissibly suggestive and a violation of Fifth Amendment due process.  (Dkt. # 24, ROA p. 35.) The photographs selected by Agent Lembke contained significant differences between the "control group" photos and Mr. Worku's photo.   Moreover, the agents who administered the photo array interviews to the witnesses failed to follow protocol that would have admonished the witnesses with important warnings to help prevent misidentification.  (Mot. Hear., Dkt. # 94, ROA pp. 65:21-24, 79:22-80:7, 82:14-18, 91:14-20, 95:21-25, 100:20-101:15, 115:1-4, 21-22.)

Mr. Worku argued that these problems were a violation of due process because the photos used and manner of presentation made the arrays unduly suggestive.  These witnesses had not seen Kefelegn Alemu in more than thirty-five years, and they ultimately testified that their sightings were in poor lighting and other challenging conditions. (10/8/13 Trial Tr., Dkt. # 133, ROA pp. 190:5-16,

191:10-16, 192:12-17, 203:1-205:4; 10/9/13 Trial Tr., Dkt. # 134, ROA pp. 531:13-14, 532:2-6, 573:11-12, 615:10-11, 619:16-18; 10/10/13 Trial Tr., Dkt. # 135, ROA pp. 657:4-5, 658:10, 754:21-23.)  Kiflu's identification, as explained above, came after being told that the person he saw at the bar was Kefelegn Alemu; there was no evidence of him independently identifying Mr. Worku as that man.  There was also evidence suggesting that the witnesses may have had communications with each other prior to making those identifications, either directly or through possible mutual acquaintances.  (*See, e.g.*, 10/9/13 Trial Tr., Dkt. # 134, ROA pp. 494:21-495:6; Mot. Hear., Dkt. # 94, ROA p. 92:17-23; 10/10/13 Trial Tr., Dkt. # 135, ROA 681:3-7, 759:23-760:5.)

The court denied the motion to suppress. (Mot. Hear., Dkt. # 94, ROA p. 120:13.)  The court held that there simply were no other photos available to add to the photo array that met the parameters of a 65-year-old Ethiopian with hair.  The court also held that even though there had been a significant lapse of time between the original observations and later identification, the "accuracy of the identification substantially outweighs the circumstance – the time lapse because of the length and circumstances and intensity of the original exposures to this defendant."  (*Id*. p. 122:2-6.)  The photo arrays were then introduced as Exhibits at trial and used by the five Higher 15 Witnesses to allegedly identify Mr. Worku as Kefelegn Alemu.  Based on these identifications, the court found that the statutory maximum of 10 years running consecutively on the violations of 18 U.S.C. §§ 1425(a) and (b) and 1546(a) was appropriate.

On appeal, Mr. Worku argued that his sentence violated due process because it was based primarily on these identifications, which did not satisfy the multi-factor test articulated under *Neil v. Biggers*.  The Court of Appeals rejected his argument, stating:

The time gap is extraordinary. Neither our court nor the Supreme Court has confronted the reliability of identification 30+ years after the witness's last viewing of the suspect. But the circumstances supporting reliability are also extraordinary: The five witnesses saw the torturer virtually every day for many months, and four of the witnesses were victims of his horrific acts. The district court determined that this combination of extraordinary circumstances rendered the identifications reliable. We agree.

*Worku*, 800 F.3d at 1206.

This was the first time Mr. Worku had been informed that an "extraordinary circumstances" test could supplant the well-settled *Neil v. Biggers* factors, or that the identifications themselves could be used to bootstrap a decades-long gap between prior exposure and later identification.

### 3.      Legal Standard

A prisoner in federal custody may move the district court, pursuant to 28 U.S.C. § 2255, to vacate, set aside, or correct his sentence where "the sentence was imposed in violation of the Constitution or the laws of the United States . . . or that the sentence . . . is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). A criminal defendant has due process protections in the sentencing process as well. "Some 'after-the-offense enlargement of the contours of the crime or maximum sentence by judicial construction' may be 'so surprising and troubling' as to implicate the due process protections of the Fifth Amendment." *United States v. Waseta*, 647 F.3d 980, 985 (10th Cir. 2011) (*citing United States v. Lata*, 415 F.3d 107, 110-11 (1st Cir. 2005)). Such a due process violation occurs when a change in law disadvantages a defendant. *See United States v. Brittain*, 931 F.2d 1413, 1417 (10th Cir. 1991).

While generally issues resolved on direct appeal will not be considered on a 28 U.S.C. § 2255 motion, that practice does not apply where the issue could not have been fairly presented on

direct appeal, such as when there is an intervening change in law of a circuit. *See United States v. Prichard*, 875 F.2d 789, 791 (10th Cir. 1989).

Courts use a two-step inquiry based on *Neil v. Biggers* when evaluating the propriety of a photo array, whereby, a conviction based on eye-witness identifications at trial following a pre-trial identification will be set aside if: (1) the photo array was impermissibly suggestive; and (2) the identification was not reliable under the totality of the circumstances. *See Grubbs v. Hannigan*, 982 F.2d 1483, 1489-90 (10th Cir. 1993) (citing *Neil v. Biggers*, 409 U.S. 188 (1972), other citations omitted.).

This Circuit, up until Mr. Worku's direct appeal, adhered to the factors set forth in *Neil v. Biggers* for evaluating whether the identification was not reliable under the totality of the circumstances. "[The factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Biggers*, 409 U.S. at 199–200.

### 4.    Discussion

When Mr. Worku moved to suppress the photo arrays and subsequent identifications, he addressed the well-settled *Neil v. Biggers* factors.  (Dkt. # 24, ROA, pp. 36-37.)  The suppression hearing featured Agent Lembke and other Government agents who had conducted the photo arrays and interviewed witnesses, but did not feature witness testimony.  (Dkt. 94.)  The Government agents testified inconclusively about the number of times the eye witnesses had allegedly seen Kefelegn Alemu while they were in prison.  Agent Tarantino testified that he had interviewed Mr.

Sibhat first, but the Agent could not recall if Mr. Sibhat had told him how frequently he had seen Kefelegn Alemu.  (Mot. Hear., Dkt. # 94, ROA p. 96:19-22, p. 99:7-19.)  Likewise, Agent Cortez testified that Ms. Demissee had recited an incident in a "torture room," but did not tell the Agent how long she had been in that room.  (*Id*. p. 113:11-18.)  Agent Tarantino testified that Mr. Darge had told him about an incident in which Kefelgne Alemu had participated in torture, and recites "repeated contact" over a nine month period, but does not state how often Mr. Darge had seen Alemu.  (*Id*. p. 94:15-95:16.)

Mr. Worku was not placed on notice that the identifications would be deemed constitutional if a court determined that there were "extraordinary circumstances" surrounding the identification, even if the length of time between observation and identification was more than 30 years.  Although the testimony of agents at the suppression hearing noted what they had learned from eye witnesses who had been at the Higher 15 prison, there was no cross examination regarding any "extraordinary circumstances" standard, because none had been articulated.  The Court of Appeals then relied on eye witness trial testimony about their experience at the Higher 15 prison to decide that the extraordinary circumstances were that "[t]he five witnesses saw the torturer virtually every day for many months, and four of the witnesses were victims of his horrific acts."  Specifically, the Court of Appeals held that each eye witness "described seeing Mr. Worku in circumstances that would have heightened their attention."  *Worku*, 800 F.3d at 1205.

But when Mr. Worku had moved to suppress the photo arrays and identifications made based on the photo arrays, he had no notice that the court would ultimately apply an "extraordinary circumstances" test.  Indeed, none of the five witnesses even testified at the suppression hearing, and thus could not be cross-examined at that time on either the *Biggers* factors or any "extraordinary

circumstances." Mr. Worku had no notice that the five witnesses' trial testimony could then be used to bootstrap the admission of the photo arrays and identifications, as they could simply testify to the circumstances of their prison detention and torture in order to create the very basis to supplant the usual factors of reliability, such as length of time between the wrongful action and the photo array.

This change of law was certainly to the disadvantage of Mr. Worku, *see United States v. Brittain*, 931 F.2d 1413, 1417 (10th Cir. 1991), as he did not have notice that he could and should have obtained expert testimony that could have dissuaded a court from applying an "extraordinary circumstances" test at all. Courts have recognized the importance of expert testimony on studies showing "a weak correlation between witness confidence and reliability of identification." *People v. Campbell*, 847 P.2d 228, 233 (Colo. App. 1992) (holding that trial court committed reversible error by excluding expert testimony). Such an expert may testify that "contrary to average juror expectations, stress actually decreases rather than increases accuracy of perception, with subsequent distortion of recall," and "that the presence of a gun or other weapon does not consciously assist but rather tends to distract a witness such that it could impair his or her memory, again contrary to the average juror expectations." *Id. See also Minor v. United States*, 57 A.3d 406, 414 (D.C. 2012) (expert could testify about the impact of severe stress, exposure-duration, the relative violence of the incident on accuracy of eye witness identifications); *Jones v. State*, 197 So. 3d 1085, 1091 (Fla. Dist. Ct. App. 2015) (trial court abused its discretion by not allowing expert testimony on stress, the tendency to confuse a suspect with someone the witness has seen before, and the presence of weapons on the accuracy of identification); *People v. Lerma*, 19 N.E.3d 95, 105, aff'd, 47 N.E.3d 985 (in holding that trial court should have allowed expert testimony on eyewitness identification, "courts in Illinois and around the country have recognized that scientific studies have shown

significant errors in eyewitness identifications and that the public have misconceptions of eyewitness identification").

With notice of the standards that would be applied, such expert testimony would have been relevant to both the motion to suppress and the subsequent trial testimony based on the initial photo arrays, because none of those five witnesses testified that they had seen Kefelgne Alemu during the intervening years from the mid-1970s to the point of identifying him beginning in 2012. Recognizing that the "time gap is extraordinary" (*Worku*, 800 F.3d at 1206), the Tenth Circuit Court of Appeals gave great weight to the fact that four of the five witnesses testified that they had been tortured by Mr. Worku, identifying a gun and other weapons. *Id.* at 1206. The Court recounted the testimony of these witnesses indicating how stressful the circumstances were. *Id*. at 1206-07. These are precisely the types of circumstances that actually can reduce reliability of identification according to many experts, but Mr. Worku had no notice that witness testimony about such circumstances would be dispositive, and effectively supplant the usual factors applied to photo arrays or line-ups.

Because the identifications were the principal basis for the court's 22-year sentence – untethered to the Sentencing Guidelines range of a maximum of 3-years if running consecutively -- and yet were also based on a surprise new legal standard for assessing the reliability of the photo identifications that permitted the later in-court testimony, Mr. Worku's due process rights were violated.  *See Waseta*, 647 F.3d at 985; *Brittain*, 931 F.2d at 1417.

**D.     CLAIM THREE:  Mr. Worku's Trial Attorney Provided Ineffective Assistance of Counsel Under the Sixth Amendment**

**1.     Introduction**

It is axiomatic that a defendant in a criminal trial is entitled to a fair trial.  "The right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution' to which they are entitled. . . . For that reason, the Court has recognized that 'the right to counsel is the right to the effective assistance of counsel.'" *Strickland v. Washington*, 466 U.S. 668, 685 (1984).

Looking at the totality of the circumstances (*id*. at 688), it is clear that Mr. Worku received ineffective assistance from his appointed trial counsel.  First, trial counsel failed to conduct an adequate investigation into the Government's five witnesses who testified at length about torture they endured while at the Higher 15 prison and who, thirty-five years later, identified Mr. Worku as a guard at the prison who allegedly was responsible for repeated acts of torture and violence.  Second, trial counsel failed to provide a reasonable defense through effective cross-examination and the presentation of expert witnesses, both of which would have discredited the identifications made by the Higher 15 Witnesses and another witness, Mr. Wolde.  Third, trial counsel's assistance was also deficient because he failed to object to the jury instructions and the prosecutor's closing arguments, which resulted in Mr. Worku being convicted and sentenced twice for the same conduct in violation of the Double Jeopardy Clause of the Fifth Amendment.  This failure to object resulted in Mr. Worku having to meet a higher burden during his direct appeal – plain error – which, as discussed above, led the Court of Appeals to improperly shift the burden to Mr. Worku in violation of his rights

against self-incrimination.  Finally, after the trial court made several statements on the record evidencing that it was no longer impartial, particularly with respect to the trial judge's early pronouncement, without even having heard any of the relevant evidence, of an intention to impose the harshest sentence available, trial counsel failed to move to recuse the trial judge.  The trial judge's bias led to numerous, erroneous and prejudicial rulings both during trial and during sentencing, culminating in the trial court sentencing Mr. Worku to twenty-two years in prison based on the erroneous conclusion that Mr. Worku had made false statements on immigration documents in order to "conceal" human rights violations.

Each of these deficiencies in and of themselves is sufficient to demonstrate a significant prejudice to Mr. Worku, such that he was denied the fair trial to which he was constitutionally entitled.  Taken together, and viewing the totality of the circumstances, that prejudice is even more apparent.

### 2.       Relevant Facts

The ineffective assistance of counsel received by Mr. Worku resulted in a trial that should have been about immigration fraud and identity theft, but ended up being focused on torture that took place at the Higher 15 prison more than thirty-five years earlier.  The facts set forth in the background section above provide a summary of how that result came about.  Additional facts supporting each of the claims of ineffective assistance of counsel are discussed in more depth below.

### 3.       Legal Standard

Under the Sixth Amendment, "an accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair."  *Strickland*, 466

U.S. at 685.  A defendant can be deprived of his right to effective assistance, "simply by [counsel] failing to render 'adequate legal assistance.'"  *Id.* at 686.

A claim for ineffective assistance of counsel involves a two-part showing.  First, the defendant must show that counsel's performance was deficient.  "In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances."  *Id.* at 688.  A court looks to "prevailing professional norms" to determine whether counsel's performance was reasonable.  *Id.* 688.  Standards issued by the American Bar Association and other similar bodies are utilized by courts to help guide what is reasonable.  *See, e.g.*, *id.* at 688; *see also Rompilla v. Beard*, 545 U.S. 374, 385-88 (2005) (relying on Standard 4-4.1 as a guide to determining what is reasonable in assessing whether counsel's investigation met the requirements of the Sixth Amendment); *United States v. Blaylock*, 20 F. 3d 1458, 1466 (9th Cir. 1994) ("[U]nder the *Strickland* test, a court deciding whether an attorney's performance fell below reasonable professional standards can look to the ABA standards for guidance.").

One of the most vital functions of a criminal defense attorney is to conduct an adequate investigation of the facts underlying a case.  The "Sixth Amendment imposes on counsel a duty to investigate, because reasonably effective assistance must be based on professional decisions and informed legal choices can be made only after investigation of options."  *Elmore v. Ozmint*, 661 F.3d 783, 858 (4th Cir. 2011) (remanding with direction to grant habeas relief or new trial due to trial counsel's failure to investigate); *see also Strickland*, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.").

Recognizing this duty, the American Bar Association's Standards for Criminal Justice and the Defense Function states that:

> Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction.  The investigation should include efforts to secure information in the possession of the prosecution and law enforcement authorities.  The duty to investigate exists regardless of the accused's admissions or statements to defense counsel of facts constituting guilt or the accused's states desire to plead guilty.

ABA Criminal Justice Section Standards, Defense Function ("ABA Criminal Justice Standards"), Standard 4-4.1(a) ("Duty to Investigate"), *available at*: http://www.americanbar.org/publications/ criminal_justice_section_archive/crimjust_standards_dfunc_toc.html.

Likewise, an attorney has an obligation to competently and diligently represent a client and to engage in "prompt action to protect the accused."  (*See* ABA Model Rules of Professional Conduct 1.1 and 1.3 ("Competence" and "Diligence"), *available at* http://www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_profess ional_conduct/model_rules _of_professional_conduct_table_of_contents.html;   ABA Criminal Justice Standards, Standard 4-3.6.)  It is also a basic duty of defense counsel to "serve as the accused's counselor and advocate with courage and devotion and to render effective, quality representation."  (ABA Criminal Justice Standards, Defense Function, Standard 4-1.2(b); *see also* 28 U.S.C. § 455 (judge shall be disqualified where "his impartiality might be reasonably questioned"); 28 U.S.C. § 144 (addressing bias or prejudice of a judge).)

Under prevailing norms, cases may also "arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence."  *See, e.g., Hinton v. Alabama*, 134 S.Ct. 1081, 1088 (2014) (failure to request additional funding to retain an

expert was ineffective assistance of counsel); *U.S. v. Becker*, 109 Fed.Appx. 264, 269-70 (10th Cir. 2004) (defendant sufficiently alleged possible ineffective assistance of counsel due to counsel's failure to investigate or present expert that could dispute evidence relied on in determining length of sentence, explaining "any amount of additional actual jail time has Sixth Amendment significance," thus entitling defendant to evidentiary hearing on his claims).

The second prong of an ineffective assistance of counsel claim requires showing "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. This means that any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution. *Id*. at 692. However, a defendant "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id*. at 693. Rather, the test is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.[9] "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. . . Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture . . . ." *Id*. at 695-96. In the end, "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Id*. at 696.

---

[9] *See Strickland* 466 U.S. at 695 ("The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision").

4.      **Discussion**

      a.      ***Trial counsel's performance was deficient for failing to investigate the connection between the Government's Higher 15 Witnesses.***

As discussed above, the investigation into Mr. Worku began after Samuel Ketema heard "rumors" that Kefelegn Alemu was in Denver using the name Tufa.  (10/8/13 Trial Tr., Dkt. # 133, ROA p. 218:5-7.)  Samuel went to the Cozy Bar, found the only man in the bar old enough to potentially be Kefelegn Alemu and called Kiflu to inform him that he had found the man.  (*Id.*, pp. 219:12-18.)  When Kiflu arrived at the bar, it did not matter what Mr. Worku looked like – Kiflu had already decided that the person his brother had seen was Kefelgn Alemu.

During Kiflu's interview with Agent Lembke, Kiflu provided the names of two other witnesses, including Nesibu Sibhat, who also testified at Mr. Worku's trial and with whom Kiflu had been in recent contact.  (10/02/13 Mot. Hear. Tr., Dkt. # 94, ROA p. 43:12-16; *see also* Government Case Initiation / Background Information Report, attached hereto as **Exhibit 5** (noting that the other witnesses who provide agents with information about "a hundred" others they knew from the prison).)  The Government's Background Information Report also notes that Kiflu was providing information about what "he and the others" had heard, further implying repeated contact between the witnesses.  (*See id.*)  Kiflu also provided agents with information regarding another witness, Kinfe Wolde, who ended up testifying that Kefelegn Alemu had been his prison cell mate and confessed to killing or torturing more than 150 people, and identified Mr. Worku as that person.  (*Id.*)

Mr. Sibhat, whose name agent received from Kiflu, then provided agents with the name of yet another witness, Berhan Dargie.  (*Id.* at 92:16-23.)  Another witness, Mr. Feleke, heard from "a friend" that there was going to be a case involving Kefelgne Alemu.  (10/10/13 Trial Tr., Dkt. #135,

35

ROA pp. 680:25-681:11.)  With Ms. Demissie, during trial she tried to explain that she heard about the case after talking to her brother and called the investigating officers in order to offer her assistance as a witness, but trial counsel for Mr. Worku interrupted her.  (10/10/13 Trial Tr., Dkt. #135, ROA p 760:2-13.)

The record suggests that at least some of the witnesses had been in contact with each other, while others had talked with other individuals who had conveyed information regarding a "case involving" Kefelegn Alemu, both of which likely impacted their subsequent identifications.  (*See, e.g.*, 10/9/13 Trial Tr., Dkt. #134, ROA p. 495:1-5 (Agent Lembke testifying that his notes reflect that Kiflu had been in recent contact with the witnesses whose names he had provided).)  But this was never adequately investigated.  Their stories also involved rumors from unidentified individuals and/or conversations with undisclosed friends about the case prior to them selecting Mr. Worku's photograph from the photo array.  Mr. Worku's trial counsel failed to fully and adequately investigate the connection between the witnesses, including the sharing of information directly between them or through mutual acquaintances.

That no proper investigation occurred is apparent from the record.[10]  First, during trial, trial counsel began his cross examinations of each of the Higher 15 witnesses by introducing himself and stating on the record that he had never met or spoken to any of the witnesses.  (10/8/13 Trial Tr., Dkt.

---

[10] During his direct appeal, Mr. Worku argued that the witnesses had likely shared information about Mr. Worku's current appearance and/or the photograph of Mr. Worku in the photo array, before they viewed the photo arrays.  The Court of Appeals, however, found that this argument was based on speculation and there "was no evidence" in the record supporting that conclusion.  *Worku*, 800 F.3d at 1206.  The reason there was not better evidence in the record on this question is because trial counsel failed to conduct an adequate investigation that would likely have yielded information that could have been used to cross-examine these witnesses at trial.

# 133, ROA p. 169:20-25; 10/9/13 Trial Tr., Dkt. # 134, ROA p. 611:17-23; 10/10/13 Trial Tr., Dkt.

#135, ROA pp. 666:1-9, 742:4-8.)

He asked one witnesses if he had spoken directly to Kiflu, to which he responded no. (10/10/13 Trial Tr., Dkt. # 135, ROA p. 681:5-13 (inquiring into Feleke's testimony that he heard about the case from a "friend" by only asking if Kiflu was that friend and nothing more.)

Similarly he asked Ms. Demissie whether she had spoken to any other witness, but never followed up on how she became involved, including who else she or her brother had spoken to.  In fact, after she said she did not speak to another witness, she began to continue answering the question and trial counsel again cut her off.  (*Id.*, p. 759:4-9.)  Had he conducted a proper investigation into this issue, he either would have known not to ask the question to avoid unhelpful testimony, or he would have cross-examined these witnesses to elicit evidence regarding who they did speak to or evidence demonstrating that their testimony was false.  The cross-examination of these witnesses focused entirely on the conditions under which they saw Kefelegn Alemu back in the 1970s, and there were no other efforts to impeach these witnesses or their subsequent in-court identifications.  (*See also infra* Section V.D.3.b.)

In addition to the connections between the witnesses, there were numerous other unknown individuals who apparently provided information regarding Mr. Worku's case to the witnesses. There is no evidence that there was any investigation into how each witness became involved, the identity of those unidentified individuals, the likely links between the witnesses, or other crucial information with which they could be impeached.  Trial counsel also never put an investigator on the stand to provide testimony that would rebut the testimony provided by the Higher 15 Witnesses or would have otherwise impeached the reliability of their testimony.  Nor is there any evidence that he

ever had an investigator speak with these witnesses or others connected to them about these possible connections.  If he had, after stating on the record that he had never met them, it is only reasonable to conclude that he would have followed up with something along the lines of "But you spoke with my investigator, correct?"  And if he had sent an investigator to speak to them and they had refused, an attorney providing effective counsel would have impeached the witnesses with their refusal (and brought up the refusal during closing arguments).[11]

Review of trial counsel's case file also revealed no evidence of an investigation into the Higher 15 Witnesses, particularly with respect to the sharing and receipt of information.  Trial counsel's notes further demonstrate that he had no intention of fully investigating the claims being made by the Higher 15 Witnesses in order to be able to present a reasonable defense to the charges and he appears to have told Mr. Worku that it was unnecessary to try to contest their allegations at trial.  (*See* Counsel Notes, attached hereto as **Exhibit 6**.)  But this was an unreasonable strategy in light of the trial court's pre-trial rulings and statements making it clear that the torture allegations were going to be front and center in this case and in light of the fact that the jury was charged with determining whether Mr. Worku had made a false statement when he answered "no" to the question of whether he had ever persecuted (either directly or indirectly) any person because of race, religion, national origin, membership in a particular social group, or political opinion.  Trial counsel's failure to conduct an adequate investigation violated the professional norms and standards for defense

---

[11] Trial counsel's file suggests that his investigator did try to interview one of the witnesses, Berhan Dargie, who only answered a few questions in response to his description of Kefelegn Alemu.  But Dargie's refusal to speak more fully to the investigator, after he had openly spoken to HSI investigators, was never brought up in front of the jury to show his potential bias.  And there is no evidence that his connection with Mr. Sibhat was ever inquired into through Mr. Sibhat or anyone else.

counsel and constitutes a deficient performance that was unreasonable under the circumstances. *Strickland*, 466 U.S. at 688; ABA Criminal Justice Standards, Standards 4-1.2 and 4-4.1; ABA Model Rules of Professional Conduct 1.1 and 1.3.

This inadequate investigation deprived Mr. Worku of a fair trial, and was so prejudicial that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 693. The Higher 15 Witnesses, despite stating that they were "certain" that Mr. Worku is really Kefelegn Alemu, had not seen this individual for more than 35 years – a longer time period than any other case addressing the reliability of witness identifications confronted by the Supreme Court or the Tenth Circuit. *See Worku*, 800 F.3d at 1206. The conditions under which they saw that individual were dark and difficult and they provided contradictory descriptions of Kefelegn Alemu. For example, Mr. Sibhat and Mr. Feleke describe the person from Higher 15 as always having facial hair, while Kiflu and Mr. Dargie stated that he never did. (Compare 10/8/13 Trial Tr., Dkt. # 133, ROA p. 189:2:16 [Kiflu] and 10/9/13 Trial Tr., Dkt. # 134, ROA p. 577:11-19 [Dargie] with *id*. p. 621:10-13 [Sibhat] and 10/10/13 Trial Tr., Dkt. # 135, ROA p. 672:3-15 [Feleke].) If there had been evidence elicited by trial counsel showing that none of the witnesses had independently identified Mr. Worku as Kefelegn Alemu, there is a reasonable probability that the jury would have found that Mr. Worku had not made a false statement when he answered no to the question of whether he had ever "persecuted (either directly or indirectly) any person because of race, religion, national origin, membership in a particular social group, or political opinion." (Special Interrogatories, Dkt. # 110-1, ROA p. 327). And there is a reasonable probability that the enhanced sentence handed out to Mr. Worku, based on the trial court's conclusion that Mr. Worku made false statements to "conceal" human rights violations, also would have been different.

   **b.**     ***Trial counsel's performance was deficient for failing to point out numerous inaccuracies in the witnesses' testimony and/or otherwise present an adequate defense.***

Kiflu testified about the violence between the Derg (the political party with which the witnesses allege Mr. Worku was affiliated) and the EPRP  (the political party the Higher 15 Witnesses were all affiliated with).  During his testimony, he stated that the EPRP did not have political prisons.  (10/8/13 Trial Tr., Dkt. # 133, ROA p. 212:13-19.)  Proper cross-examination and a reasonable defense would have questioned the witnesses about their political affiliations and dislike of or biases against presumed members of the Derg (prejudices that remain to this day).  An adequate defense in rebuttal would have also considered putting on evidence to show that the statement that the EPRP never imprisoned its opponents was false.  *See Abusing Self-Determination and Democracy: How the TPLF is Looting Ethiopia*, Matthew J. McCracken, 36 Case W. Res. J. Int'l L. 183, 191 (2004).  These types of inquiries would have called into question the bias of these EPRP members.  Instead, trial counsel did not cross-examine the Higher 15 Witnesses on numerous basis for which their veracity would have been questioned.

During trial, trial counsel also failed to reasonably cross-examine the Higher 15 Witnesses regarding prior sworn statements.  For example, as part of the discovery process, trial counsel received copies of the asylum applications that had been previously submitted by a number of the Higher 15 Witnesses.  These applications, in which the individuals applying for asylum swore to tell the truth, apparently contained different versions of the events they testified to during trial.  And yet, no cross-examination was made into these inconsistencies in an attempt to discredit these witnesses.  In his application, for example, Mr. Feleke stated that he was arrested in December 1977 from his home.  (5/24/14 Email from Mr. Worku to trial counsel, attached hereto as **Exhibit 7**.)  During trial

he testified that he was arrested in January 1978[12] from his sister's home.  (10/10/13 Trial Tr., Dkt. #

135, ROA p. 649:15-16, 650:13-14; *see also* Exhibit 7 (discussing other possible discrepancies

involving witnesses' testimony).)  In Mr. Dargie's asylum application, he identified two individuals

"responsible for [his] detention, torture and arrest" – Sahlu Wolde Giorgis and Solomon Gebre.

(Declaration of Berhan Dargie in support of asylum application, attached hereto as **Exhibit 8**, ¶ 4.)

Kefelegn Alemu is not identified anywhere in the application.  (*See id*.)  Trial counsel never cross-

examined Mr. Dargie about this inconsistency.

Similarly, the Government put on testimony from another individual named Kinfe Wolde

who allegedly spent time in a prison facility around 1980 or 1981 in Ethiopia with Kefelgn Alemu.

Mr. Wolde testified that Kefelegn Alemu had told him that he had tortured or killed many people.

(10/10/13 Trial Tr., Dkt. # 135, ROA p. 570:17-20.)  He identified Mr. Worku as that person he had

met more than thirty years earlier, when Kefelegn Alemu was in his early thirties, and whom he

hadn't seen since.  Mr. Worku informed his trial attorney that Mr. Wolde was the brother of one of

his good friends here in the United States and that he believed Mr. Wolde may have seen him around

town, including at the gas station owned by Mr. Wolde's brother.[13]  Despite this information, trial

counsel never questioned Mr. Wolde about this connection or his possible unconscious transference.

*See, e.g., Jones*, 197 So.3d at 1091 (expert should have been permitted to testify that violent and

stressful circumstances reduce the reliability of witness identification and that through unconscious

---

[12] During his interview with the investigating agents he told them he had been arrested in November
1978.

[13] Mr. Worku had not known Mr. Wolde's brother in Ethiopia, so they first became friends in
Colorado.

transference a person can confuse the actual culprit with someone they had seen before, but with whom they are not familiar).

The failures discussed above severely prejudiced Mr. Worku.  Because trial counsel only put on two character witnesses, both of whom had known Mr. Worku for only a few short years, the failure to investigate and fully cross-examine the Higher 15 Witnesses and Mr. Wolde left their testimony effectively unchallenged.  As discussed above, the testimony of the Higher 15 Witnesses, as well as Mr. Wolde's subsequent identification, had a substantial impact on both the jury's responses to the special interrogatories and the trial court's significantly enhanced and unreasonable sentence.  Thus, there is more than a reasonable probability that questioning the reliability of their testimony would have resulted in a different outcome for Mr. Worku.

> **c.**     ***Trial counsel's performance was deficient for failing to present expert testimony that would have discredited the reliability of identifications 30+ years later under the conditions at issue.***

In addition to and/or in the alternative to the argument that there was an unconstitutional change in photo identification standards that prejudiced Mr. Worku, Mr. Worku suffered from ineffective assistance of counsel from his trial counsel's failure to obtain an expert who could have testified as to studies and research about the reliability of identifications and the circumstances that make that reliability questionable.

As a defense, trial counsel only put on two character witnesses.[14]  He never put on an investigator, nor did he present any sort of expert witness who also could have rebutted their

---

[14] These were individuals who have known Mr. Worku here in the United States for the last 5-7 years.  (10/10/13 Trial Tr., Dkt. # 135, ROA pp. 772: 20-21, 778:13-14.)  Their testimony was short and consisted of them stating that Mr. Worku is thought of as being peaceful and nice and that he had "helped" them out a few times.

testimony.  As noted above, expert testimony in other cases has pointed to studies showing "a weak correlation between witness confidence and reliability of identification."  *Campbell*, 847 P.2d at 233 (holding that trial court committed reversible error by excluding expert testimony).  Such an expert may testify that "contrary to average juror expectations, stress actually decreases rather than increases accuracy of perception, with subsequent distortion of recall," and "that the presence of a gun or other weapon does not consciously assist but rather tends to distract a witness such that it could impair his or her memory, again contrary to the average juror expectations."  *Id.  See also Minor*, 57 A.3d at 414 (expert could testify about the impact of severe stress, exposure-duration, the relative violence of the incident on accuracy of eye witness identifications); *Jones*, 197 So. 3d at 1091 (trial court abused its discretion by not allowing expert testimony on stress, the tendency to confuse a suspect with someone the witness has seen before, and the presence of weapons on the accuracy of identification); *Lerma*, 19 N.E.3d at 105 (in holding that trial court should have allowed expert testimony on eyewitness identification, "courts in Illinois and around the country have recognized that scientific studies have shown significant errors in eyewitness identifications and that the public have misconceptions of eyewitness identification").

In this case, the witnesses who had first identified Mr. Worku in a photo array and later testified at trial were asked questions by the prosecutor regarding how certain they were about these identifications.  Trial counsel for Mr. Worku needed to have presented an expert witness who could testify regarding research disputing that the level of confidence is even relevant to accuracy.  *See, e.g., Campbell*, 847 P.2d at 233.  The witnesses testified at trial about violent conditions, leading the Tenth Circuit to conclude that these conditions actually enhanced the likelihood of accuracy.  Trial counsel for Mr. Worku obviously needed to have expert testimony disputing that assumption, as

research shows that a person under violent or otherwise stressful circumstances is actually less likely to have an accurate identification.  *See e.g, id.; see also Minor*, 57 A.3d at 414.  And as to Mr. Wolde and other Denver-based witnesses, an expert could have testified regarding the concept of unconscious transference, which would suggest that these witnesses did not recognize Mr. Worku from Ethiopia but instead from his presence in the Ethiopian community and Ethiopian-frequented establishments in the Denver area.  See, e.g., *Jones*, 197 So. 3d at 1091.  Such testimony would have been vital to questioning the reliability of the testimony provided by the Higher 15 Witnesses and Mr. Wolde and the failure to present any such expert testimony was unreasonable.  *See, e.g*., *Hinton*, 134 S.Ct. at 1088; *Becker*, 109 Fed.Appx. at 269-70.

> **d.      *Trial counsel's performance was deficient for failing to object to the jury instructions and during closing arguments, resulting in Mr. Worku being convicted and sentenced for the same conduct twice, in violation of the Double Jeopardy Clause.***

As discussed in more detail above (*see supra* Section V.B), Mr. Worku's conviction and subsequent sentences related to Counts 1 and 3 were in violation of the Double Jeopardy Clause of the Fifth Amendment because the jury instructions and statements made by the prosecutor during closing arguments made it clear that the jury could convict on both counts if it found that Mr. Worku had made false statements on his N-400.  Trial counsel failed to object to the jury instructions and during closing arguments.  This failure constitutes unreasonable performance and resulted in Mr. Worku being convicted and sentenced for the same conduct (making false statements in connection with the N-400) twice in violation of the Double Jeopardy Clause.

Normally a Court of Appeals would have reviewed a double jeopardy claim *de novo*, without deference to the trial court's decision.  *See United States v. McAleer*, 138 F.3d 852, 855 (10th Cir.

1998).  But because Mr. Worku's counsel did not object below, the Court of Appeals applied plain

error review.  A defendant must then show that the trial court made an error that "is plain, that affects

substantial rights, and that seriously affects the fairness, integrity, or public reputation of judicial

proceedings."  *United States v. Burns*, 775 F.3d 1221, 1223 (10th Cir. 2014).  That required Mr.

Worku on appeal to show that the error was "clear and obvious under current law," and that "there is

a reasonable probability that the error affected the outcome of the proceedings."  *See id*. at 1223-24.

There also is Tenth Circuit precedent holding that the fourth prong of plain error review cannot be

met if there is "overwhelming and essentially uncontroverted evidence pertaining to the charged

crime,"  *United States v. Gonzalez Edeza*, 359 F.3d 1246, 1251 (10th Cir. 2004), which the Court

invoked in the appeal here.  Under the law of this Circuit, counsel's failure to preserve the issue for

appeal essentially rendered the double jeopardy issue unappealable.  As such, trial counsel's

performance fell below the prevailing professional norms and was deficient, which significantly

prejudiced Mr. Worku.

> **e.     *Trial counsel's performance was deficient for failing to move to recuse the trial judge after he demonstrated an inability to be impartial in sentencing Mr. Worku.***

Another fundamental aspect to a defendant's right to a fair trial under the Sixth Amendment

is that the trial judge be fair and impartial.  "As a general rule, recusal is required when 'a reasonable

person armed with the relevant facts would harbor doubts about the judge's impartiality.'"

*Dambman v. Long*, No. 09-cv-02167, 2009 WL 2983187, at *1 (D. Colo. Sept. 11, 2009) (order from

trial judge recusing himself from the case); *see also* 28 U.S.C. § 455 (a United States Judge shall be

disqualified "in any proceeding in which his impartiality might reasonably be questioned").

"Recusal is required 'where there is the appearance of bias, regardless of whether there is actual

bias. . . . If the issue of whether § 455 requires disqualification is a close one, the judge must be recused.'"   *United States v. Twitty*, No. 13-cr-0076, 2013 WL 5303488, at *1 (D. Colo. Sept. 20, 2013); *see also United States v. Franco-Guillen*, 196 Fed. Appx. 716, 718-19 (10th Cir. 2006) (reversing conviction where judge should have been recused after making statements on the record that created the appearance of bias against defendant); *In re Estate of Elliott*, 993 P.2d 474, 482 (Colo. 2000) (judge prejudged defendant's guilt when stating "[I]t's my belief that you may have stolen property from that estate, and we are going to recover that property," and "You are in an awful lot of trouble with me").

On July 11, 2013, a hearing was held before the Court to discuss the possibility of a plea change, letters received from Mr. Worku, and various other matters.  This hearing took place prior to the hearing on Mr. Worku's motion to suppress and Mr. Worku's trial.  Accordingly, the Court had not yet heard any evidence in this case.  Nevertheless, the trial judge made numerous statements on the record which created the appearance that the judge was biased against Mr. Worku and which called his ability to be impartial into question.

For example, the trial judge recited that he "would not be following the sentencing guidelines but, rather, would be sentencing under the general statute on sentencing, Title 18 United States Code Section 3553, which spells out exclusive criteria for sentencing." (7/11/13 Hearing Tr., Dkt. #55, ROA pp. 6:18-25).  The trial judge went on to explain that he would conceivably impose sentences to be "served consecutively" (which he ultimately did do) and that the sentence would not be based on some advisory guideline "which, in [his] view, never contemplated the kind of case which is presented here.  It simply – there is no rational basis to apply the guidelines in this kind of case." (*Id*. at 8:24-9:2.)  He also stated that "the sentence does not depend . . . on the guidelines at all.  Nor

does it – does the sentencing find its basis in the offense, itself." (*Id*. at 16:21-22.)  At another point in the hearing, the trial judge began to discuss his "concern" regarding this case given the significant number of Ethiopian people living in the Denver area.  (*Id*. at 11:16-20.)  Inexplicably, he spoke of friends he had in the Ethiopian community, things they had told him, that there was a Coptic Church in Denver, that he frequents Ethiopian restaurants, and "[s]o this is a matter, in other words, of public concern.  It's a significant part of the public." (*Id*. at 11:21-12:11.)

All of these statements, taken together, at a minimum, create doubts regarding the judge's ability to be impartial and create the appearance of bias against Mr. Worku.  It is clear that, despite the lack of any charge related to torture, murder, or human rights' violations and before hearing the evidence in the case and receiving the jury's verdict, the trial court had already decided that Mr. Worku was guilty not only for immigration fraud, but also for human rights violations, for which there was "no rational basis" to apply the sentencing guidelines, and that he was planning to give him the harshest penalty possible.  It is also clear that this case, despite the absence of any violent or human rights-related charges, was going to be about the alleged torture.  And that is exactly what happened.  After hearing these statements from the trial judge, trial counsel had an obligation to move to recuse the trial judge at that time.  He did not and Mr. Worku was severely prejudiced.

As a result of the failure to move to recuse, the trial judge's bias against Mr. Worku permeated its subsequent rulings during the motion's hearing on September 13, 2013, during trial, and at sentencing, substantially prejudicing Mr. Worku.  For example, the trial court denied Mr. Worku's motion to suppress the Higher 15 Witnesses' identifications made based on impermissibly suggestive photo arrays in violation of Mr. Worku's due process rights.  (Mot. Hear. Tr., Dkt. # 94, ROA p. 120:13; *see also supra* Section V.C.)  Thus, these witnesses all testified during trial, and two

of them testified against during the sentencing hearing, even though none of the testimony was relevant to whether Mr. Worku misidentified himself as the father of the Berhe family.

The trial judge also admitted into evidence a photograph of one of the witnesses' feet, showing scars from alleged torture encountered at the Higher 15 prison.  This photograph was unfairly prejudicial to Mr. Worku in violation of Federal Rule of Evidence 403 and was only introduced in order to try to inflame the jury.  The photograph lacked any probative value – whether the witness had ever been tortured was not a question in this case.  (10/9/13 Trial Tr., Dkt. #134, ROA p. 607:17-18.)

The trial judge also allowed cumulative testimony after two of the Higher 15 witnesses, and the brother of one of those individuals, had already testified about the events at Higher 15 and Mr. Worku's alleged identity as one of the prison guards there.  (*Id.*, p. 587:9-17.)  The trial judge overruled Mr. Worku's objection:

> Well, the motion is denied.  The identity has been the key denial in this case by the defense, and the question of the credibility of each and every witness identifying this defendant has been vigorously questioned.  So the jury could believe or not believe anyone or number of these witnesses, so I think the Government's fully justified in putting on more than one of these witnesses.

(*Id.*, p. 587:18-25.)  By the trial court's logic, there could never a basis for excluding evidence that results in "undue delay, wasting time, or needlessly presenting cumulative evidence."  F.R.E. 403.

That the trial judge was biased against Mr. Worku is further evidenced by not only this ruling, but the scope of those subsequent witnesses' testimony.  They spoke of the general violence in Ethiopia, just as the prior witnesses did.  They spoke of torture occurring at the prison in excessive detail, for the same time period covering the other witnesses' testimony.  Their testimony was not only about the torture they experienced, but the general torture and violence they witnessed,

including violence perpetrated by people other than the alleged prison guard known as Kefelgn Alemu.  This was unnecessarily cumulative, a waste of time, lacked any probative value, and the risk of unfair prejudice to Mr. Worku substantially outweighed any suggested benefit.  It also demonstrated that the trial judge had already decided that this was a war crimes / human rights violations trial, notwithstanding the lack of any such charges.  The trial judge's decision to let the additional witnesses testify displayed "a deep-seated . . . antagonism that would make fair judgment impossible."  *See Liteky v. United States*, 510 U.S. 540, 554-55 (1994).  Trial counsel should have again moved for the judge to be recused, but he unreasonably did not.  Had the trial judge been recused and an impartial judge had taken over, these rulings likely would not have been made and there is a reasonable probability that the jury would have answered the special interrogatories differently.

Moreover, there is also more than a reasonable probability that Mr. Worku would have ended up with a different sentence, in line with the recommendations set forth in the Sentencing Guidelines if his counsel had successfully moved to recuse the trial judge.  After the trial, Mr. Worku was sentenced by the same trial judge who presided over the pre-trial hearings and the trial.  The failure to seek recusal of the trial judge led to Mr. Worku's twenty-two year sentence, representing a 31-level increase to the Sentencing Guidelines.

It is clear that the trial court's bias impacted its decision that the sentencing guidelines should be wholly and arbitrarily ignored.  In fact, during sentencing, the trial judge again evidenced his clear personal opinion that Mr. Worku was to be sentenced for these alleged human rights violations as opposed to the crimes for which he had been convicted:

> The second thing I want, and this will come as no surprise, I think, to the attorneys in this case, I am not about to follow the guidelines in this case. I reject them. And I wish I could say that with greater emphasis, but I am limited in the words I use to describe *an offense of this nature* with a recommendation of zero to eight months imprisonment as anything other than fanciful and absurd.

(Vol. 6, Sentencing Hear., Dkt. # 155, ROA pp. 36:22-37:5 (emphasis added).) Mr. Worku was convicted only of making false statements on immigration documentation and of identity theft. But he was sentenced for allegedly having tortured people more than thirty-five years prior in a different country – charges which were never brought and with which he had no notice he would need to defend against.

Further, the trial court's pronouncement that the guidelines "never contemplated the kind of case which is presented here" is not supported by the record. While the 2010 Guidelines may not have expressly contemplated such circumstances, the 2012 amendments did. Those amendments provided that a sentence can be enhanced if "the defendant committed any part of the instant offense **to conceal** the defendant's membership in, or authority over, a military, parliamentary, or police organization that was involved in a serious human rights offense during the period in which the defendant was such a member or had such authority," U.S.S.G. § 2L2.2(b)(4)(A) (emphasis added), resulting in an offense level of 13. The 2012 amendments also add to the offense level upon the following findings: "[i]f the defendant committed any part of the instant offense to conceal the defendant's participation in (i) the offense of incitement to genocide, increase by 6 levels; or (ii) any other serious human rights offense, increase by 10 levels. If clause (ii) applies and the resulting offense level is less than level 25, increase to level 25." U.S.S.G. § 2L2.2(b)(4)(B).

The trial court found that Mr. Worku "concealed his true identity and sought to avoid further prosecution and punishment for his participation in Ethiopia of the crimes of torture and murder." (Sent. Order, Dkt. # 140, ROA p. 502.)  The court added: "I find that the nature of Worku's conduct in Ethiopia and the lies he employed to cover up that sordid  conduct take this case out of the heartland of § 1425 prosecutions." (*Id.* p. 503.)  The court likewise referred to Mr. Worku as "a person fleeing another country on the basis of convictions for human rights violations." (*Id.,* p. 513.)  But those were not plausible findings and can only be the result of the trial court's bias against Mr. Worku.  This is because there was ***no evidence*** that Mr. Worku came to the United States to conceal his Ethiopian conduct, whatever that might be.  Instead, the PSR stated that Mr. Worku moved to ***Kenya*** in 1992, six years after his release from prison in Ethiopia and eight years before the Ethiopian conviction of Kefelegn Alemu *in abstentia*, and there is no record evidence that he did so to "conceal" anything. (PSR, Dkt. # 131, Restr. ROA p. 110.)  Instead, the PSR notes that he did so after a change in the controlling political party that caused Mr.  Worku to be worried about political persecution. (*Id.*)  The evidence from the Government's own witnesses was that Mr. Worku had assumed Habteab Berhe Temanu's identity to assist the latter's family in entering the United States. Nor did the jury make any finding that he had assumed Mr. Temanu's identity in order to conceal any such acts.  (*See* Dkt. # 110-1, Special Interrogatories, COA p. 327).

Mr. Worku received a 22-year sentence. This represented the equivalent of an offense level of 39, or 31 levels above the actual Guidelines level 8.  It also was 14 levels above even what the 2012 Guidelines could have possibly provided  under U.S.S.G. § 2L2.2 even if there was sufficient evidence that "the defendant committed any part of the instant offense to conceal the defendant's participation in … any … serious human rights offense."  Such a sentence is procedurally and

substantively unreasonable and the result of bias, as opposed to any facts supported by the record.

*See, e.g.*, *United States v. Haley*, 529 F.3d 1308, 1311 (10th Cir. 2008) (citation omitted) ("A

sentence is procedurally unreasonable if the district court . . . relies on clearly erroneous facts . . . .").

 With an impartial decision-maker, Mr. Worku's sentence would have been significantly less than.

Given Mr. Worku's advance age, the failure to move to recuse the trial judge resulted in Mr. Worku

receiving what is effectively a life sentence.

## VI.     OTHER CONVICTIONS

1.      Movant has no other convictions other than the conviction under attack in this petition.

## VII.     LEGAL REPRESENTATION

Matthew C. Golla
Assistant Federal Public Defender
633 Seventeenth Street, Suite 1000
Denver, CO 80202

Jessica E. Yates
Bethany A. Gorlin
Snell & Wilmer L.L.P.
1200 Seventeenth Street, Suite 1900
Denver, Colorado 80202

Mr. Golla represented Movant from arraignment through sentencing.  Ms. Yates was appointed to
represent Movant in his direct appeal pursuant to the Criminal Justice Act.  Ms. Yates and Ms.
Gorlin have represented Movant during his direct appeal through present.

## VIII.   REQUEST FOR RELIEF/CONCLUSION

For the reasons set forth above, Mr. Worku respectfully requests that his conviction for Count

3, which is duplicative of Count 1, in violation of the Double Jeopardy Clause, be overturned.  He

also requests that his sentence for the remaining two counts be reversed and he be resentenced in

accordance with the Sentencing Guidelines.

Dated this 24th day of February, 2017.


*s/ Bethany A. Gorlin*
Jessica E. Yates
Bethany A. Gorlin
Stephanie Kanan
SNELL & WILMER L.L.P.
1200 17th Street, Suite 1900
Denver, CO  80303
Phone:  303-634-2000
Emails: jyates@swlaw.com; bgorlin@swlaw.com;
skanan@swlaw.com
***Attorneys for Movant***

## DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I am the movant in this action, that I have read this motion, and that the information in this motion is true and correct. *See* 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Executed on ___FEB. 23, 2017___.

_____
(Movant's Original Signature)

Movant's prisoner identification number and complete mailing address:

Kefelegne Alemu Worku – Reg. No. 38772-013
F.C.I. Florence
Federal Correctional Institution
P.O. Box 6000
Florence, CO 81226