**FILED**
**United States Court of Appeals**
**Tenth Circuit**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**September 1, 2015**

**FOR THE TENTH CIRCUIT**

**Elisabeth A. Shumaker**
**Clerk of Court**

---

UNITED STATES OF AMERICA,

      Plaintiff – Appellee,

v.

KEFELEGNE ALEMU WORKU,
a/k/a Habteab Berhe Temanu, a/k/a
Habteab B. Temanu, a/k/a TUFA,
a/k/a Kefelegn Alemu,

      Defendant – Appellant.

No. 14–1218

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:12-CR-00346-JLK-1)**

---

Jessica E. Yates (Bethany A. Gorlin, with her on the briefs) Snell &
Wilmer, L.L.P., Denver, Colorado, for Defendant–Appellant.

J. Bishop Grewell, Assistant U.S. Attorney (John F. Walsh, United States
Attorney, with him on the brief) Office of the United States Attorney,
Denver, Colorado, for Plaintiff–Appellee.

---

Before **MATHESON**, **BACHARACH**, and **MORITZ**, Circuit Judges.

---

**BACHARACH**, Circuit Judge.

---

      Mr. Kefelegne Alemu Worku is an Ethiopian man who entered the

United States after assuming the identity of an Eritrean man, Mr. Habteab

**EXHIBIT 3**

Berhe Temanu. Using Mr. Berhe's identity, Mr. Worku lived in the Denver area for years and eventually became a U.S. citizen.

Immigration authorities learned that Mr. Worku was using a false identity and suspected that he had tortured Ethiopian prisoners in the 1970s. After an investigation and trial, Mr. Worku was convicted of three crimes:

1.   unlawful procurement of citizenship or naturalization,

2.   fraud and misuse of visas, permits, and other documents, and

3.   aggravated identity theft.

The court sentenced Mr. Worku to 22 years, relying in part on a finding that he had committed these crimes to conceal violations of human rights in Ethiopia.

On appeal, Mr. Worku makes four contentions:

1.   The immigration-related convictions violated the Double Jeopardy Clause.

2.   The conviction for aggravated identify theft was improper because Mr. Worku had permission to use the identity of Mr. Berhe.

3.   The sentence was procedurally unreasonable because (1) there was no evidence that Mr. Worku had come to the United States to conceal violations of human rights and (2) the witnesses identifying him as an Ethiopian torturer had done so because of improperly suggestive photo arrays.

4.   The sentence was substantively unreasonable.

We reject these challenges and affirm.

## I.   Challenges to the Conviction

In the first two contentions, Mr. Worku attacks his conviction for the first time on appeal. Because these contentions were not raised in district court, we confine our review to the plain-error standard. *United States v. Burns*, 775 F.3d 1221, 1223 (10th Cir. 2014). To establish plain error, Mr. Worku must show an error that is plain, affects his substantial rights, and seriously affects the fairness, integrity, or public reputation of the judicial proceedings. *Id.* Applying this standard of review, we reject Mr. Worku's challenges to his conviction.

### A.   Double Jeopardy

Mr. Worku argues that his conviction under Counts 1 and 3 violated the Double Jeopardy Clause. Count 1 was based on 18 U.S.C. § 1425(a) and (b), and Count 3 was based on 18 U.S.C. § 1546(a). These statutes criminalize the fraudulent use of immigration or naturalization documents. 18 U.S.C. § 1425(a), (b) (2006); 18 U.S.C. § 1546(a) (2006).

We must consider these statutes against the backdrop of the Double Jeopardy Clause, which protects a defendant from being punished multiple times for the same offense. *United States v. Benoit*, 713 F.3d 1, 12 (10th Cir. 2013). Mr. Worku's conviction under Counts 1 and 3 would have violated the Double Jeopardy Clause if

- the conviction under Counts 1 and 3 was based on the same conduct and

- one of the statutes of conviction was a lesser-included offense of the other.

*United States v. Morehead*, 959 F.2d 1489, 1506-07 (10th Cir. 1992). For the sake of argument, we can assume that Mr. Worku has satisfied the first three prongs of the plain-error test.

But even with these assumptions, we must affirm the conviction on Counts 1 and 3 because Mr. Worku has not satisfied the fourth prong of the plain-error standard. Under this prong, we must affirm when evidence of guilt "on the challenged point is 'overwhelming' and 'essentially uncontroverted.'" *United States v. Edeza*, 359 F.3d 1246, 1251 (10th Cir. 2004). In our view, the evidence of guilt would have remained overwhelming and essentially uncontroverted even if the charges in Counts 1 and 3 had been more clearly identified with different acts.

Mr. Worku argues that his conviction under Counts 1 and 3 constituted a double-jeopardy violation in part because the two counts were based on the same conduct: misrepresentations in his form for naturalization (N-400 form). But the government contends that Counts 1 and 3 related to different conduct: Count 1 related to misrepresentations in Mr. Worku's form for naturalization (N-400 form), and Count 3 related to misrepresentations in Mr. Worku's application for permanent residence (I-485 form).

According to Mr. Worku, this distinction was blurred in the jury instructions. The instruction for Count 1 referred to lies in Mr. Worku's form for naturalization (N-400 form). But the jury instruction for Count 3 did not refer to any specific documents. Instead, the instruction referred to conduct occurring over a time span that covered both Mr. Worku's form for naturalization (N-400 form) and his application for permanent residence (I-485 form).

For the sake of argument, we can assume that the jury relied on Mr. Worku's form for naturalization (N-400 form) as the basis for finding Mr. Worku guilty under both counts (1 and 3). But even then, the government could easily have cured the alleged error by narrowing the charge in Count 3 to exclude the form for naturalization (N-400 form). *See United States v. Goode*, 483 F.3d 676, 682 (10th Cir. 2007) (holding that the fourth prong was not satisfied because the alleged error "could have been quickly cured by amending the instruction" if the defendant had raised the issue at trial).

And we can reasonably expect that the government *would have* modified the charge to avoid the alleged double-jeopardy violation. In closing argument, the government linked Count 3 with the form for permanent residence, indicating an intent to match the counts to different conduct. *See, e.g.*, R., vol. VI, at 377 ("Count 3 is fraud and misuse of visa, permits and other documents. So what's the document? The lawful

permanent resident card."); R. vol. V, at 405-06 (discussing the contents of the form for permanent residence in connection with Count 3).

If the jury instruction for Count 3 had been narrowed to false statements in the form for permanent residence, we know that the jury would have found Mr. Worku guilty of lying in two different documents, constituting two separate acts. In both forms, the defendant stated under oath that his name was "Habteab Berhu Temanu." But the defendant never denied that he had used a false name on both forms.

Without any dispute on this fact, the jury found that Mr. Worku had used a false name. This finding is spelled out in the special interrogatories for Count 1, where the jury found that "the government [had] proved beyond a reasonable doubt that [Mr. Worku] falsely identified himself as 'Habteab Berhe Temanu'" in the naturalization form (N-400). R., vol. I, at 327. Mr. Worku made the same representation in his form for permanent residence (I-485 form). Thus, the jury's finding of a lie in the naturalization form (N-400 form) would have required a finding that Mr. Worku had lied on the form for permanent residence (I-485 form). And a finding that Mr. Worku had lied on the I-485 form would have required the jury to find guilt on Count 3. *See* R., vol. I, at 255 (the district court's instruction to the jury that 18 U.S.C. § 1546(a) "prohibits someone from knowingly possessing or using a visa or other document required as

evidence of an authorized stay or employment in the United States that is falsely made or that was procured by means of a false statement").

Under these circumstances, we conclude that the evidence of guilt would have remained overwhelming and essentially uncontroverted even if the two counts had more clearly identified different acts. Thus, Mr. Worku has failed to show that the alleged double-jeopardy violation seriously affected the fairness, integrity, or public reputation of the proceedings, leading us to affirm based on the fourth prong of the plain-error standard. *See United States v. Sinks*, 473 F.3d 1315, 1320-21 (10th Cir. 2007).[1]

## B.   Lawful Authority to Assume Another's Identity

Mr. Worku was also convicted of aggravated identity theft under 18 U.S.C. § 1028A(a)(1). The subsection provides:

> (1) In general.--Whoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, *without lawful authority*, a means of

---

[1]     *Sinks* involved an analogous situation. There the defendant was charged with two counts: (1) possession of stolen explosive materials, and (2) being a felon in possession of explosives. *Sinks*, 473 F.3d at 1318. Both charges required a jury finding that the explosives had traveled in interstate commerce. *Id.* at 1321. On the second count, the jury found that the explosives had traveled in interstate commerce. *Id.* On the first count, however, the government did not allege that the explosives had traveled in interstate commerce and the jury did not make a finding on this element. *Id.* at 1320-21. The government conceded that the omission constituted an obvious error with regard to the first count. *Id.* at 1321. But our court rejected the defendant's challenge based on the fourth prong of the plain-error standard, reasoning that the jury had already found (in connection with Count Two) that the explosives had traveled in interstate commerce and the evidence on that element was essentially uncontroverted. *Id.*

> identification of another person shall, in addition to the
> punishment provided for such felony, be sentenced to a term of
> imprisonment of 2 years.

18 U.S.C. § 1028A(a)(1) (2006) (emphasis added). Mr. Worku obtained

permission to use Mr. Berhe's identity from his children. As a result,

Mr. Worku argues that he had "lawful authority" to use Mr. Berhe's

identity. We reject the claim under the plain-error standard because the

alleged error would not have been obvious.

Mr. Berhe's children approached Mr. Worku, asking him to tell

federal authorities that he was their father. Their actual father had

developed dementia, and the children feared he could not complete the

interview requirements for admission into the United States.

But Mr. Worku has not presented any cases suggesting that the

children could lawfully allow another person to use their father's identity.

Rather, Mr. Worku has provided cases indicating at most that

§ 1028A(a)(i) is not violated when someone allows use of his or her *own*

identity. These cases are inapplicable, for Mr. Worku does not allege

consent from the person whose identity was used: Mr. Berhe. Thus, even if

the district court had erred, the error would not have been obvious.[2] In

---

[2]    Mr. Worku also challenges precedent supporting the view that a
conviction under § 1028A can be upheld even when the victim gives
consent. According to Mr. Worku, this precedent fails to distinguish
between identity theft (§ 1028A) and identity fraud (§ 1028). Because the
record does not suggest consent by the victim (Mr. Berhe), we need not
address Mr. Worku's argument.

these circumstances, we conclude that Mr. Worku has not established plain error.

## II.   Challenges to the Sentence

Mr. Worku raises procedural and substantive challenges to his 22-year sentence. We reject these challenges.

### A.   Procedural Reasonableness

At sentencing, the court determined that Mr. Worku had committed the underlying crimes to avoid punishment for the violation of human rights in Ethiopia. This determination affected the judge's decision to sentence Mr. Worku above the guideline range.

Mr. Worku argues that his sentence is procedurally unreasonable because the record does not show that he

- immigrated to conceal his involvement in torture or

- was the notorious torturer.

We review challenges to the procedural reasonableness of sentences for an abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007). Because the district court did not abuse its discretion in making these findings, we reject Mr. Worku's arguments.

### 1.   Immigrating to Conceal Human Rights Violations

Mr. Worku argues that the record does not support the sentencing court's finding that he immigrated to the United States to conceal involvement in torture. The sentence was procedurally unreasonable if the

9

district court had relied on clearly erroneous facts. *See United States v. Haley*, 529 F.3d 1308, 1311 (10th Cir. 2008). In applying the clear-error standard,  we can reverse only if the finding was "'simply not plausible or permissible in light of the entire record on appeal.'" *United States v. Garcia*, 635 F.3d 472, 478 (10th Cir. 2011) (quoting *United States v. McClatchey*, 316 F.3d 1122, 1128 (10th Cir. 2003)).

The record includes three facts supporting the district court's conclusion:

1.   The jury found beyond a reasonable doubt that Mr. Worku had (1) persecuted others "because of race, religion, national origin, membership in a particular social group, or political opinion," and (2) lied about committing those crimes. R., vol. I, at 327.

2.   Mr. Worku said that he had never been at ease in Kenya because of "fear that he would be kidnapped and returned to Ethiopia." R., vol. II, at 111 (presentence report).

3.   The Berhe children hired a broker who stated that Mr. Worku was to pay part of the broker's fee. R., vol. V, at 350.

Together, these facts create a plausible inference that Mr. Worku wanted to come to the United States to avoid punishment for his human rights violations in Ethiopia. Because this finding is plausible, the district court did not abuse its discretion in finding that Mr. Worku had committed the U.S. crimes to conceal his violations of human rights in Ethiopia.

Mr. Worku argues that the evidence more readily supports an inference that he came to the United States to escape political turmoil.

That inference is possible. But under the clear-error standard, we must affirm when the evidence would support an inference that is either culpable or innocent. *See United States v. Garcia*, 635 F.3d 472, 479–80 (10th Cir. 2011) (rejecting the defendant's inference of innocence on the basis of ample circumstantial evidence from which the district court could have inferred guilt).

Urging an innocent inference, Mr. Worku likens his circumstances to those of the Berhe children. They wanted to come to the United States for a better way of life. If we would not suspect the Berhe children of trying to conceal their past, Mr. Worku argues that we should not suspect him of trying to conceal his past.

But a jury could reasonably have found that Mr. Worku's circumstances had differed from those of the Berhe children. If Mr. Worku had been the notorious torturer in the 1970s, he would have been facing a death sentence in Ethiopia for genocide. Regardless of whether Mr. Worku was aware of his Ethiopian death sentence, he admitted that he had never been "'at ease'" in Kenya, fearing that he would be kidnapped and returned to Ethiopia. R., vol. II, at 111 (presentence report). The Berhe children had neither expressed similar fears nor been convicted of genocide. Thus, the jury could have distinguished Mr. Worku's circumstances from those of the Berhe children.

Considering Mr. Worku's genocide conviction and his kidnapping fears, the court could reasonably find that Mr. Worku had lied about his identity on the immigration-related documents to conceal the atrocities committed in Ethiopia.

## 2.   Identification as the Notorious Torturer: Suggestive Photo Arrays

Federal agents showed photo arrays to at least six former inmates at an Ethiopian prison camp, and five identified Mr. Worku as a supervisor who had tortured inmates.[3] Mr. Worku argues that the photo arrays were unduly suggestive, resulting in a deprivation of due process.[4]

---

[3]   The government also presented testimony from Mr. Kinfe Wolday, who had met Mr. Worku in the 1980s during an interrogation in Ethiopia. Mr. Worku allegedly bragged to Mr. Wolday about his role at the prison camp and how he had killed, arrested, and tortured people. Mr. Wolday could not identify Mr. Worku from the photo array, but identified him at trial. In imposing the sentence, the district court mentioned Mr. Wolday's identification, but relied more heavily on the testimony of the other eye-witnesses. In this appeal, Mr. Worku does not mention Mr. Wolday's testimony.

[4]   The government contends that this argument is forfeited. Mr. Worku raised his objections to the use of the photo arrays through a pretrial motion in limine. The district court denied the motion, concluding that the identifications did not violate due process. But when the district court relied on the witness identifications at sentencing, Mr. Worku did not object. Because Mr. Worku did not challenge use of the identifications at sentencing, the government argues that Mr. Worku has forfeited his challenge. We need not resolve this issue because Mr. Worku's challenge would fail even if the issue had been preserved.

### a.    Standard of Review

Because the ultimate issue involves the procedural reasonableness of a sentence, we apply an overarching standard of abuse-of-discretion.[5] Within this overarching standard, we confine our review of the district court's factual findings under the clear-error standard and engage in de novo review of legal determinations. *United States v. Ruby*, 706 F.3d 1221, 1225 (10th Cir. 2013). We conclude that the district court did not clearly err by concluding that the photo arrays had not been impermissibly suggestive. And in conducting de novo review, we conclude that use of the photo arrays did not violate Mr. Worku's right to due process.

### b.    The Due-Process Test

For a due process violation, the photo array must be "so unnecessarily suggestive that it is 'conducive to irreparable mistaken identification.'" *Grubbs v. Hannigan*, 982 F.2d 1483, 1489–90 (10th Cir. 1993) (quoting *Kirby v. Illinois*, 406 U.S. 682, 691 (1972)). The use of a photo array is evaluated under a two-step inquiry:

---

[5]    Mr. Worku argues that the overarching standard of review is de novo, relying on a case involving reversal of a conviction. But here, the challenge involves the sentence, not the conviction. As a result, we consider the argument involving the photo arrays as a challenge to the procedural reasonableness of the sentence. *See United States v. Ruby*, 706 F.3d 1221, 1225 (10th Cir. 2013) ("Because unreliable hearsay evidence can result in a sentence based on erroneous facts, we construe Ruby's argument as an objection that his sentence was procedurally unreasonable."). This type of challenge is reviewable under the abuse-of-discretion standard. *Id.*

1.    Was the photo array impermissibly suggestive?

2.    If the array was impermissibly suggestive, was identification reliable under the totality of the circumstances?

*Id.*

### c.    Impermissibly Suggestive

Courts consider three factors to determine whether an array was impermissibly suggestive:

1.    the number of photographs,

2.    the details of the photographs, and

3.    the manner of presentation by the officers.

*United States v. Sanchez*, 24 F.3d 1259, 1262 (10th Cir. 1994). We apply the clear-error standard to findings involving suggestiveness of a photo array. *See United States v. Kamahele*, 748 F.3d 984, 1018 (10th Cir. 2014) (concluding that the district court did not clearly err by discounting facial irregularities or concluding that the array had been presented in a neutral manner); *United States v. Wiseman*, 172 F.3d 1196, 1209–10 (10th Cir. 1999) (characterizing as factual a district court's conclusion that a photo array was not overly suggestive).

The number of photographs affects how the other two factors are evaluated. *Id.* In this case, four photographic arrays were used, three containing six photographs and one containing twelve. *See* Supp. R., vol. I, at 3, 16–19.

14

### i.   Six-Photograph Arrays

Mr. Worku alleges the six-photograph arrays suffer from three problems:

1.   There are irregularities between the photographs.

2.   The photographs were presented as a composite.

3.   The witnesses were not properly admonished.

In six-photograph arrays, significant weight is given to irregularities. *United States v. Wiseman*, 172 F.3d 1196, 1209 (10th Cir. 1999), *abrogated on other grounds*, *Rosemond v. United States*, __U.S. __, 134 S. Ct. 1240 (2014); *Sanchez*, 24 F.3d at 1262. Mr. Worku identifies three irregularities in the six-photograph arrays:

- **Lighting:** Mr. Worku's picture is the brightest and clearest (the newest looking) in two of the arrays. And in the third array, his photo is heavily shadowed and dark compared to the other photos.

- **Facial Hair:** There were only two individuals without facial hair, and only one had hair on his head.

- **Clothing:** Mr. Worku is the only member of the array wearing a large hooded winter jacket.

In our view, however, the district court did not clearly err by discounting these irregularities.

Mr. Worku complains that the lighting in his photograph is different from the lighting in the other photographs. We agree that in the arrays, the lighting is slightly different for Mr. Worku's photograph and some of the

15

other photographs. But all are color photographs and depict Ethiopian men

of similar ages. With these similarities among the men depicted, the court

- had the discretion to conclude that the differences in lighting
  would not have suggested which photograph to pick and

- did not clearly err by concluding that no particular individual
  stuck out within the array.

*See United States v. Bautista*, 23 F.3d 726, 731 (2d Cir. 1994) (holding

that the photo array was not overly suggestive even though the defendant's

photograph was brighter and more close-up than the five other photos).

The same is true of the differences in facial hair and clothing. In

other cases, we have held that differences in facial hair do not render photo

arrays overly suggestive. *See United States v. Kamahele*, 748 F.3d 984,

1020 (10th Cir. 2014) ("[W]e have held that a difference in facial

hair—even when the suspect was the only one with a beard and one with a

beard and braided hair—did not render the photo array unduly

suggestive."). And other circuits have held that differences in clothing do

not render a photo array unduly suggestive. *Briscoe v. Cnty. of St. Louis*,

690 F.3d 1004, 1013 (8th Cir. 2012); *United States v. Brennick*, 405 F.3d

96, 99 (1st Cir. 2005).

The differences in facial hair and clothing could be downplayed

because of the passage of over 30 years from the sightings to the photo

arrays. Over this period of time, the suspect's facial hair and clothing

would likely have changed. Thus, in viewing the photos, the victims likely

16

would have focused on the individuals' faces rather than their facial hair or clothing. *See Harker v. Maryland*, 800 F.2d 437, 444 (4th Cir. 1986) (rejecting a challenge to an identification based on differences in clothing because "facial features, rather than clothing, appear to have been more important to the identification in this case"). In these circumstances, the district court did not clearly err by concluding that Mr. Worku had not stood out in the photo array.

In addition, Mr. Worku argues the arrays were overly suggestive because they had been presented as a composite. In rejecting this argument, the district court determined that there had been "no evidence" about the greater reliability of sequential presentations. R., vol. V, at 121. Although the judge recognized that some studies suggest that sequential presentation enhances reliability, these studies had not been presented. Thus, the district court's rejection of this argument did not constitute clear error.

Mr. Worku also alleges that the officers failed to provide the witnesses with department-policy admonitions before the witnesses viewed the arrays. The court reviewed the manner of presentation to the witnesses, concluding that it was "neither suggestive nor intrusive nor intimidating." R., vol. V., at 122. Mr. Worku has not shown a clear error.

In sum, the district court did not clearly err in evaluating the suggestiveness of the six-photograph arrays.

### ii.   Twelve-Photograph Array

Mr. Worku argues that the same problems plague the twelve-photo array: irregularities in the photographs, composite presentation, and lack of admonitions. The alleged problems in the twelve-photograph array are no more acute than they were in the six-photograph arrays, and we have already concluded that the alleged problems in the six-photograph arrays did not create a due process violation. Because there were twice as many pictures in the twelve-photograph array, this array is even less problematic. *See United States v. Sanchez*, 24 F.3d 1259, 1262 (10th Cir. 1994) (reasoning that irregularities have greater impact when there is a smaller group of photos). Therefore, the district court did not clearly err by concluding that the twelve-photograph array had not been impermissibly suggestive.

### d.   Totality of the Circumstances

Even if the arrays were overly suggestive, the identifications could violate due process only if the suggestiveness rendered the identifications unreliable in light of the totality of the circumstances. *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972). In assessing reliability, courts generally consider five factors:

1.   witnesses' opportunity to view the suspect when the wrongful action was committed,

2.   witnesses' degree of attention,

3.      accuracy of witnesses' prior description of the suspect,

4.      level of certainty demonstrated by the witnesses, and

5.      length of time between the wrongful action and the photo array.

*Id.* Weighing these factors, we apply de novo review on the ultimate issue (whether a due process violation took place). *United States v. Sanchez*, 24 F.3d 1259, 1262 (10th Cir. 1994); *see Cikora v. Dugger*, 840 F.2d 893, 895 (11th Cir. 1988) ("The district court's *ultimate* conclusion, taking into consideration the five factors of the *Neil v. Biggers* test, that [the defendant] was not deprived of due process by the admission of the out-of-court identification, is subject to plenary review as a mixed question of fact and law."). But we review the district court's underlying findings of fact for clear error. *See Sumner v. Mata*, 455 U.S. 591, 597–98 (1982) (evaluating a habeas claim and explaining that the federal appellate court was required to defer to the factual findings underpinning the state court's decision on reliability of the photo array).

The issue involves identification of Mr. Worku by five individuals: Assayehgen Feleke, Kiflu Ketema, Nesibu Sibhat, Berhan Dargie, and Abebech Demissie. Four of them recalled seeing Mr. Worku regularly over lengthy time spans.[6] Mr. Ketema stated that he had seen Mr. Worku 4–5

---

[6]      Mr. Worku argues that none of the witnesses had meaningful opportunities to view the torturer in the Ethiopian prison because of poor lighting, the witnesses' physical position, and their physical condition. Appellant's Opening Br. at 40 (citing R., vol. V, at 190–91, 203–05, 531–

times almost every day for 7–8 months. Mr. Berhan Dargie saw Mr. Worku nearly every day for 10 months. Mr. Assayehgen Feleke saw Mr. Worku nearly every day for 6–7 months. Mr. Sibhat saw Mr. Worku practically every day for 2 months.

Each described seeing Mr. Worku in circumstances that would have heightened their attention. For example, 4 of the victims testified that they had been tortured by Mr. Worku.

Ms. Demissie said she had been beaten by Mr. Worku, sometimes with his rifle, and had seen him

- order others to burn a boy, then shoot him,

- shoot another boy in the stomach as he begged for mercy, and

- make a boy drink the blood of two teenagers Mr. Worku had killed.

Mr. Dargie testified that he was facing execution at the hands of Mr. Worku as the two men stood face-to-face, before another guard intervened.

Mr. Sibhat testified that at the age of fourteen, he had been victimized by Mr. Worku's

- beatings with a whip, an electrical wire, and a piece of wood, and

- almost daily threats of death over a two-month period.

---

32, 573, 615, 619, 657–58, 754). But a reasonable fact-finder could conclude that the witnesses had an adequate opportunity to observe the torturer at the Ethiopian prison.

According to Mr. Feleke, he had been ordered by Mr. Worku to strip, hang upside down, take a beating, and undergo torture by having hot water poured over his wounds.

The fifth former prisoner, Mr. Ketema, stated that he was able to avoid physical torture because of the intervention of a guard. But Mr. Ketema saw Mr. Worku beat other inmates with whips and sticks and direct guards to sit on the inmates' feet.

All were certain that Mr. Worku had been the torturer. And multiple victims added that they were able to identify Mr. Worku with "100%" certainty, one based on his voice.

Finally, Mr. Worku admitted to the probation officer that in the late 1970s, he had worked in the Ethiopian city where the five individuals were imprisoned. With this admission, the district court could reasonably infer that the witness identifications were reliable.

Mr. Worku points to (1) a gap of over 30 years between the prior sightings and the pretrial identifications and (2) the possible sharing of information between the witnesses. These arguments do not suggest an abuse of discretion.

The time gap is extraordinary. Neither our court nor the Supreme Court has confronted the reliability of identification 30+ years after the witness's last viewing of the suspect. But the circumstances supporting reliability are also extraordinary: The five witnesses saw the torturer

21

virtually every day for many months, and four of the witnesses were victims of his horrific acts. The district court determined that this combination of extraordinary circumstances rendered the identifications reliable. We agree.

According to Mr. Worku, the identifications were unreliable because the witnesses had likely shared information about Mr. Worku's current appearance before viewing the photo arrays. Mr. Worku speculates that Mr. Ketema likely reported his identification to Mr. Sibhat and that Mr. Sibhat likely shared information with Mr. Dargie. But there was no evidence to support this speculation.

Mr. Worku also complains that Mr. Ketema's identification had been tainted before he viewed the photo array. The alleged taint involved a discussion between Mr. Ketema and his brother. The brother did not know what the torturer looked like, but heard that he had been in a Denver café called "The Cozy Bar." Mr. Ketema went there and saw Mr. Worku, confirming he was the man who had tortured prisoners in Ethiopia over 30 years earlier.

The district court could legitimately have questioned Mr. Ketema's identification based on his conversation with his brother. But the district court could also find the identification reliable based on other factors. Mr. Ketema testified that he was 100% certain when he saw Mr. Worku's photograph. Though decades had passed, Mr. Ketema explained that Mr.

Worku was unforgettable because he was "the most feared person" in the prison camp, causing everyone to shake whenever he entered. R., vol. V, at 215.

But even if Mr. Ketema's identification were disregarded, we would still be left with the identifications of Mr. Worku by four other individuals, all of whom picked Mr. Worku from photo arrays without evidence of any prior conversations with one another.

In these circumstances, the identifications were reliable notwithstanding the passage of over 30 years and Mr. Ketema's prior conversation with his brother.

### B.    Substantive Unreasonableness

Mr. Worku argues his sentence is substantively unreasonable because the duration of the sentence cannot be reconciled with the sentencing guidelines. We review the sentence for an abuse of discretion. *United States v. Smart*, 518 F.3d 800, 805–06 (10th Cir. 2008).

Because Mr. Worku's last criminal acts took place in 2010, the 2010 version of the guidelines applies. *See Peugh v. United States*, __ U.S. __, 133 S. Ct. 2072, 2088 (2013). This version did not include any factors for crimes perpetrated in connection with human rights violations. Under these guidelines, Mr. Worku's base-offense level was 8, which resulted in guideline ranges capped at 3 years (assuming the sentences would run consecutively).

The court thought a guideline sentence would have been too short:

> [The recommended sentence] is the product of a matrix established for all violations of the statutes forming the charges in the Indictment. There are not enough cases involving convictions of human rights violators entering the United States with false documents and false statements to form the basis for a statistically valid array. The Sentencing Commission has failed to provide a justification or empirical data to support its recommendation. The incongruity of a Guideline sentence of zero to six months, followed by a two year mandatory sentence for a lesser offense, is enough to reject it.

R., vol. I, at 512–13.

Sentencing courts have the discretion to "impose a non-Guidelines sentence based on a disagreement with the Commission's views." *Pepper v. United States*, 562 U.S. 476, 501 (2011). But a sentencing court cannot reject the guidelines for arbitrary and capricious reasons. *United States v. Pinson*, 542 F.3d 822, 836 (10th Cir. 2008). In applying this standard of review to a sentence above the guideline range, we "may consider the extent of the deviation, but must give due deference to the district court's decision that the [18 U.S.C.] § 3553(a) factors, on a whole, justify the extent of the variance." *Gall v. United States*, 552 U.S. 38, 51 (2007).

The district court considered the § 3553(a) factors and reached three conclusions:

> 1.   Mr. Worku concealed his identity to avoid prosecution for the violations of human rights in Ethiopia. With this conduct, "the very integrity of the United States [was] challenged and its claim to decency in the world community [was] besmirched."

24

2.      Mr. Worku was capable of torture and had no neurological or
        psychotic disorders, though he had clinical depression.

3.      The crime was serious because it corrupted the established
        processes of immigration and limited the prospects of truly
        deserving immigrants. Deterrence was necessary for the United
        States to avoid "becoming a haven for fugitives from justice in
        their own countries."

R., vol. I, at 502–11. Based on these conclusions, the district court

imposed the maximum statutory sentence for each count, explaining:

"Congress has provided maximum sentences for the most egregious

violations of these statutes. If this case is not egregious, I cannot imagine

what case would be." *Id.* at 514.

This rationale fell within the district court's discretion. The court

carefully evaluated the § 3553(a) factors and the policies behind the

Sentencing Commission's recommendation. Doing so, the court varied

significantly from the guidelines. But a district court can vary from the

guidelines so long as it does not do so arbitrarily and capriciously. *See*

*Pepper v. United States*, 562 U.S. 476, 501 (2011). The district court's

variance was not arbitrary or capricious.

Mr. Worku refers to recent guideline amendments to highlight the

degree of the variance. In 2012, the Sentencing Guidelines were amended

to increase the guideline range for offenders violating immigration laws to

conceal the violation of human rights. U.S. Sentencing Guidelines Manual

§ 2L2.2(b)(4) (U.S. Sentencing Comm'n 2012). Under the newly enacted

section, the district court is to apply the greater of two choices:

1.   If the defendant committed the offense to conceal "membership in, or authority over, a military, paramilitary, or police organization that was involved in a serious human rights offense during the period in which the defendant was such a member or had such authority," the offense level is increased by 2 levels or to level 13, whichever is greater.

2.   If the defendant committed the offense "to conceal the defendant's participation in (i) the offense of incitement to genocide, increase by 6 levels; or (ii) any other serious human rights offense, increase by 10 levels" or to level 25, whichever is greater.

U.S. Sentencing Guidelines Manual § 2L2.2(b)(4)(A)–(B) (U.S. Sentencing

Comm'n 2012). Had these amendments been applied, Mr. Worku's

recommended offense level could have been as high as 25. But Mr.

Worku's actual sentence corresponded to an even higher offense level (39).

But whether the variance was 14 levels above the range under the

2012 guidelines or 31 levels above the range under the 2010 guidelines, the

district court acted within its discretion. The district court analyzed the

sentence and concluded that the guideline range was too low because of

(1) the horrific nature of Mr. Worku's violations of human rights in

Ethiopia and (2) his lying about his identity to avoid punishment in

Ethiopia. This conclusion did not entail an abuse of discretion.

### III.   Conclusion

Mr. Worku has failed to establish (1) an effect on his substantial rights from the alleged double-jeopardy violation or (2) a legal flaw in the conviction for aggravated identity theft. And under our deferential standards of review, we conclude that the sentence was procedurally and substantively reasonable. For these reasons, we affirm the conviction and sentence.

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

## UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

**September 28, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

_____

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff - Appellee, | |
| v. | No. 14-1218 |
| KEFELEGNE ALEMU WORKU, a/k/a Habteab Berhe Temanu, a/k/a Habteab B. Temanu, a/k/a TUFA, a/k/a Kefelegn Alemu, | |
| Defendant - Appellant. | |

_____

### ORDER
_____

Before **MATHESON**, **BACHARACH**, and **MORITZ**, Circuit Judges.
_____

Appellant's petition for rehearing is denied.

The petition for rehearing en banc was transmitted to all of the judges of the court who are in regular active service.  As no member of the panel and no judge in regular active service on the court requested that the court be polled, that petition is also denied.

Entered for the Court

ELISABETH A. SHUMAKER, Clerk

**UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**
**OFFICE OF THE CLERK**
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157

| | | |
|---|---|---|
| Elisabeth A. Shumaker | October 06, 2015 | Chris Wolpert |
| Clerk of Court | | Chief Deputy Clerk |

Mr. Jeffrey P. Colwell
United States District Court for the District of Colorado
Office of the Clerk
Alfred A. Arraj U.S. Courthouse
901 19th Street
Denver, CO 80294-3589

**RE:      14-1218, United States v. Worku**
Dist/Ag docket: 1:12-CR-00346-JLK-1

Dear Clerk:

Please be advised that the mandate for this case has issued today. Please file accordingly in the records of your court.

Please contact this office if you have questions.

Sincerely,

*Elisabeth A. Shumaker*

Elisabeth A. Shumaker
Clerk of the Court

cc:      Bethany A. Gorlin
J. Bishop Grewell
Judith Smith
Brenda Taylor
Jessica E. Yates

EAS/lg