

## DECLARATION OF BERHAN DARGE

I, Berhan Darge, a national and citizen of Ethiopia, depose and declare the following statement in support of my application for asylum in the United States.

1. I am unable or unwilling to return to Ethiopia because of fear of persecution due to my political opinion and beliefs and my alleged membership in a social group which is considered an enemy of the Ethiopian Communist Government. I fear that I will be subjected to persecution in the form of detention, torture, imprisonment, loss of social and economic rights, including and up to loss of life and liberty, due to the political beliefs I held, have expressed and continue to express. I also fear that I will be singled out for persecution due to the fact that I was charged with defection, which is considered to be a crime of high treason and entails rigorous imprisonment of up to 25 (twenty five) years in accordance with the Special Penal Code, Proclamation No. 214/81 Article 12 (1B). My belief that I am likely to be singled out for persecution in Ethiopia is based upon the totality of circumstances of my case.

2. After the overthrow of the late Emperor Haile Selassie I, the Provisional Military Administrative Council ("PMAC") also known as Dergue, a military junta, took over power in September 1974. On December 20, 1974, the PMAC declared socialism as the ideology of the nation and on the following day, launched the National Work Campaign for Development Through Cooperation ("NWCD"), also known as Zemetcha. The official purpose of the Zemetcha was to teach farmers to read and write and organize farmers associations to be used as a conduit for introducing modern farming techniques. However, the real objective of the Zemetcha was to remove the opposing students from the urban centers and to use the students in the dissemination of the Dergue's communist economic and social programs. At the time of the Zemetcha, I was a junior in the Law School of the Addis Ababa University. As part of the first contigent of the Zemetcha, I was sent to a remote rural area in the western part of the country called Illubabor. Soon after our arrival at the Zemetcha station, the Dergue proclaimed the nationalization of all rural lands. This major event, which took place on or about March 4, 1975, and the subsequent practical measures taken for the implementation of the nationalized rural lands brought to limelight the true nature of the Dergue and the Zemetcha. The day to day activities of the military supervisors assigned at each station made it clear that the Zemetcha was intended to instigate the farmers to rebel against their landlords, to attempt to change all the past religious and social values and instill in the farmers communist ideas. Thus, some of us decided to abandon the Zemetcha. I was among the first participants who abandoned the Zemetcha. I stayed at my station for only 4 (four) months. (The Zemetcha lasted for a period of two years). Leaving or fleeing from the government assigned Zemetcha camp was considered as a political opposition to the rule of the Dergue. The punishments were imprisonment, torture, deprivation of the right to be employed, attend school, or travel abroad. Records are maintained that follow such deserters wherever he or she may go and they are always the focus of interrogation. My opposition to and withdrawal from the Zemetcha was of the factors for my subsequent arrest and torture.

3. After my return from the Zemetcha, I was neither able to continue my studies for the University was closed for two years; nor could I be able to get any employment because of my desertion from the Zemetcha. During the years 1975-1977 the Dergue embarked on massive communist indoctrination campaigns and organized farmers, youth, labor unions, and city dwellers association. It was also a time when the Dergue was faced with very strong resistance from all angles and was forced to declare a state of emergency. It was a time when all students who were not active participants in the Dergue's politicizing (via the urban dwellers association also known as the Kebelle Youth Association or neighborhood association)

**EXHIBIT 8**

were suspected as members or sympathizers of the opposing forces. (At this juncture the main opposition force specially in the cities was the Ethiopian People's Party or "EPRP"). I declined to join the Dergue's group or the opposing forces. I found both sides totally insensitive to the suffering of the general public. For me both of them were undemocratic and inherently totalitarian. During this time, I indulged in self-education and assisting my old father. On September, 1976, I joined the University. Immediately after the university was opened and the students had the chance to gather together, they began demanding the reinstitution of professional association and the university students' union in accordance with the University's establishing legislation. Even if the demands were legitimate and within the academic freedom given to the university, independent associations of whatever kind were not tolerated by the military junta. Each department and faculty formed its own ad-hoc committee to present its demands. I was elected to the ad-hoc committee for the formation of the Law School's professional association. Before the different committees had a chance to meet and formulate their demands, the military junta raided the University and forced us to leave the University without being able to withdraw formally, for Mengistu Haile Mariam (the present President) the next day massacred Teferi Benti, who was the titular Head of State of Ethiopia.

4. The period that immediately followed the advent of Mengistu H. Mariam as the absolute dictator of Ethiopia is usually referred as the period of the Reign of the Red Terror; the Dergue had authorized the summary killing of anyone suspected of anti-Dergue activities. On January 20, 1978, I was detained and tortured without court warrant. The men responsible for my detention, torture and arrest were a Mr. Sahlu Wolde Giorgis and Solomon Gebre. Both of them were seniors in the Law School, where we met and came to know each other. In fact during our student days, we had informally discussed, inter alia, the seizure of power by the military junta, the pros and cons of the Zemetcha, the success and failure of Emperor Haile Selassie's Government, etc.. We had basic political differences. They were advocating the need for socialist revolution and considered the military junta as agent of the revolution. They were demanding the nationalization of all types of private property. On the other hand, I had a different view; I approved only of constitutional changes and I respected the established institutions. I vehemently opposed the nationalization of private property. My attitude could have been shaped by my family background. My family used to own farm land, urban land and property. In fact, the title deed of some of my family property was in my name. Anyway, at the time of writing this DECLARATION, Solomon has advanced to the position of member of the Central Committee of the Worker's Party of Ethiopia or "WPE" and Sahlu holds a chief ideologue position in the Central Committee. On the day of my arrest I was representing my employer at the High Court. I was waiting for my turn when Sahlu arrived with about four armed revolutionary squads. I was ordered to raise my hands and then all of a sudden Solomon appeared from his hidings and started beating me with a hand gun. I was searched by the revolutionary guards. As I was being searched they took the opportunity to inflict atrocious pains by squeezing my testicles, I was then ordered to get in their car, which was designed for five people; however, seven of us were packed into it. Scarcity of space did not prevent them from beating me inside the car. It did not take us long to arrive at one of the temporary "prisons" exclusively set up for the purposes of the Red Terror. Its name, as related to me by one of the prisoners, was Kefetgna 15 revolutionary prison. Sahlu and Solomon handed me over to the guards with the instruction that severe treatment should be carried upon me. The first move was code named "warm-up", in which every one present was beating me with whatever instrument he/she held. (There were two women torturers in the room. Later on I had discovered that there were no separate rooms or torturers for women prisoners). The beating was so fast and shocking, I was not even able to guess the direction of the next blow. The warm-up

took nearly half an hour. All of a sudden I was ordered to take out my clothes. The torturers then proceeded with tieing my hands and feet to a pole, which was specially designed for easily beating the sole of one's feet. The instruments used for beating the sole of my feet and the rest of my naked body were traditional as well as modern. Their preferred form of instrument was made up of wire strings specially knotted to give severe pain when accompanied by the pouring of cold water to the already beaten sole of my feet. The physical torture was accompanied by verbal abuses. The purposes of the torture were twofold, i.e.: to punish and to extract confessions. Despite my repeated denials of the accusations, the beating and kicking continued for nearly 14 (fourteen) hours. Sahlu and Solomon accused me of being a member of the EPRP, of opposing and of abandoning the Zemetcha, of instigating the University students, of failure to join their youth association, of having grudges against the military junta for nationalizing my family's property and of organizing anti-Dergue labor union at my work place. I was not a member of any party. It was true that I did not participate in their youth association for anyone whose property was nationalized was prohibited by law from electing or being elected. Before my arrest, i.e., on or about September 14, 1977, I was employed by the Ethiopian Transport Construction Authority (herein after referred as "ETCA"). I had joined the trade union of ETCA for I was employed on contractual basis. The trade union's officials were elected in accordance with the by-laws of the union. However the tortures considered it as an extension of EPRP and subsquently I was branded as member of the labor union wing of EPRP. The first day the torture took nearly 14 (fourteen) hours. During this time, all my nails were taken away; each and every part of my body was systematically beaten; and all through the proceedings, I was not allowed to eat, to drink, or to smoke. The first day they tortured me until I fainted; they tried to revive me but I was in no position to answer to their questions. I stayed in Kefetegna 15 prison for nearly 10 (ten) months and during this time I was taken to the torture chamber for 5 (five) times. Since no member of the EPRP had identified me as a member of that party and since this was their tested method of proving membership, I was released after 10 (ten) months of imprisonment without any court judgement. Upon my release a certificate was sent to all concerned authorities, i.e., my employer, the university and the Kebelle of my residence. In this document, I was labelled for all times as anti-communist, anti-Dergue, counter-revolutionary and enemy of the people (I attach a photocopy and English translation of this document as ANNEX 1).

5. As a former political prisoner I was monitored closely by the authorities. In order to illustrate the scrutiny to which I was subject I cite the following three events. Upon my release from prison I applied for re-admission to the University. I was late for registration; so my application was referred to the Vice-President of the University, Mr. Billing Mandefro. Despite the fact that I had good grounds for being late, Mr. Billing rejected my application on grounds of my classification as enemy of the revolution. The Kebelle of my residence was, on the other hand, employing crude forms of survailance. On one occasion I was detained for more than 36 hours and fined Birr 30 for allowing my girlfriend to spend a night at my home without notifying the Kebelle. It was not only myself that were taken to the Kebelle at different times for questioning; sometimes the friends who happended to be at my home would be taken along. During my stay in my Kebelle of residence, i.e. until my departure for the United States, I was either detained or taken for interrogation and questioning by the Kebelle for more than a dozen times. I request the opportunity to provide detailed testimony of as to the severe and shocking mistreatment I experienced at the hand of the Kebelle of my residence.

6. The harassment at my work place was subtle in form. At every work place employees are required to attend once a month discussion sessions where communist philosophy and ideology are taught and discussed. In these meetings I was singled

out on several occasions and reprimanded for not taking an active part and for not taking the initiative in discussions with a clear reference to my past imprisonment. On several occasions, I was asked in these meetings to renounce my past political beliefs, to admit my past political mistakes and to pledge support to the ideology and principle of WPE. I found it hard to lend support to an ideology I don't believe in and to bless the government and individuals who repress human rights. I would leave out other forms of harassment carried on my work place in preference of a major event, an event which would demonstrate beyond any reasonable doubt the perpetual nature of my persecution at my work place.

7. I held the position of Legal Counsel in ETCA, the Ethiopian Transportation. This agency of the Ethiopian Government is responsible for the construction and maintenance of highways. In order to accomplish its objectives ETCA obtains loans, grants and credits from international organizations. The World Bank (hereinafter referred as the "Bank") is the major leading agency. In its Second Sector Credit Agreement, the Bank imposed an obligation on ETCA to the effect that the latter undertakes to train its senior staffs. Selection criterion, which was objective, was set by ETCA with close approval of the Bank. Since I had all the qualifications, I was among the 17 (seventeen) senior staffs selected for training. The training was scheduled in different phases so that the activities of ETCA would not be disrupted. The 17 participants were divided into four major groups. I was placed in group II, whose training was to take place during the August 1987 academic period. After the selection was approved by the Bank, the actual coordination of the training program was given to the International Road Federation (hereinafter reffered as "IRF"). IRF made the arrangements with educational institutions here in the United States and Canada in accordance with the training need of the trainee as identified by ETCA. In my case, first, the University of Maryland tailored courses pertinent to my field of activities. I was supposed to take these courses starting August, 1987. After a letter of acceptance by the University of Maryland and an IAP-66 form by IRF were issued to me, the training was postponed without cause by the Ethiopian authorities. However all the other trainees in group II attended their trainings as previously scheduled. When I was told of the postponment, I was deeply frustrated at first. But I quickly regained my composure and pretended as if I was satisfied with the decision of the party committee of the agency and the General Manager of ETCA, Comrade Keleta Tesfa Michael. In fact I had to keep a low profile for I had worked hard to be nominated for the training and for it was my only chance of escaping the inhumanly treatment, the political oppression and the continous surveillance of the Ethiopian government towards me. So, IRF made other arrangements for me. This time I was to start courses at the University of Pennsylvania by January 1988. These later plans eventually also failed due to the General Manager's refusal to allow me to obtain travel documents. The rest of the members of this group left as scheduled. I remained behind. Once again I was not given any explaination and the cancellation of my departure wasn't even communicated to the IRF. The underlying reason for the cancellation of my previous two attempts to enroll in the IRF program was my political classification as enemy of the revolution and my present status of not being a member the communist party. But due to the overriding commitment to the Bank, I was again included in the program and placed with the last group (group IV). The IRF was instructed to seek ways of maintaining the courses tailored by the University of Pennsylvania so that I would be able to begin my studies in August, 1988. Group IV, consisted of three participating, including me. In accordance with the usual practice, orientation program and arrival dates were arranged by IRF for the group. Back in Ethiopia, travel documents had to be processed for the group as a whole. But somehow the party committee that oversees the activities of ETCA started exclusive investigation of my political integrity and personal life. I was called into the office of the party committee, where I was interrogated by the cadres and an intelligence officer. The interrogation revolved around my political

convictions, the fact that I was branded as anti-revolutionary and a long history of political opposition to the regime. During the meeting I sought to assure the committee that my non-involvement in Party activities should not be interpreted as opposition to the government, rather as an indication of total dedication to my profession. At the end of close door deliberations the committee was unable to reach a decision and referred my case to the higher authorities within the party structure. The cadres were tempted to cut me from the training program. The bureacrats, on the other hand, were afraid of its repercussions. The latter were in favor of respecting their committments to the Bank. I was able to get my travel documents solely because of the existence of the Bank behind the training program. The money for the tuition fee and maintenance allowance was also transferred from the Bank account into IRF account. I was supposed to begin orientation here in the United States as of August 8, 1988. Just as I was making the final preparations for my departure I was informed by the General Manager that he would withhold my airplane ticket and the foreign exchange that I was to receive. As time was running out IRF sent a strong telex advising the General Manager that I would be at a disadvantage for missing the orientation. The IRF further underlined that unless I arrive in the U.S. by September 5, 1988 the University would no longer accept me.

8. Upon receipt of this last telex from the IRF the General Manager in unequivocal terms noted that he would not allow me to travel. The General Manager was creating technical barricades intended to impede my departure and, at the same time, save face with the IRF and the Bank by camouflaging the political considerations behind his decision. At that juncture the situation was thus: I was in possession of a passport and an exit permit, my arrival was anticipated by the University of Pennsylvania, the money for my training had already been transferred to the IRF account but foreign exchange and my plane ticket were being withheld. I so decided to purchase my own airplane ticket and reach the USA.. My desire to attend the educational program at University of Pennsylvania was only surpassed by my intense desire to finally be free from the oppression, the constant scrutiny, the inhumanity of the Ethiopian Government. The day after my arrival I visited the IRF office in Washington, D.C.. The first thing that came to my mind on my arrival was to tell the truth, the whole truth to the officials of IRF. Mr. Merron L. Latta, the Vice-President of IRF was sympathetic; he even hoped that the Ethiopian authorities might endorse my action for he thought they were the ultimate beneficiaries of the training. With this understanding, I received written instructions on how to proceed to the University of Pennsylvania and my first month allowance. I was excited by the things that happenend to me the first day in and around the university. Regardless of my status as a student of the College of General Studies, the Law School permitted me to take three hard core law courses. Despite the fact that I was left without any financial resources, I was able to get a place to stay. However, this excitement did not last through the following day for I was informed by IRF that they were instructed by ETCA to cease disbursement of all funds. Out of pure desperation, I requested IRF to disregard the instruction and refund me of my expenses. But later on when I was informed by IRF that certain charges were forwarded by the Ethiopian to discredit me before United States citizens and officials. I think it would be appropriate to analyze the telexes sent by the Ethiopian authorities to demonstrate their motives. For this purpose, I would follow the chronological orders, of the telexes.

> A. <u>Telex dated Sep. 6/88</u>. It speaks for itself. It is universal characteristics of all communist governments to first react instinctively, like shooting down a civilan aircraft without giving prior warning to correct direction. That is what the General Manager did; in just plain and crude language, he ordered IRF to stop disbursements of funds. Period.

B. <u>Telex dated Sep. 7/88.</u> The General Manager realized that IRF is not (loke) Ethiopian institution with whom he can deal as he wishes. In this telex, he admitted his intention to disqualify me from the training program when he stated that it was decided <u>to delay</u> my training. He was however naive when he charged me of leaving "... the country without authorization.." unless this phrase is intended to mean that I had defected the country. Any person who was given a passport and an exit visa is <u>de jure</u> "authorized" to leave the country. Whatever terminology was chosen, the charge of defection is within acceptable limits. What is obnoxious and unacceptable is the other two charges of failure to hand over government property and appellate documents. As a matter of fact, I was a legal advisor, not custodian of any government "property". "Legal documents related to appellate courts were not under my jurisdiction. The only government "property" that were issued to me were stationery materials, which I have left in the office. As to "legal documents" I have no use in bringing them over here. It is quite interesting that I was not charged of misappropriation of government "property" or destruction of "legal documents". I was accused of <u>failure to hand over.</u> The charges are self-contradictory in the sense that a "defector" does not "hand over" property or document without exposing his intention. Finally, I was called back to Ethiopia to reply to the statement of charges, i.e. disprove my intention of defecting, hand over property and documents and go to their death chambers. Further, the Ethiopian authorities claim that they are taking "disciplinary actions", which are entirely based on their personnel manual. This would be the only personnel manual that covers cases of defection.

C. <u>Telex of Sep. 22/88.</u> This telex demonstrates the efficiency of communist administrators. No humanitarian appeal would distrust them from their committed ways of destroying human careers. Since they had no confidence in what they did, they have issued threats of disclaimers and allocate the fund. In this telex, the officials of ETCA have admitted that their decision was beyond their <u>"control"</u>. It is not longer a disciplinary measure entirely based on personnel manual but pure and simple political considerations.

9. In the last few weeks I was informed by friends and relatives that my emloyer, the General Manager of ETCA, has notified in writting the Ministry of Domestic Affairs that I have defected. The Ministry is undertaking the task to confiscate my property, i.e.: a house with all its furnishings. I also received information that it may be possible for my friends to smuggle out a copy of the letter of the General Manager to the Ministry of Domestic Affairs. Should I receive such letter I will submit it as evidence in support of this application.

10. I have lived for 14 (fourteen) years under the rule of communism. I am quite capable of understanding their terminology. It might be difficult for someone who remained in a democratic society like the United States to understand the meaning of such phrases like "leaving the country without authorization".

It simply means defection. If ever I return to Ethiopia, I would definitely be labelled as a "spy of the imperialist America". What would follow would not be easy death by shooting. With the purpose of extracting information, they would torture me to death. I have already tasted torture until my nails were falling like ice cubes. The pain is still fresh; and the scars have not healed yet. I would therefore prefer to take my life rather than return to Ethiopia.

Therefore, if I were to return to Ethiopia I would suffer persecution, imprisonment, torture and probably death.

I declare, under penalty of perjury, that the foregoing statements are true and correct to the best of my knowledge and recollection.

_____
BERHAN DARGE

SWORN TO AND SUBSCRIBED BEFORE ME
this 3rd day of February, 1989.

_____
NOTARY-PUBLIC

NOTARIAL SEAL
JUANITA CANCEL, Notary Public
Philadelphia, Philadelphia County
My Commission Expires March 2, 1991