**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 17-cv-00497-JLK
Criminal Case No. 12-cr-00346-JLK-1

UNITED STATES OF AMERICA,

      Plaintiff-Respondent,

v.

KEFELEGNE ALEMU WORKU,

      Defendant-Movant.

---

**ORDER DENYING MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR
CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY (ECF NO. 170)**

---

Kane, J.

      Defendant Kefelegne Alemu Worku (Worku) moves to have his sentence vacated, set

aside, or corrected pursuant to 28 U.S.C. § 2255. A number of Worku's arguments—particularly

those urging me to reverse a court of appeals decision—are disconcerting, but of even greater

concern is Worku's inept citation to sources throughout his filings. Many of his citations are

inaccurate and clearly distinguishable to the point that they are misleading. In the end, such

distortions of sources and the record fail to persuade. I deny the Motion.[1]

      A motion pursuant to 28 U.S.C. § 2255 attacks the legality of detention and must be filed

with the court that imposed the sentence. *Bradshaw v. Story*, 86 F.3d 164, 166 (10th Cir. 1996).

---

[1] If this decision is appealed, the Court of Appeals will review questions of law *de novo* and
questions of fact for clear error. *United States v. Harms*, 371 F.3d 1208, 1210 (10th Cir. 2004)
(citing *United States v. Pearce*, 146 F.2d 771, 774 (10th Cir. 1998)). Because the issues here will
almost certainly be construed as legal, the standard will be *de novo*. My analysis is, therefore,
primarily of interest to the parties and not substantiating in the sense of being able to confirm the
rulings about which the Motion complains.

A defendant may assert "the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255. Worku alleges his 22-year sentence for identity theft and immigration fraud violates the Double Jeopardy and Due Process Clauses of the Fifth Amendment to the U.S. Constitution and his right to effective assistance of counsel under the Sixth Amendment.

Specifically, Worku's § 2255 Motion asserts three grounds for relief: (1) by shifting the burden of proof to Worku, the Tenth Circuit improperly upheld his conviction which would have otherwise been invalidated on double jeopardy grounds; (2) the Tenth Circuit used a new standard in upholding the constitutionality of the photo array identifications, violating Worku's due process rights; and (3) his attorney provided ineffective assistance of counsel. His first two claims are not cognizable in a habeas corpus proceeding as they petition a district court to reverse a federal court of appeals. And the third, a demonstration of the maxim that no good deed goes unpunished, is meritless. To illustrate the fallacies underlying Worku's positions, some background information is necessary.

## I. Background[2]

In Ethiopia in the late 1970s, Defendant Kefelegne Alemu Worku tortured political prisoners, including children, while acting as a guard at a makeshift prison known as Higher 15. At that time, Ethiopia was in turmoil; monarchal rule had ended and a military regime, known as the Derg, had come to power. Matthew J. McCracken, *Abusing Self-Determination and Democracy: How the TPLF is Looting Ethiopia*, 36 Case W. Res. J. Int'l L. 183, 190 (2004). The chief opposition group of the Derg, the Ethiopian People's Revolutionary Party (EPRP),

---

[2]The facts relevant for this proceeding are recited here. I previously recounted the facts of the case in detail in my Sentencing Memorandum and Order, *United States v. Worku*, No. 12-cr-346-JLK, 2014 WL 2197537 (D. Colo. May 27, 2014), which additionally provides the justification

"launched systematic attacks designed to undermine the military rule of the Derg." *Id.* at 191. In response, the Derg pursued a two-year campaign known as the Red Terror, in which countless individuals deemed threats to the government or suspected of supporting the EPRP were killed or disappeared. *Id.*

In 1992, after the Derg was overthrown, Worku fled to Kenya. He was tried *in absentia* in Ethiopia and convicted by the resurgent government of the murder of at least 70 people. While in Kenya, Worku was put into contact with the children of Habteab Berhe Temanu who sought to immigrate to the United States and needed a stand-in for their father who was too ill to participate in the immigration process. Worku falsely assumed the identity of Mr. Temanu and immigrated to the United States with the children. They settled in Denver.

Then, in order to obtain a Permanent Resident Card from U.S. Citizenship and Immigration Services, Worku represented on an Application to Register Permanent Residence or Adjust Status, Form I-485, that he was Habteab Berhe Temanu. Almost three years later, he filed an Application for Naturalization, Form N-400, in which he again made false representations, including that he was Habteab Berhe Temanu and that he had never persecuted any person because of political opinion or membership in a particular social group. He was issued a Permanent Resident Card and then a Certificate of Naturalization on the basis of those false Applications.

Worku covertly lived in Denver for years until a witness of his torture discovered him. Kiflu Ketema, a former prisoner of Higher 15, heard through his brother that one of the guards from the prison was in Denver. At first, Mr. Ketema did not believe his brother, but then, he recognized Worku smoking outside a bar where his brother believed he had seen him. Mr.

---

for the sentence imposed.

Ketema reported the information about Worku's identity and history to U.S. Department of Homeland Security Immigration and Customs Enforcement, and Special Agent Jeffrey Lembke promptly began investigating.

Special Agent Lembke created a photo array containing Worku's photo from his immigration file and five other photographs of Ethiopian males similar in age to Worku. This array was presented at separate times and places to Mr. Ketema and three other individuals who were imprisoned at Higher 15—Berhan Dargie, Nesibu Sibhat, and Abebech Demissie. Each of these individuals independently identified Worku as Kefelegne Alemu, one of the men who was responsible for the torture of prisoners at Higher 15. Assayehgen Feleke, a fifth prisoner of Higher 15, was shown an array with six additional photos, 12 in total, and also identified Worku.

Months after he was arrested, Worku notified the court that he wished to plead guilty to procurement of citizenship in violation of 18 U.S.C. § 1425 and fraud and misuse of immigration documents in violation of 18 U.S.C. § 1546. It seemed he mistakenly believed that doing so could prevent witnesses from testifying against him and exposing his past in Ethiopia. Since the prosecutor had already advised that she would present testimony at the time of sentencing, *see* Notice of Intent to Present Testimonial Evid., ECF No. 37, I informed Worku that witnesses would be permitted to testify at sentencing even if he chose to plead guilty and forgo a trial. Worku consequently decided to proceed with the trial instead of pleading guilty.

During the trial, three of the Temanu children identified Worku as the man who immigrated with them using their father's name. In addition, each of the five witnesses who had been imprisoned at Higher 15 and had picked Worku out of the photo arrays gave heartrending testimony and identified Worku with complete certainty. The relevant testimony of the Higher 15 witnesses is as follows.

- Berhan Dargie, now an attorney in Washington, D.C., was arrested in about January 1978 and taken to Higher 15 where he was beaten multiple times by Worku. He identified Worku as a man he saw twice a week over the almost ten months he was imprisoned and testified that he would never forget Worku's face because Worku almost killed him one night. Transcript 10/9/13 at 458:23-459:9, ECF No. 134.

- Nesibu Sibhat was arrested along with his sister and taken to Higher 15 in about December 1977. He testified that, at age 14 over several months, he was stripped and severely beaten at the prison by a number of people, including Worku. Mr. Sibhat identified Worku by sight and by his voice and expressed no doubt about the accuracy of his identification. Transcript 10/9/13 at 483, 500-501.

- Assayehgen Feleke was arrested in January 1978 and later transferred to the Higher 15 prison. He testified that, with Worku present, he was beaten and hot water was poured in his open wounds while he was naked and hanging upside down. Mr. Feleke confidently stated he would never forget Worku's face. Transcript 10/10/13 at 538:14-15, ECF No. 135.

- Abebech Demissie, then a sixteen-year-old schoolgirl, was arrested near the end of 1977, and on her first night at Higher 15, stripped to her underwear and beaten by three people, one of whom she identified as Worku. Ms. Demissie testified she was beaten by Worku multiple other times over her eight months at the prison and was one hundred percent sure of his identity. Transcript 10/10/13 at 614:9-13. One night at the prison Ms. Demissie stated she would never forget was when she saw Worku shoot and kill three boys and order another prisoner to drink the blood of the others. *Id.* at 604:17-610:15, 635:23-636:6.

- Remembering the exact day on which he first encountered Worku, Mr. Ketema testified that he witnessed Worku come to Higher 15 and beat and torture prisoners almost on a daily basis for many months. Mr. Ketema was one hundred percent sure of Worku's identity and stated he could pick Worku's face out of a million people. Transcript 10/8/13 at 89:6-10, ECF No. 133. Mr. Ketema further described Worku as "a big fish" at Higher 15 and the "most feared" of those in control. *Id.* at 64:21, 88:18-19, 89:1-2.

Apart from prisoners at Higher 15, Worku was also identified by Kinfe Wolday, who had conversations with Worku while they were detained together for around seven months in the early 1980s. Wolday testified that Worku gloated saying he had been in charge of the Higher 15 prison and had killed around 150 people. Transcript 10/10/13 at 569:15-570:20.

After hearing this testimony, the jury returned a verdict of guilty on all three counts: (1) procurement of citizenship in violation of 18 U.S.C. § 1425(a) and (b); (2) aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1); and (3) fraud and misuse of immigration documents in violation of 18 U.S.C. § 1546(a). The jury answered six special interrogatories in the affirmative, including that Worku falsely represented that he had never "persecuted (either directly or indirectly) any person because of race, religion, national origin, membership in a particular social group, or political opinion." Verdict Form, ECF No. 110-1. I sentenced Worku based on the factors set forth in 18 U.S.C. § 3553 and not under the U.S. Sentencing Guidelines. I found the Guidelines to be inapplicable to the circumstances of the case and that the egregious nature of Worku's conduct warranted imposition of the maximum sentence for each count, a total of 22 years.

On appeal, Worku argued that (1) his convictions under 18 U.S.C. § 1425 and § 1546 violated the Double Jeopardy Clause of the Fifth Amendment, (2) he could not be convicted

under 18 U.S.C. § 1028A since his use of the identity of another was consensual, and (3) his sentence was substantively unreasonable. The Tenth Circuit Court of Appeals rejected these arguments and affirmed his convictions and sentences in a published opinion, *United States v. Worku*, 800 F.3d 1195 (10th Cir. 2015). The court then denied his petition for rehearing and rehearing *en banc*. Worku filed a petition for writ of certiorari with the Supreme Court, and it was denied on February 29, 2016. Worku's instant § 2255 motion was filed February 24, 2017 and, as stated above, raises double jeopardy, due process, and ineffective assistance of counsel claims.[3]

## II. Double Jeopardy and Due Process Claims

Both Worku's first and second claims—that his convictions under 18 U.S.C. § 1425 and § 1546 violate the Double Jeopardy Clause and that the use of photo array identifications violated his due process rights—were presented to and disposed of by the Tenth Circuit on direct appeal. "Absent an intervening change in the law of a circuit, issues disposed of on direct appeal generally will not be considered on a collateral attack by a motion pursuant to § 2255." *United States v. Prichard*, 875 F.2d 789, 791 (10th Cir. 1989) (citing *United States v. Nolan*, 571 F.2d 528, 530 (10th Cir. 1978)). Worku nevertheless argues his double jeopardy and due process claims should not be rejected because he was not provided the opportunity for full and fair consideration of them on direct review. For authority he cites *Stone v. Powell*, 428 U.S. 465, 495

---

[3]The instant motion was filed within the one-year limitation period provided by 28 U.S.C. §2255(f). Rule 7 of the Rules Governing § 2255 Proceedings provides the judge may direct the parties to expand the record by submitting additional materials relating to the motion. None are needed here as the entire record and transcripts of proceedings are relied upon and no additional references or allegations beyond the record are made. I have reviewed the Motion, the Response, the Reply, the transcripts of proceedings, the records of prior proceedings, and the Sentencing Memorandum previously issued and determined that an evidentiary hearing is not warranted. Based on the briefs and my extensive review of the record, I have also concluded that oral argument would not materially assist me in making this ruling.

(1976), but that case has no bearing or relevance whatsoever to the issues here.[4] It is axiomatic

that, absent an intervening change in the law, this court cannot review the Tenth Circuit's

substantive rulings. It is the height of presumption to suggest that it otherwise could.[5] However,

even if it could sit in review of such rulings, Worku's double jeopardy and due process claims

lack merit.

A. Double Jeopardy

Worku argued on direct appeal and again here that his sentences under 18 U.S.C. § 1425

and § 1546 violate the Double Jeopardy Clause of the Fifth Amendment because they are based

on the same conduct. He now also asserts that, in disposing of his double jeopardy claim on

appeal, the Tenth Circuit subjected him to an additional violation of his Fifth Amendment rights

by basing its affirmance of his conviction on his failure to testify or prove his innocence. Due to

the Tenth Circuit's "improper and unconstitutional analysis," Worku submits that, although his

double jeopardy argument was addressed on direct appeal, he is not precluded from raising it

again here. Mot. at 16, ECF No. 170. I am not persuaded. Since Worku does not allege an

intervening change in the law, his double jeopardy claim cannot be revisited via the instant

motion.[6] *See Prichard*, 875 F.2d at 791 (citing *Nolan*, 571 F.2d at 530).

---

[4]In *Stone*, the Supreme Court held that "where the State has provided an opportunity for full and
fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas
corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was
introduced at his trial." 428 U.S. at 494. This rule does not translate to a § 2255 motion, in which
the movant was tried and convicted in federal court. Nor does it apply outside the scope of the
Fourth Amendment. The reference to *Stone* by Worku is frankly bewildering and inapposite.
[5]I am reminded of the latin phrase "ne supra crepidam sutor iudicaret," literally translated to
mean a cobbler should not judge above the sandal. *See* Pliny the Elder, *Naturalis Historia* (1st
Cent. A.D.). The admonition was purportedly given by a renowned painter indignant from a
cobbler critiquing more than the shoes in his painting. It is similar to the English proverb
"cobbler, stick to thy last." Reviewing decisions of the court of appeals is above my last, and I
heed the warning.
[6]Although Worku did raise his underlying double jeopardy argument on direct appeal, he claims

Regardless, neither his convictions under § 1425 and § 1546 nor the Tenth Circuit's affirmance of those convictions violate his Fifth Amendment rights. The government charged Worku under § 1425 and § 1546, based on his statements on two separate immigration and naturalization forms, Form I-485 and Form N-400, completed at different times. Worku complains that the jury instructions did not distinguish the facts required to prove each count and that the jury was permitted to convict him of both counts without proof of any additional fact for either. Thus, he argues that his sentences for the convictions are for the same offense, in violation of the Double Jeopardy Clause of the Fifth Amendment. After considering this double jeopardy argument on direct appeal, the Tenth Circuit properly held that the evidence of Worku's guilt of lying on the two separate documents would have remained "overwhelming and essentially uncontroverted" even if the jury instructions had more clearly identified the different acts. *Worku*, 800 F.3d at 1199-1200.

The court did not, as alleged by Worku, shift the burden of proof to him or require him to testify in violation of the Fifth Amendment's privilege against self-incrimination. The court's comments that "the defendant never denied that he had used a false name on both forms" and that there was no dispute on that fact were made in evaluating whether the evidence was controverted under the plain error standard. *Worku*, 800 F.3d at 1199 ("Under [the final] prong

___

he could not have addressed the Tenth Circuit's improper burden shifting "because he had no notice that the Tenth Circuit was going to affirm his conviction on this unconstitutional basis until after it issued its mandate and the U.S. Supreme Court refused to hear the case, denying Mr. Worku a meaningful opportunity to address this particular violation of his constitutional rights." Mot. at 17. Worku consequently alleges that my refusal to hear this claim now would result in a fundamental miscarriage of justice. I disagree. First, the Tenth Circuit applied the plain error standard just as it has in numerous previous cases, so Worku had sufficient notice. Second, Worku had the opportunity to raise his complaint in his petition to the Supreme Court for a writ of certiorari. Third, although I recognize the circular nature in my concluding so, the Tenth Circuit's rejection of Worku's double jeopardy argument demonstrates that there is no underlying prejudice or fundamental miscarriage of justice.

[of the plain error standard], we must affirm when evidence of guilt on the challenged point is overwhelming and essentially uncontroverted." (citation and internal quotation marks omitted)). The court did not proclaim that Worku's decision not to testify or put on evidence denying his use of a false name demonstrated his guilt per se; rather, it concluded under the standard that there was overwhelming evidence of guilt at trial and no evidence to the contrary. With its application of the plain error standard, the court did not violate Worku's Fifth Amendment rights.

To support his argument, Worku cites a number of inapplicable cases including *United States v. Simpson*, 7 F.3d 186, 189 (10th Cir. 1993), *Runnels v. Hess*, 653 F.2d 1359, 1361 (10th Cir. 1981), and *United States v. Nolan*, 416 F.2d 588, 594 (10th Cir. 1969). Worku's Reply attributes to *Nolan* the principle that "it is reversible error for the prosecution or the judge to comment on the failure of the defendant to take the stand and testify on his own behalf." Reply at 2, ECF No. 183. In *Nolan*, however, the court held "it is reversible error for counsel for the United States or the *trial* judge to comment on the failure of the defendant to take the stand." 416 F.2d at 594 (emphasis added). There is no support whatever in *Nolan* for the assertion that this statement by an appellate court, applying a well-settled standard, violates a defendant's Fifth Amendment rights. Leaving out the quintessential qualifier "trial" before judge to make it appear that *Nolan* supports his argument, when in fact it does not, is grossly misleading. The other cases cited similarly involve circumstances in which a *judge or prosecutor* commented on a defendant's failure to testify *during a trial*. The cases do not hold that it is a violation of a defendant's Fifth Amendment rights for a court of appeals to, as the Tenth Circuit did here, base its ruling on the balance of the evidence.[7]

_____

[7]In his Reply, Worku further asserts: "[T]he extension of a defendant's Fifth Amendment

B. Due Process

In his underlying due process claim, Worku maintains that his sentence violates his rights because it is primarily based on witness photograph identifications that were not reliable under the multi-factor test articulated in *Neil v. Biggers*, 409 U.S. 188 (1972). As with his double jeopardy claim, he argues that the Tenth Circuit effected a separate violation of his rights in reviewing his due process claim. According to Worku, the court affirmed his conviction under an "extraordinary circumstances" standard and not the well-settled *Biggers* standard for assessing the reliability of identifications, so he had no notice of the law and could not fairly present the issue.

Citing *Prichard*, 875 F.2d at 791, Worku asserts that, although his due process claim was disposed of on direct appeal, he should be allowed to raise it again here because application of the "extraordinary circumstances" standard amounts to an intervening change in the law of the circuit. This argument is incomprehensible. The Tenth Circuit did not supplant the *Biggers* standard with an "extraordinary circumstances" standard on appeal, and besides, any new standard it announced would not constitute an "intervening" change authorizing this court to review the ruling.

---

privilege on appeal [would not] eliminate plain error review. There are many recitations and applications of the standard that do not rely on the fact that evidence was uncontroverted by the defendant himself. *See, e.g., Sinks,* 473 F.3d at 1321." Reply at 3 n.2. In *United States v. Sinks*, 473 F.3d 1315, 1321 (10th Cir. 2007), the Tenth Circuit concluded that, although it was error for the government not to charge the interstate commerce element of the crime and for the jury not to find the element was fulfilled, the fourth prong of the plain error standard was not met because the evidence proving the interstate commerce element was "overwhelming" and "essentially uncontroverted." Specifically, the court stated that "it was uncontroverted that the dynamite was stolen in Arizona and found in a vehicle driven by Sinks in New Mexico." *Id.* Worku fails to differentiate this statement from those made by the Tenth Circuit in his case. Perhaps he takes issue with the court's failure to use the passive voice in his case. But, undoubtedly, saying "it was uncontroverted" means that the defendant, himself, did not present evidence to the contrary. *Sinks* is actually an example of the Tenth Circuit's uniform and consistent application of the

The Tenth Circuit unquestionably used the *Biggers* factors to assess the reliability of the witness photograph identifications in this case. *Worku*, 300 F.3d at 1205-1207. The court listed the factors and noted that it must consider the reliability of the identifications in light of the totality of the circumstances. *Id.* at 1205.[8] It addressed the factor that weighed most heavily in favor of Worku—that more than thirty years that had passed from when most of the witness had viewed the suspect to when they identified him. *Id.* at 1206. And it found that circumstance to be extraordinary. *Id.* Nevertheless, the court determined the other *Biggers* factors weighed more heavily in favor of the reliability of the identifications. *Id.* at 1207. It noted that the witnesses had seen Worku many times per week over multiple months and made their identifications with certainty. *Id.* at 1205-06. The court further stated that "[e]ach [witness] described seeing Mr. Worku in circumstances that would have heightened their attention." *Id.* at 1205. It commented that these circumstances—experiencing and witnessing torture committed by Worku—were also extraordinary and contributed to the reliability of the identifications. Without reducing the opinion to an inartful formula, the court effectively touched on each pertinent *Biggers* factor.

As this court ruled during the trial and as was affirmed by the Tenth Circuit, when considering the factors in their totality, the identifications were reliable. "Extraordinary circumstances" is not a new test, but rather a term used to describe the facts as they relate to the *Biggers* factors. The witnesses were highly unlikely to have forgotten the face of the man who repeatedly tortured them or who they saw torture others, even thirty years after the torture

---

plain error standard, which does not run afoul of the Fifth Amendment privilege.
[8]"[T]he identifications could violate due process only if the suggestiveness rendered the identifications unreliable in light of the totality of the circumstances. *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). In assessing reliability, courts generally consider five factors: 1. witnesses' opportunity to view the suspect when the wrongful action was committed, 2. witnesses' degree of attention, 3. accuracy of witnesses' prior description of the suspect, 4. level of certainty demonstrated by the witnesses, and 5. length of time between the wrongful action and the photo

occurred. Considering the extraordinary influence of torture on the witnesses' degree of attention when viewing Worku, their identifications of him were reliable.

Even if the Tenth Circuit had announced an intervening change in the law, it would have done so on Worku's direct appeal, and such a decision by the Tenth Circuit is not reviewable by this court. While an intervening change that occurs after a movant's direct appeal is reviewable through a § 2255 motion, *see Prichard*, 875 F.2d at 791, a change of law that occurs in a movant's own direct appeal is not. Worku cites no authority to suggest otherwise. Indeed, to allow such review would upend the traditional and jurisdictional roles of district and appellate courts.

As the government points out, Worku's citation to *United States v. Brittain*, 931 F.2d 1413 (10th Cir. 1991), and *United States v. Waseta*, 647 F.3d 980 (10th Cir. 2011), is misplaced. Unlike the circumstances here, the changes in law discussed in *Brittain* and *Waseta* were announced through different cases altogether and not in the same case on appeal. *Brittain*, 931 F.2d at 1417 (discussing the impact of the Tenth Circuit's decision in *United States v. Daily*, 921 F.2d 994, 1004-06 (10th Cir. 1990), which was issued after the trial but before oral argument on appeal); *Waseta*, 647 F.3d at 981-982 (discussing the impact of *United States v. Booker*, 543 U.S. 220 (2005), which held, after the defendant committed the crime but before sentencing, that the U.S. Sentencing Guidelines were advisory and no longer mandatory). Furthermore, the ex post facto concerns addressed in those cases are not relevant here because the alleged change in law is merely procedural and "does not increase the punishment nor change the ingredients of the offense or the ultimate facts necessary to establish guilt." *Weaver v. Graham*, 450 U.S. 24, 29 n.12 (1981) (citation and internal quotation marks omitted).

---

array. *Id.*"

The proper mechanisms for complaining about constitutional violations by the Tenth Circuit were Worku's petitions for rehearing and for a writ of certiorari, not the instant motion. Even so, his double jeopardy and due process arguments have been heard multiple times and found to be baseless.

### III. Ineffective Assistance of Counsel

Worku's third claim in his § 2255 motion alleges he received ineffective assistance from his trial counsel, violating his Sixth Amendment right to counsel. He makes this argument on the grounds that his trial counsel failed to: (1) conduct an adequate investigation into the witnesses who identified Mr. Worku as the prison guard at Higher 15, (2) adequately cross-examine witnesses and present expert witness testimony, (3) object to improper jury instructions and closing argument by the prosecutor, and (4) move to recuse the trial judge. None of these grounds, individually or combined, substantiate that Worku was denied his Sixth Amendment right to counsel.

Unlike his double jeopardy and due process claims, Worku's ineffective assistance claim is properly raised in this § 2255 motion. *United States v. Galloway*, 56 F.3d 1239, 1240 (10th Cir. 1995*)*. To succeed, however, he must establish both elements set forth in the seminal case of *Strickland v. Washington*, 466 U.S. 668 (1984): (1) deficient performance by his trial counsel and (2) prejudice. 466 U.S. at 687. These requirements may be addressed in any order and both need not be addressed if there is a failure to make a sufficient showing of one. *Cooks v. Ward*, 165 F.3d 1283, 1292-93 (10th Cir. 1998) (citing *Strickland*, 466 U.S. at 697).

The performance of trial counsel is deficient if it falls below an objective standard of reasonableness for attorneys in criminal cases such that the errors are "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."

*Strickland*, 466 U.S. at 687. "Judicial scrutiny of counsel's performance must be highly deferential and [courts] must indulge a strong presumption 'that counsel's conduct falls within the wide range of reasonable professional assistance . . . .'" *United States v. Owens*, 882 F.2d 1493, 1500 (10th Cir. 1989) (quoting *Strickland*, 466 U.S. at 689). A defendant "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955). As *Strickland* warns:

> It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. Engle v. Isaac, 456 U.S. 107, 133-34 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

*Strickland*, 466 U.S. at 689.

More importantly, here, Worku must demonstrate prejudice, which means that there is a reasonable probability that, but for his attorney's deficient performance, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687-94. "It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Id.* at 693 (citation omitted).

Worku's allegations of ineffective representation relate to nothing more than Monday quarterbacking about strategic decisions made by counsel. As I describe below, trial counsel's conduct was reasonable under the prevailing professional norms and was within his discretion for formulating and implementing a trial strategy. But, even assuming that trial counsel's

performance was deficient on all the grounds cited, Worku has failed to show that he suffered any prejudice as a result.

A. Investigation, Cross-examination, and Expert Testimony

Worku claims his attorney defied professional norms by failing to investigate the witnesses who identified him, to appropriately cross-examine those witnesses, and to call an expert witness to raise doubt regarding their identifications. Worku speculates that, had counsel performed those tasks, the witnesses' testimony would have been sufficiently impeached and rebutted such that there is a reasonable probability that the jury's response to the special interrogatories would have been different and/or Worku would have received a lesser sentence.

Worku's allegation that trial counsel did not properly investigate the witnesses from Higher 15 is entirely fanciful. There is no showing that any one of the witnesses was mistaken or acted in collusion with other witnesses. None of the witnesses testified to the same events so that a suggestion could be made that they had "cooked up" a common story. That all of these witnesses identified Worku with certainty does not suggest collusion when independent reasons were given of separate events of shocking proportions. On the contrary, the testimony at trial and the pretrial information provided in discovery showed that each of the witnesses who identified Worku, save one, were tortured at different times. There is no showing that any further investigation would have produced any indication, much less evidence, that any identification of Worku was unreliable.

In a case in which ineffective assistance of counsel is claimed, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. Trial counsel was not remiss in his obligation to investigate or unreasonable in not investigating. That

accusation has no basis in fact and amounts to nothing more than spurious speculation.

As demonstrated in the Response, Worku's factual assertions are contradicted by the record. Worku contends that, when Mr. Ketema first saw him, Mr. Ketema had already decided that the person his brother had seen was Worku. He offers no support for this statement. And Mr. Ketema testified to just the opposite—that he did not believe Worku was in Denver until he saw Worku for himself. Transcript 10/8/13 at 37:21-38:12, 81:9-16.Worku similarly claims without basis that it was dark where the witnesses saw him in Ethiopia, yet all the identification witnesses testified that when they saw Worku the lighting was good or normal. *Id.* at 73:12-16; Transcript 10/9/13 at 448:21-449:2, 490:10-14; Transcript 10/10/13 at 525:3-10, 599:8-14.

Additionally, Worku claims the witnesses were inconsistent about whether he had facial hair. He falsely states that Mr. Sibhat testified Worku always had facial hair, while Mr. Ketema testified that he never had facial hair. However, the record is clear: Mr. Sibhat explained that sometimes Worku had facial hair and other times he did not, Transcript 10/9/13 at 495:11-21, and Mr. Ketema testified that he could not remember if Worku ever had facial hair, Transcript 10/8/13 at 62:2-16. If anything, the record bolsters the witnesses' identification of Worku, as they could positively identify him both with and without facial hair.

Worku also attacks his trial counsel's discerning judgment on what aspects of certain testimony he should have cross-examined. An attorney's decisions about how best to cross-examine involve subtle, intricate decisions arising in the immediacy of the circumstance, thus requiring the exercise of judgment that constitutes sound trial strategy and intuition based upon experience. *See Richie v. Mullin*, 417 F.3d 1117, 1124 (10th Cir. 2005). In its simplest definition, strategy is a plan toward a goal. Webster's Third New International Dictionary, Unabridged 2256 (3d ed. 1981). In more detail, it is "a plan, or series of maneuvers or stratagems for obtaining a

specific goal or result." Random House Unabridged Dictionary 1880 (2nd ed. 1993). Such strategic decisions of counsel are not within the compass of *Strickland*.

A review of the transcript of the trial demonstrates that defense counsel was an effective cross-examiner. He could not, however, nor does the law expect that he could, make a silk purse out of a sow's ear. The witnesses who identified Worku, even after the passage of about thirty five years, were readily credible because they had seen him on a daily basis for months on end, were tortured by him and by others under his direct supervision, and they witnessed murders and atrocities that are unforgettable to any sentient being. As Ms. Demissie, testified, she vividly remembered her experience in the prison because every time she showers she sees the scars that were then inflicted on her body. Transcript 10/10/13 at 601:7-10. Such is a grim, daily reminder that was unimpeached. The most effective step a defense attorney can take when confronted with such dramatic testimony is to get the witnesses off the stand as soon as possible, and that is precisely what trial counsel endeavored to do. A highly skilled prosecutor's proficiency in presenting such evidence is not indicative of ineffectiveness on the part of her adversary.

To the extent it was strategically beneficial, Worku's trial counsel vigorously cross-examined and succeeded in pointing out weakness and minor inconsistencies in the witnesses' testimonies. That the jury yet found the witnesses to be credible is not an indication of incompetent cross-examination; it is rather that the jury was more impressed by the unshakeable, vivid truth of the facts as they were related in context than the minor discrepancies that suggested candor rather than cunning.

Again, Worku's portrayal of the record is wrong. He claims that trial counsel should have put on evidence to show that Mr. Ketema's statement that the EPRP never imprisoned individuals was false. Although Mr. Ketema made that statement, the article to which Worku

cites as evidence that the EPRP did imprison individuals says nothing of the sort. *Abusing Self-Determination and Democracy*, 36 Case W. Res. J. Int'l L. at 191. The article discusses the EPRP launching targeted attacks on the Derg, which Mr. Ketema acknowledged in his testimony. Additionally, Worku claims that his trial counsel should have cross-examined Mr. Dargie on the fact that he did not list Worku in his asylum application as an individual responsible for his detention, torture, and arrest. It is clear from the application, though, that individuals other than the two listed tortured him once he arrived at Higher 15. *See* Darge Decl. ¶ 4, ECF No. 170-8.

Worku further complains that his counsel should have called an expert witness on the questionable reliability of eyewitness testimony. Such complaints of "should've, would've," witnesses are not favored because allegations of what a witness might have testified to are speculative absent contextual application. Worku presents no evidence about what expert testimony could have been offered. Such expert testimony usually relates to the accuracy of eyewitness identification in highly stressful situations where the opportunity to see is only brief or momentary and the tests are usually based on mechanical measurements or physical reaction time data. It does not relate to repeated exposures over long periods of time.

More to the point, such expert testimony does not relate to many witnesses testifying to numerous identifications made at separate times. In any event, calling or not calling a witness is generally a matter of trial counsel's discretion. *See Jackson v. Shanks,* 143 F.3d 1313, 1320 (10th Cir. 1998). Here, Worku makes no showing whatsoever that any experienced criminal defense attorney would have attempted to call such an expert under the circumstances of this case or that the failure to call such an expert to give generic opinions falls below any known standard of competence.[9]

---

[9]Worku cites *Hinton v. Alabama*, 134 S.Ct. 1081, 1088 (2014), as holding that the "failure to

What any witness *could have provided* is not presented with testimony or affidavits to show that such evidence *likely would have been furnished* or that it even existed. *See Petsche v. Tafoya*, 146 Fed. App'x. 306, 311 (10th Cir. 2005) (unpublished). We are left with vapid speculation and that is a patently insufficient basis upon which to tag or besmirch an attorney as ineffective.

B. Recusal of the Trial Judge

Somewhat surprisingly, perhaps astonishingly, Worku also claims that trial counsel was ineffective because he failed to move to recuse the trial judge. Plainly stated, whether to move to recuse a judge is entirely a strategic decision, and there are a number of cogent reasons Worku's trial counsel elected the strategy of proceeding with the case and not moving to recuse the trial judge. Primary among those reasons are that there were no rational grounds to support recusal.

Worku suggests bias based on comments regarding his potential sentence and public interest in the trial made by the trial judge (presently writing) during a Federal Rule of Criminal Procedure 11 change of plea hearing. The hearing was precipitated by Worku sending a letter directly to the judge in which he admitted committing the offenses charged and offered to plead guilty to two counts.[10] *See* Letter 6/25/13, ECF No. 47. The letter was forwarded to defense

---

request additional funding to retain an expert was ineffective assistance of counsel." Mot. at 33; Reply at 17. Worku misstates the holding and omits a key caveat. The Court in *Hinton* did not reach an ultimate determination on ineffective assistance of counsel; it merely found that counsel's performance was deficient, and then it remanded the case for consideration of whether the second prong under *Strickland*—prejudice—was met. *Hinton* held that "it was unreasonable for [the defendant's] lawyer to fail to seek additional funds to hire an expert where that failure was based *not on any strategic choice* but on a mistaken belief that available funding was capped at $1,000." 134 S.Ct. at 1088 (emphasis added). Here, in contrast, the decision of Worku's trial counsel not to call an expert witness was a strategic choice and not due to his mistaken belief that he could not obtain funding to contract one. In fact, this defense counsel was at all relevant times a Deputy Federal Public Defender and, perforce, would not and could not apply for funding under the Criminal Justice Act.

[10]A second letter was sent by Worku requesting that he be immediately sentenced at the change

counsel and, in turn, a notice of disposition was filed and a hearing was set.

In compliance with Rule 11(b)(1), the court must address the defendant personally in open court and inform the defendant of the several consequences of the plea and determine that the defendant understands fifteen enumerated topics. Fed. R. Crim. P. 11(b)(1). Included in the advisement are "(H) any maximum possible penalty, including imprisonment, fine, and term of supervised release;" and "(M) in determining a sentence, the court's obligation to calculate the applicable sentencing-guideline range and to consider that range, possible departures under the Sentencing Guidelines, and other sentencing factors under 18 U.S.C. § 3553(a)." *Id.* As the transcript of Worku's Rule 11 hearing discloses, that is precisely what was done. Worku was advised that the court would not be imposing a sentence under the U.S. Sentencing Guidelines, but instead, would impose a sentence based on the factors specified in § 3553. Transcript 7/11/13 at 2-5, 12-15, ECF No. 55. Worku was also informed that the court conceivably could impose consecutive sentences because such a consecutive order would affect the Rule 11 subparagraph (H) description of a maximum possible penalty. *Id.* at 4.

Worku wanted to be sentenced according to the Guidelines, and I announced that I would not do so. Suffice to say here that it is error to treat the Guidelines as mandatory. *See United States v. Labastida-Segura*, 396 F.3d 1140, 1143 (10th Cir. 2005). Whether to impose a Guideline sentence is entirely discretionary and reviewable only for an abuse of that discretion. *See United States v. Booker*, 543 U.S. 220, 245-46 (2005).

As for the court's comments during the Rule 11 hearing on the considerable public interest in the case (at least in the region's large Ethiopian community), they were rightly made in explaining that the case would not be tried anonymously and that the witnesses in the case

---

of plea hearing and that he be sentenced to zero to six months, based on his inaccurate

needed to be identified. Transcript 7/11/13 at 5-8.

Worku further argues that his 22-year sentence itself is evidence of the trial judge's bias.[11] This argument is unconvincing, since the sentence was appealed and affirmed by the Court of Appeals as appropriate. *See Worku*, 800 F.3d at 1208.

In sum, any grounds on which trial counsel would have moved for recusal are shaky at best. There is no evidence that trial counsel did not conform to the standard of reasonableness in not moving for recusal, thus his performance was not deficient on that basis.

C. Prejudice

While I am certain trial counsel exceeded the professional norms in his representation, even if he had not, Worku has not shown any resulting prejudice. Worku merely asserts that there is a reasonable probability the outcome would have been different, but I cannot fathom how that is the case with the overwhelming evidence of his guilt. Worku's argument is based on unfounded speculation that investigation of the identification witnesses would have led to helpful information and additional cross-examination or that an expert witness would have discredited their testimony in full. If trial counsel had successfully discredited one or two of the

---

calculation under the U.S. Sentencing Guidelines. Letter 7/8/13, ECF No. 52.

[11]Additionally, Worku asserts that his sentence was so far removed from the Sentencing Guidelines range that he did not have notice at the time the offenses were committed that a 22-year sentence was possible. To support his argument, Worku cites *United States v. Waseta*, 647 F.3d 980 (10th Cir. 2011), in which the Tenth Circuit evaluated whether a sentence outside the Guidelines range violated the due process rights of the defendant when the crime was committed at the time the Guidelines were mandatory but the sentence was imposed after the Guidelines were made advisory in *United States v. Booker*, 543 U.S. 220 (2005). While the *Waseta* court observed that considerations of notice, foreseeability, and the right to fair warning of possible penalties are paramount in sentencing, it held that the defendant had notice of the sentencing range that encompassed his sentence due to the departures and enhancements permitted by the Guidelines. *Waseta*, 647 F.3d at 987-88. Unlike in *Waseta*, Worku's crimes occurred after the Guidelines were made advisory, so there is no need to consider whether the Guidelines permitted sufficient departure or enhancement to encompass his sentence. Obviously, his sentence was within the permissible range set forth by Congress in the statutes, and notice is therefore

identification witnesses, the persuasive testimony of at least three other witnesses would have remained. It is not enough for Worku "to show that the errors had some conceivable effect on the outcome of the proceeding," he must demonstrate that the errors undermined the reliability of the result of the proceeding. *Strickland*, 466 U.S. at 693. He has not done so.[12]

To show prejudice for trial counsel's failure to move to recuse the trial judge, Worku would have to show not only that the trial judge would have granted the motion or erred in not

---

constructive and irrefutable.

[12]Worku states in his Reply that:

> When the jury was faced with hearing that (1) it had been thirty plus years since any witness has seen Kefelegn Alemu; (2) [Mr. Ketema's] identification was unreliable and based on rumor; and (3) that the witnesses had connections and communications about Mr. Worku's appearance, there is a reasonable probability that the jury would have found that the Higher 15 Witnesses were inaccurate in their selection of Mr. Worku as "Kefelegn Alemu" despite their confidence in those identifications and/or that the Court would not have enhanced its sentence of Mr. Worku based on its belief that these witnesses' identifications were reliable. *United States v. Horey*, 333 F.3d 1185 (10th Cir. 2003) (holding that defendant established prejudice for purposes of ineffective assistance of counsel claim where his sentence was enhanced) (*citing Glover v. United States*, 531 U.S. 198, 203 (2001) ("[A]ny amount of actual jail time has Sixth Amendment significance.").

Reply at 15. At the risk of sounding like a broken record, this citation to *United States v. Horey*, along with the two others in Worku's Reply, is misplaced. In *Horey*, the district court had found that, under *United States v. Kissick*, 69 F.3d 1048, 1056 (10th Cir. 2003), the movant had not established that his attorney's failure to object to an undisputedly inapplicable career offender Guideline enhancement at sentencing had resulted in a sufficiently greater sentence. *Horey*, 333 F.3d at 1187. The Tenth Circuit, however, determined that the holding in *Glover v. United States* 531 U.S. 198 (2001), had abrogated the holding in *Kissick*, and a movant no longer need demonstrate a "significantly greater sentence" but, instead, could satisfy the prejudice requirement by showing any increase in the amount of jail time. *Id.* at 1188. As a result, the Tenth Circuit reversed the district court and held that the § 2255 movant had established that his counsel's deficient performance resulted in prejudice. *Id.* While I agree that any increase in jail time resulting from the error of counsel is sufficient to fulfill the prejudice requirement under *Strickland*, the key is that (1) there is an error and (2) the additional jail time *results from* that error. Undoubtedly, it was reasonably probable in *Horey* that the failure of counsel to object to the improper sentence enhancement resulted in a longer sentence for the movant. Here, though, the court did not "enhance" Worku's sentence, as he was sentenced outside the Guidelines. And there is no clear impact of counsel's conduct on Worku's sentence. There is only attenuated conjecture.

doing so, but that there is a reasonable probability that the result of the proceedings would have been different under a different judge. As explained above, there were no grounds for recusal. Furthermore, it is fundamental to our jurisprudence that the duty of a judge to recuse is no greater than the duty to sit and there is no presumption favoring recusal. *See Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 659-60 (10th Cir. 2002). If, however, recusal was appropriate, there is no indication that another judge would not have ruled similarly. In view of the evidence adduced by the government that more than amply justifies the sentences imposed, a motion to recuse by trial counsel would have been jejune. Moreover, the sentences imposed were not made of whole cloth by the judge. Rather, the sentences were precisely those which were persuasively advocated by the prosecution.

Finally, related to his double jeopardy claim, Worku argues that his trial counsel was ineffective in failing to object to the jury instructions and the prosecutor's closing argument. Consistent with the Tenth Circuit's opinion on appeal, perhaps trial counsel should have objected. Again, though, Worku cannot show prejudice. If trial counsel had objected and the jury instructions had been changed to lay out the different conduct for each count, the Tenth Circuit specifically found that the jury still would have found Worku guilty of each count. *Worku*, 800 F.3d at 1199 ("If the jury instruction for Count 3 had been narrowed to false statements in the form for permanent residence, we know that the jury would have found Mr. Worku guilty of lying in two different documents, constituting two separate acts.").

Worku has not shown that there is a reasonable probability that absent trial counsel's alleged failures, separately or in combination, the results of the proceedings would have been different. Thus, his claim for ineffective assistance of counsel fails under the standard set forth in *Strickland v. Washington*.

## IV. Conclusion

Worku's Motion (ECF No. 170) is, therefore, DENIED. A court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "Such a showing is made only where a prisoner demonstrates 'that jurists of reason would find it debatable' that a constitutional violation occurred, and that the district court erred in its resolution." *United States v. Pinson*, 584 F.3d 972, 975 (10th Cir. 2009) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Worku has not made a substantial showing of the denial of a constitutional right. Accordingly, a certificate of appealability is DENIED.[13]

DATED this 11th day of September, 2017.

_____
JOHN L. KANE
SENIOR U.S. DISTRICT JUDGE

---

[13]Although I understand the rationale and have engaged in the exercise countless times, determining whether a certificate of appealability shall issue continues to feel like grading my own homework.